**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

| | |
|---|---|
| MURRAY ENERGY CORPORATION,<br>46226 National Road<br>St. Clairsville, Ohio  43950 | Case No.:  5:14-cv-39 |
| Murray American Energy, Inc.<br>46226 National Road<br>St. Clairsville, Ohio 43950 | Judge:   Bailey |
| | Electronically Filed March 24, 2014 |
| The American Coal Company<br>9085 Highway 34 North<br>Galatia, Illinois 62935 | **COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |
| American Energy Corporation<br>43521 Mayhugh Hill Road<br>Beallsville, Ohio 43716 | |
| The Harrison County Coal Company<br>71 Camp Run Road<br>Mannington, West Virginia  26582 | |
| KenAmerican Resources, Inc.<br>297-A State Route 2551<br>Bremen, Kentucky  42325 | |
| The Marion County Coal Company<br>151 Johnny Cake Road<br>Mannington, West Virginia  26585 | |
| The Marshall County Coal Company<br>57 Goshorn Woods Road<br>Cameron, West Virginia  26033 | |
| The Monongalia County Coal Company<br>701 Oak Forest Road<br>Kuhntown, Pennsylvania  15366 | |
| OhioAmerican Energy, Inc.<br>34 Kelley Way, Suite 100<br>Brilliant, Ohio  43913 | |
| The Ohio County Coal Company<br>Rd 1, Box 62 A<br>Dallas, West Virginia  26036 | |

UtahAmerican Energy, Inc.
794 "C" Canyon Road
P.O Box 910
East Carbon, Utah 8452

      Plaintiffs,

      v.

GINA McCARTHY, Administrator,
United States Environmental Protection
Agency, in her official capacity,
1200 Pennsylvania Ave. NW
Washington, D.C. 20004,

      Defendant.

## INTRODUCTION

1.     This is an action for declaratory judgment and injunctive relief to compel Defendant Gina McCarthy, Administrator of the United States Environmental Protection Agency ("EPA"), to take actions required by § 321 of the Clean Air Act.  42 U.S.C. § 7621.  Section 321(a) of the Clean Air Act ("CAA") requires the Administrator to "conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provision of [the Clean Air Act] and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement."

2.     The Administrator has not taken the actions required by CAA § 321(a).  Moreover, despite notice to the Administrator of her obligation under CAA § 321(a), her failure to comply with this nondiscretionary duty, and the adverse impacts of her failure to comply, the Administrator has continued to administer and enforce the Clean Air Act in a manner that is causing coal mines to close, costing hard-working Americans their jobs, and shifting employment away from areas rich in coal resources to areas with energy resources preferred by the Agency.

3.     The continued pressure placed on the coal industry by EPA's administration and enforcement of the Clean Air Act, combined with the Administrator's refusal to evaluate the impact her actions are having on the American coal industry and the hundreds of thousands of people it directly or indirectly employs, will irreparably harm Plaintiffs if allowed to continue unchecked.

4.     Consequently, Plaintiffs seek a determination that the Administrator's failure to perform the actions required by CAA § 321(a) violates the CAA, an order to compel the Administrator to take the required actions in accordance with an expeditious deadline set by this Court, and an injunction barring the Administrator from promulgating new regulations impacting the coal industry before completing the acts required by CAA § 321(a).

## JURISDICTION AND VENUE

5.     This action arises under CAA § 321(a).  42 U.S.C. § 7621(a).  This Court has jurisdiction pursuant to CAA § 304(a)(2), 42 U.S.C. § 7604(a)(2), and 28 U.S.C. § 1331.  This Court may order the Administrator to perform the requisite acts and duties, may issue a declaratory judgment, and may grant further relief pursuant to CAA § 304(a), 42 U.S.C. § 7604(a), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  Moreover, the Court may issue all necessary and appropriate process to postpone the effective date of any agency action, or to preserve the status or rights of the parties pending its review, under 5 U.S.C. § 705.

6.     Plaintiffs have a right to bring this action pursuant to CAA § 304(a)(2), 42 U.S.C. § 7604(a)(2), and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

7.     By certified letter to the Administrator posted on January 21, 2014, Plaintiffs have provided Defendant with notice of this action as required by CAA § 304(b)(2), 42 U.S.C. § 7604(b)(2), and 40 C.F.R. Part 54.

8.     Venue is vested in this Court under 28 U.S.C. § 1391(e).

**Parties**

9.       Plaintiffs are "persons" within the meaning of § 302(e) of the Act, 42 U.S.C. §7602(e), who may commence a civil action under § 304(a) of the Act, 42 U.S.C. § 7604(a).

10.      Plaintiff The American Coal Company is a corporation organized and existing under the laws of the State of Delaware and with its principal place of business in Galatia, Illinois.

11.      Plaintiff American Energy Corporation is a corporation organized and existing under the laws of the State of Ohio and with its principal place of business in Beallsville, Ohio.

12.      Plaintiff The Harrison County Coal Company is a corporation organized and existing under the laws of the State of West Virginia and with its principal place of business in Mannington, West Virginia.

13.      Plaintiff KenAmerican Resources, Inc. is a corporation organized and existing under the laws of the State of Kentucky and with its principal place of business in Bremen, Kentucky.

14.      Plaintiff The Marion County Coal Company is a corporation organized and existing under the laws of the State of West Virginia and with its principal place of business in Mannington, West Virginia.

15.      Plaintiff The Marshall County Coal Company is a corporation organized and existing under the laws of the State of West Virginia and with its principal place of business in Cameron, West Virginia.

16.      Plaintiff The Monongalia County Coal Company is a corporation organized and existing under the laws of the State of West Virginia and with its principal place of business in Kuhntown, West Virginia.

17.      Plaintiff Murray American Energy, Inc., is a corporation organized and existing under the laws of the State of Delaware and with its principal place of business in St. Clairsville, Ohio.

18.     Plaintiff Murray Energy Corporation is a corporation organized and existing under the laws of the State of Ohio and with its principal place of business in St. Clairsville, Ohio.

19.     Plaintiff OhioAmerican Energy, Inc. is a corporation organized and existing under the laws of the State of Ohio and with its principal place of business in Brilliant, Ohio.

20.     Plaintiff The Ohio County Coal Company is a corporation organized and existing under the laws of the State of West Virginia and with its principal place of business in Dallas, West Virginia.

21.     Plaintiff UtahAmerican Energy, Inc. is a corporation organized and existing under the laws of the State of Utah and with its principal place of business in East Carbon, Utah.

22.     Defendant Gina McCarthy is the Administrator of EPA ("the Administrator" or "Defendant").  In that role she is charged with the duty to uphold the CAA and to take required regulatory actions according to the schedules established therein.

## LEGAL FRAMEWORK

### I.  The Clean Air Act

23.     The Clean Air Act grants the Administrator broad authority to impose significant regulatory burdens on emission sources.

24.     The Administrator is, for example, authorized to set national ambient air quality standards for criteria pollutants, which often result in new emission limits being placed directly on major sources within designated areas; the Administrator is authorized to set standards of performance for new sources, which can result in emission limits and operational standards being imposed across entire industries and source categories; and the Administrator can establish emission standards for hazardous air pollutants, which can result in strict emission limits and pollution control requirements on facilities within a number of designated source categories.  *See* 42 U.S.C. §§ 7409-12, 7470, et seq., and 7501, et seq.

25.     In addition, the Administrator is vested with broad authority to enforce the Clean Air Act. *See* 42 U.S.C. § 7413.

**II.  Clean Air Act § 321(a)**

26.     By 1977, as Congress was implementing programs that would vastly expand EPA's authority and augment its enforcement powers, Congress had already begun to investigate claims that EPA's administration and enforcement of the Clean Air Act were resulting in plants and facilities shutting down or new facilities not being built because of the large costs associated with environmental compliance.

27.     As stated by the Committee on Interstate and Foreign Commerce ("Committee"), "[a]mong the issues which have arisen frequently since the enactment of the 1970 Amendments is the extent to which the Clean Air Act or other factors are responsible for plant shutdowns, decisions not to build new plants, and consequent losses of employment opportunities." CONFERENCE COMMITTEE STATEMENT ON H.R. 6161, HOUSE REP. NO. 95-294, pp. 316-17 (1977).[1]

28.     The Committee further recognized the need to investigate these allegations "[i]n any particular case in which a substantial job loss is threatened, in which a plant closing is blamed on Clean Air Act requirements, or possible new construction is alleged to have been postponed or prevented by such requirements. . . ." *Id.* at 317.

29.     Congress therefore enacted a number of investigatory and information-gathering provisions as part for the 1977 amendments to the Clean Air Act that would require EPA to become directly involved in analyzing the employment effects of its decisions, quantifying those impacts, and making its findings available to the public.

---

[1] The issue was also discussed at length in the Hearing on Economic Dislocation Resulting from Environmental Controls, Subcommittee on Air and Water Pollution of the Committee on the Public Works, Serial No. 92-H19 (May 17, 18, and June 28, 1971).

30.     In particular, in Pub. L. 95–95, title IV, § 403(e) (Aug. 7, 1977), Congress required the Administrator to consult with the Secretary of Labor on a study of the potential dislocation of employees due to implementation of laws administered by the Administrator and required that the Secretary submit to Congress the results of that study not more than one year after Aug. 7, 1977.

31.     Further, Congress enacted Clean Air Act § 321(b), which requires the Administrator to investigate specific allegations of job loss or shift by any employee or employee representative.

32.     Finally, Congress enacted Clean Air Act § 321(a), which requires the Administrator to conduct continuing evaluations of the impact on employment of EPA's actions, stating:

> The Administrator *shall conduct continuing evaluations of potential loss or shifts of employment* which may result from the administration or enforcement of the provision of this chapter and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement.

42 U.S.C. § 7621(a) (emphasis added).

33.     The Report by the Committee on Interstate and Foreign Commerce explained that "[u]nder this provision, the Administrator *is mandated* to undertake an *ongoing evaluation of job losses and employment shifts* due to requirements of the act" and that this evaluation is to include investigations of threatened plant closures or reductions in employment allegedly due to requirements of the act or any actual closures or reductions which are alleged to have occurred because of such requirements." H.R. REP. NO. 95-294, at 317 (1977) (emphasis added).

## FACTUAL BACKGROUND

## II.  EPA Wages A War on Coal

34.     In the past five years, EPA has administered and enforced the Clean Air Act in a manner that places immense pressure on the electric generating sector—and other industries that traditionally burn coal—to reduce their consumption of coal by:

(a)    encouraging facilities to switch from coal to other fuels;

(b)    imposing costly regulations that have compelled or incentivized existing coal-burning facilities to shut down;

(c)    engaging in enforcement activities that discourage the repair and continued operation of existing coal-burning facilities; and

(d)    developing regulations and guidance that will make it more costly—and in many cases impractical—for new coal-burning facilities to be constructed.

35.    These actions permeate EPA's administration and enforcement of the Clean Air Act and have done so for the past five years.

36.    A few recent examples of actions taken by EPA that impact the market for coal include:

(a)    Promulgation of regulations that are more onerous for facilities burning coal than facilities burning other types of fuel, *see, e.g.*, National Emission Standards for Hazardous Air Pollutants for Area Sources: Industrial, Commercial, and Institutional Boilers: Final Rule, 76 Fed. Reg. 15554 (March 21, 2011);

(b)    Promulgation of rules that offer switching from coal to natural gas as an offramp to regulation, *see, e.g.*, National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units, 77 Fed. Reg. 9304 (February 16, 2012);

(c)    Selectively targeting coal-fired emission sources for additional regulation, *see, e.g.*, Air Quality Designations for the 2006 24-Hour Fine Particle (PM2.5) National Ambient Air Quality Standards, 74 Fed. Reg. 58688 (November 13, 2009);

(d)      Imposing regulations that encourage states to develop state implementation plans that require reductions in the consumption of coal, *see, e.g.*, Air Quality Designations for the 2010 Sulfur Dioxide (SO2) Primary National Ambient Air Quality Standard, 78 Fed. Reg. 47191 (August 5, 2013);

(e)      Developing proposed regulations that discourage the construction of new coal-fired power plants, *see, e.g.*, New Source Performance Standards for Greenhouse Gas Emissions for New Stationary Sources, Electric Utility Generating Units, 77 Fed. Reg. 22,392 (Proposed Rule April 13, 2012); and

(f)      Engaging in enforcement initiatives that have targeted coal-fired sources, seeking to impose massive penalties and require costly pollution control upgrades based on work alleged to have been completed years, and in many cases, decades ago, making it more expensive for coal-fired sources to operate, making the costs of future repairs and improvements difficult to predict, and increasing the incentive for current operators to either shut down or switch to other fuels, *see, e.g., U.S. v. Oklahoma Gas & Electric Co.*, Case No. 5:13-cv-00690-D (W.D. Okla.); *U.S. v. EME Homer City Generation, L.P.*, Case No. 2:11-cv-19 (W.D. Pa.); *U.S. v. DTE*, Case No. 10-13101 (E.D. Mich.); *U.S. v. Midwest Generation, LLC*, Case No. 09-5277 (N.D. Ill); *Commonwealth v. Allegheny Energy, Inc, et al.*, Case No. 2:05-cv-008895-JFC (W.D. Pa.), etc.

## II.  EPA's War on Coal Inflicts Numerous Casualties on the Electric Generating Sector, the Largest Market for Coal in the United States

37.      Citing the costs of environmental compliance, numerous coal-fired power plants have been idled, shut down, or converted to other fuels in the past few years.

38.      In June 2011, American Electric Power announced a plan for compliance with proposed EPA regulations that involved permanently retiring five coal-fired power plants in West

Virginia, Virginia, and Ohio, and retiring generating units at an additional seven facilities in Kentucky, Virginia, Ohio, and Texas.[2]

39.     In January, 2012, First Energy announced it would shut down six coal-fired power plants in Ohio, Pennsylvania, and Maryland, citing the impact of environmental regulations, including EPA's Mercury Air Toxics Standards.[3]

40.     In February 2012 First Energy announced it would retire three coal-fired power plants in West Virginia, citing EPA's Mercury Air Toxics Standards and other environmental regulations;[4] and the Washington Post reported closures of 10 additional coal-fired power plants, two in Illinois owned by Midwest Generation and seven more in Pennsylvania and Ohio, owned by GenOn Energy, citing environmental rules being phased in over the next three years.[5]

41.     In January 2013, Georgia Power announced it would ask to decertify two coal-fired power plants by the effective date of EPA's Mercury Air Toxics Standards, citing factors including the cost to comply with existing and future environmental regulations.[6]

---

[2] AEP Shares Plan For Compliance With Proposed EPA Regulations, http://www.aep.com/environment/news/?id=1697 (last visited February 12, 2014).

[3] FirstEnergy, Citing Impact of Environmental Regulations, Will Retire Six Coal-Fired Power Plants, https://www.firstenergycorp.com/content/fecorp/newsroom/news_releases/firstenergy_citingimpactofenvironmentalregulationswillretiresixc.html (last visited February 12, 2014).

[4] FirstEnergy, Citing Impact of Environmental Regulations, Will Retire Three Coal-Fired Power Plants in West Virginia, https://www.firstenergycorp.com/content/fecorp/newsroom/news_releases/firstenergy_citingimpactofenvironmentalregulationswillretirethre.html (last visited February 12, 2014).

[5] Utilities announce closure of 10 aging power plants in Midwest, East, http://www.washingtonpost.com/national/health-science/utilities-announce-closure-of-10-aging-power-plants-in-midwest-east/2012/02/29/gIQANSLEiR_story.html (last visited February 12, 2014).

[6] Georgia Power seeks approval to retire generating units at four plants, http://www.georgiapower.com/about-us/media-resources/newsroom.cshtml (last visited February 12, 2014).

42.     In July 2013 First Energy announced it would deactivate two coal-fired power plants in western Pennsylvania, stating the decision was based on, among other things, the cost of compliance with current and future environmental regulations.[7]

43.     In October 2013, the Salt Lake Tribune reported that Rocky Mountain Power's plant in Carbon County, Utah would close because of an inability to install equipment to bring the plant in line with federal clean air regulations.[8]

44.     In November 2013, Tennessee Valley Authority announced it would close eight coal-fired power plants in Alabama and Kentucky, prompted by, among other things, environmental requirements.[9]

45.     Since 2010 alone, it has been estimated that 330 coal-fired electric generating units across the nation have been or are retiring or converting to other fuels because of EPA's regulations and enforcement activities.[10]

46.     These retirements and conversions, caused in whole or in part by EPA's administration and enforcement of the Clean Air Act, have had a direct and significant impact on the market for coal.

---

[7] FirstEnergy to Deactivate Two Coal-Fired Power Plants in Pennsylvania, https://www.firstenergycorp.com/content/fecorp/newsroom/news_releases/firstenergy-to-deactivate-two-coal-fired-power-plants-in-pennsyl.html (last visited February 12, 2014).
[8] *See* Utah's Carbon Power Plant heads for early retirement, http://www.sltrib.com/sltrib/news/56919729-78/coal-power-carbon-plant.html.csp (last visited February 12, 2014).
[9] *See* Tennessee Valley Authority to close 8 coal-fired power plants, http://www.washingtonpost.com/business/economy/tennessee-valley-authority-to-close-8-coal-fired-power-plants/2013/11/14/be1e4f1e-4d60-11e3-9890-a1e0997fb0c0_story.html (last visited February 12, 2014).
[10] Coal Unit Shutdowns as of January 26, 2014, https://www.americaspower.org/sites/default/files/Coal_Unit_Retirements_JAN_26_2014.pdf (last visited February 18, 2014).

47.     According to data maintained by the U.S. Energy Information Administration, the electricity power sector alone consumed approximately 1,041.6 million tons of coal in 2008, comprising approximately 93% of the total U.S. market for coal.[11]

48.     While the electric power sector remains by far the largest consumer of domestically-produced coal in the United States, its consumption has plummeted in the past five years, to approximately 823.6 million tons of coal by 2012, a reduction of approximately 21% in just four years.[12]

49.     Further, the continued pressure EPA has placed on coal-fired power plants through its proposed regulation of greenhouse gas emissions and other proposed rules that increase the costs of operating coal-fired power plants make it unlikely that any new coal-fired power plants will be constructed unless EPA begins evaluating the adverse effects its actions are having on the coal industry, and in particular on the people who depend on the coal industry for their livelihood.

**III.  EPA's War on Coal Costs Jobs**

50.     By reducing the present and future demand for coal, EPA's actions have and will result in the shift or loss of jobs associated with coal mining and processing in the United States.

51.     Coal production in central Appalachia is down approximately 43% from 2008 levels.[13]

52.     In June 2012, Arch Coal announced the closure of three mines in West Virginia, Virginia, and Kentucky, citing weakness in the thermal coal market, stating that "[c]urrent market

---

[11] U.S. Coal Supply and Demand, http://www.eia.gov/coal/review/pdf/feature08.pdf (last visited February 18, 2014).
[12] U.S. Coal Consumption by End-Use Sector, 2007 – 2013, http://www.eia.gov/coal/production/quarterly/pdf/t32p01p1.pdf (last visited February 12, 2014).
[13] Central Appalachia coal production down nearly 43% from 2008 levels, http://www.snl.com/InteractiveX/Article.aspx?cdid=A-19099691-11303 (last visited February 17, 2014).

pressures and a challenging regulatory environment have pushed coal consumption in the United States to a 20-year low."[14]

53.     In July 2012, Murray Energy Corporation announced the closure of OhioAmerican Energy, Incorporated's Red Bird West mine in Ohio, citing the Obama administration's war on coal;[15] the Ohio Valley Coal Company announced it had to reduce the workforce at its Powhatan No. 6 Mine in Belmont County, Ohio by 29 hourly jobs, citing the regulatory excess of the Obama Administration as a direct cause;[16] PBS Coals Inc. and its affiliate company, RoxCoal Inc., laid off about 225 workers as part of an immediate idling of deep and surface mines in Somerset County, Pennsylvania, citing softened demand for coal and the escalating costs and uncertainty generated by recently advanced EPA regulations and interpretations;[17] and Consol Energy Inc. laid off 318 coal miners in West Virginia, citing among other things pressure from federal environmental regulators.[18]

---

[14] *See* Arch Coal closes 3 mines, lays off 750 in WV, KY, VA, http://www.wowktv.com/story/18850558/arch-coal-closes-three-mines-lays-off-750-in-wv-ky-and-va (last visited February 12, 2014).

[15] *See* Murray Closing Red Bird West Coal Mine, http://www.theintelligencer.net/page/content.detail/id/572533/Murray-Closing-Red-Bird-West-Coal-Mine.html?nav=515 (last visited February 12, 2014).

[16] *See* Murray Cuts 29 Coal Jobs, http://www.theintelligencer.net/page/content.detail/id/572187/Murray-Cuts-29-Coal-Jobs.html?nav=515 (last visited February 12, 2014).

[17] *See* Two coal companies downsize, http://www.post-gazette.com/business/businessnews/2012/07/21/Two-coal-companies-downsize/stories/201207210107 (last visited February 12, 2014).

[18] *See* Coal Jobs Cut; Consol, Others Scaling Back, http://www.theintelligencer.net/page/content.detail/id/571753/Coal-Jobs-Cut--Consol--Others-Scaling-Back.html?nav=515 (last visited February 12, 2014).

54.     In late 2012 Alpha Natural Resources announced the closure of eight coal mines, costing approximately 1,200 people their jobs, citing in part "a regulatory environment that's aggressively aimed at constraining the use of coal."[19]

55.     In November 2012, The American Coal Company, Utah American Energy, Inc., and Kanawha Transportation Center, Inc., were each forced to cut jobs, 163 in total, directly attributed to the Administration's "war on coal".[20]

56.     In June 2013, Arch Coal Company announced the loss of approximately 110 jobs in Virginia and Kentucky due to ongoing coal market challenges.[21]

57.     In September 2013, Alliance Resource Partners announced it would shut down its Pontiki mine in Kentucky citing weak demand.[22]

58.     In February 2014, it was reported that national coal mine employment has dropped nearly 20% in the past two years, from a high of about 94,000 jobs in the fourth quarter of 2011 to about 77,000 people today.[23]

59.     In total, the Administrator's administration and enforcement of the Clean Air Act has caused or contributed to the loss of tens of thousands of coal mining jobs over the past five years.

---

[19] *See* Coal company facing aggressive regulations announces 1,200 layoffs, http://dailycaller.com/2012/09/18/coal-company-facing-aggressive-regulations-announces-1200-layoffs/(last visited February 12, 2014).

[20] *See* Murray Energy Fires 163 Workers, Citing a 'War on Coal', http://www.bloomberg.com/news/2012-11-09/murray-energy-fires-163-workers-citing-a-war-on-coal-.html (last visited February 12, 2014).

[21] *See* Coal company cutting Kentucky jobs, http://www.bizjournals.com/louisville/news/2013/06/10/coal-company-cutting-kentucky-jobs.html (last visited February 12, 2014).

[22] *See* American coal miner announces mine closure, http://www.mining.com/american-coal-miner-announces-mine-closure-24364/ (last visited February 12, 2014).

[23] *See* Coal Miner Jobs Are Vanishing At An Astounding Rate, *http://www.businessinsider.com/coal-mine-job-losses-2014-2#ixzz2tcEfFMiA* (last visited February 17, 2014).

**IV. EPA Refuses to Evaluate the Job Losses Caused by its War on Coal**

60.     Despite the continuing public statements of coal companies that increasingly stringent regulations have been causing or contributing to layoffs and workforce reductions in the coal industry for years, and the Clean Air Act's express mandate that the Administrator "conduct continuing evaluations" of these job losses, the Administrator has consistently refused to acknowledge either the need or the obligation to evaluate these job losses in developing new Clean Air Act regulations for the electricity generating sector or in developing its enforcement strategy against sources that use coal as a primary fuel source.

61.     To the contrary, the Administrator has repeatedly stated, in both her official capacity and in prior statements that EPA does not and will not evaluate the employment impacts of its regulatory actions.

62.     On November 19, 2009, for example, Representatives Joe Barton and Greg Walden wrote a letter to then-EPA Administrator Lisa Jackson regarding the cumulative impacts of "a number of unprecedented actions [taken by EPA] to pursue regulation of greenhouse gas emissions under the Clean Air Act" including EPA's Mandatory Reporting Rule, Proposed Light Duty Vehicles Rule, and Proposed Tailoring Rule.[24]

63.     In that letter, Representatives Barton and Walden expressed their concern that "the Administration and EPA's proposed global warming regulations will cumulatively result in job losses, and contribute to the flight of U.S. manufacturing and other businesses overseas — stifling future economic growth," and expressed their belief that, before EPA proceeded with

---

[24] Letter from Representatives Barton and Walden to Lisa Jackson, Administrator, EPA, at 1 (November 19, 2009).

these regulations, "Congress and the American public should know the potential employment impacts in the United States of EPA's proposed regulatory actions."[25]

64.     The letter reminded the Administrator that "EPA is obligated pursuant to Executive Order 12866 to assess the costs anticipated from significant regulatory actions, including adverse effects on employment" and that "Section 321 of the Clean Air Act, 42 U.S.C. 7621, expressly requires EPA to conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of provisions of the Act," and asked the Administrator specifically, "[w]ith regard to Section 321 of the Clean Air Act, does EPA comply with this provision?"[26]

65.     In response, then-Assistant Administrator (now Administrator) Gina McCarthy disclaimed any obligation of EPA to evaluate the employment impacts of its greenhouse gas regulations, on the coal industry or anyone else, writing that "there was no statutory requirement or purpose for conducting economic analysis as part of the development of [EPA's endangerment and cause or contribute] findings," and that "EPA has not interpreted CAA section 321 to require EPA to conduct employment investigations in taking regulatory actions."[27]  Such considerations would have "limited utility" the letter states.[28]

66.     Further, at Administrator McCarthy's confirmation hearing, Senator Vitter asked whether EPA had "ever investigated a plant closure or reduction in employment to see what role, if any,

---

[25] *Id.* at 3.
[26] *Id.* at 3-4.
[27] Enclosure with Letters from Gina McCarthy, Assistant Administrator, EPA to Representatives Barton and Walden, at 1, 3 (January 12, 2010).
[28] *Id.* at 3.

the administration or enforcement of the Clean Air Act played."[29]  In response, Administrator McCarthy stated:

> EPA has not interpreted this provision to require EPA to conduct employment investigations in taking regulatory actions. Section 321 was instead intended to protect employees in individual companies by providing a mechanism for EPA to investigate allegations that specific requirements, including enforcement actions, as applied to those individual companies, would result in lay-offs. EPA has found no records indicating that any Administration since 1977 has interpreted section 321 to require job impacts analysis for rulemaking actions. EPA does perform detailed regulatory impact analyses (RIAs) for each major rule it issues, including cost-benefit analysis, various types of economic impacts analysis, and analysis of any significant small business impacts. Since 2009 EPA has focused increased attention on consideration and (where data and methods permit) assessment of potential employment effects as part of the routine RIAs conducted for each major rule. The agency could not find any records of any requests for section 321 investigation of job losses alleged to be related to regulation-induced plant closure.[30]

67.    More recently, when asked by Senator Inhofe about EPA's compliance with § 321(a) at a Senate committee hearing, the Administrator implied that EPA has discretion under § 321(a) to "look at employment impacts" only for "major" rulemaking and even then only "to the extent" that EPA believes "peer reviewed science and modeling allows."[31]

68.    The Administrator has no discretion to avoid or limit its obligation to continuously evaluate the employment impacts of EPA's administration and enforcement of the Clean Air Act.

69.    In responding to Senator Inhofe's question regarding the EPA's § 321(a) obligation, the Administrator went on to reference "efforts to have" EPA "relook at whole economy modeling"

---

[29] Senator David Vitter, Questions for the Record, Gina McCarthy Confirmation Hearing, *Environment and Public Works Committee*, at 17 (April 11, 2013) (available at http://www.epw.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=9a1465d3-1490-4788-95d0-7d178b3dc320 (last visited February 13, 2014)).

[30] *Id.* at 17-18.

[31] See Senate Environment & Public Works Committee Recording, http://www.c-span.org/video/?317244-1/administration-defends-climate-change-plan.  (Jan. 16, 2014).

and EPA's plan to assemble "an expert panel . . . to continue to look at these issues and mature that science."[32]

70.    On information and belief, this discussion of "whole economy modeling" refers to the use of Computable General Equilibrium models that are designed to project the consequences of regulatory price increases, and are neither an effective nor an appropriate means of evaluating employment impacts.

71.    When, in that same hearing, the Administrator was asked specifically by Senator Inhofe whether EPA would avoid enacting new regulations under the Clean Air Act until such time as EPA would know the effect it is having on jobs, the Administrator again stated it could not conduct such an analysis in all cases given the state of the "science" available:

> Senator, what you can be assured of is that when we do rules, we'll do it to the full extent the science is available and the analysis can be done in the way that's consistent with all the requirements at OMB.[33]

72.    On information and belief, EPA has never conducted the evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the Clean Air Act expressly mandated by § 321(a).

73.    At the same time, in the absence of the evaluations required by CAA § 321(a) on employment shift and losses, EPA has persisted in developing regulatory impact analyses for its rulemakings that tout the economic benefits of its actions. *See, e.g.*, Regulatory Impact Analysis: National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial, and Institutional Boilers and Process Heaters (December 21, 2012) (estimating total monetized benefits of between $22 billion and $67 billion); Regulatory Impact Analysis for the Final

---

[32] See Senate Environment & Public Works Committee Recording, http://www.c-span.org/video/?317244-1/administration-defends-climate-change-plan.  (Jan. 16, 2014).
[33] *Id.*

Mercury and Air Toxics Standards (December 21, 2011) (estimating net benefit of $24 billion to $80 billion).

74.     Plaintiffs submitted a notice letter to EPA on January 21, 2014 identifying EPA's obligation under CAA § 321(a) and EPA's failure to comply with its statutory obligation.

75.     Despite the lapse of over 60 days, EPA has never responded directly to Plaintiffs' letter.

## VI.  EPA's Failure to Comply with CAA § 321 is Causing Ongoing Harm to Plaintiffs

76.     Combined, Plaintiffs employ over 7,200 people and comprise the largest underground coal mining operations in the United States.

77.     Each Plaintiff is dependent on a continuing domestic market for coal for its livelihood and the livelihood of its employees.

78.     Each Plaintiff has been directly impacted by the reduced market for coal caused by EPA's administration and enforcement of the Clean Air Act, which has either resulted in, or threatens to result in, the closure of coal mines and the loss of good-paying jobs in areas of the country already suffering from economic uncertainly and high unemployment.

79.     The Administrator's failure to comply with her obligations under CAA § 321(a) has directly injured and will continue to directly injure each Plaintiff by:

        (a)     Allowing the Administrator to pressure the electric power sector and other major consumers of coal to switch to other fuels, to the detriment of Plaintiffs, without evaluating the very real costs to public welfare and the environment from the unemployment and underemployment of the tens of thousands of people currently employed in the coal industry and the hundreds of thousands of people whose jobs are supported by the coal industry;

        (b)     Allowing the Administrator to administer and enforce the Clean Air Act in a manner that costs or will cost thousands of people their jobs without creating the public record required by CAA § 321(a), depriving each Plaintiff of its right to obtain this information and use

it in its own efforts to inform the public, comment on pending and future rulemakings, and lobby Congress for changes to the Administrator's administration and enforcement of the Clean Air Act;

(c)     Allowing EPA to develop a public record on the purported economic benefits of its efforts to induce sources to switch from coal to other fuels, a record used and that will be used in EPA's regulation of Plaintiffs and Plaintiffs' customers, without evaluating the very real harm caused to families and local economies when coal jobs are lost or shifted from coal to other industries.

## Claim for Relief

80.    Plaintiffs incorporate all allegations set forth above by reference.

81.    As set forth above, the Administrator has a nondiscretionary duty to conduct continuing evaluations of the potential loss or shifts of employment which may result from her administration or enforcement of the Clean Air Act.

82.    The Administrator's ongoing failure to conduct continuing evaluations of the potential loss or shifts of employment in the coal industry which may result from her administration or enforcement of the Clean Air Act is a violation of 42 U.S.C. § 7621(a), which continues to this day.

83.    This violation constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary" within the meaning of § 304(a)(2) of the CAA, 42 U.S.C. § 7604(a)(2).

84.    The Administrator's failure to comply with 42 U.S.C. § 7621(a) has harmed and continues to harm Plaintiffs by delaying evaluations that will prevent or impede EPA's continued efforts to reduce the market for coal, directly harming Plaintiffs and by preventing Plaintiffs from obtaining and using these evaluations to protect their interests in ensuring a continuing

domestic market for coal and protecting the jobs of the approximately 7,200 people Plaintiffs employ.

### **Prayer for Relief**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

(a)     Declaring that the Administrator's refusal to conduct continuing evaluations of the employment effects of its administration and enforcement of the Clean Air Act violates CAA § 321;

(b)     Ordering the Administrator to evaluate whether its administration and enforcement of the Clean Air Act over the past six years has resulted in job losses or shifts in the coal industry and to complete its evaluation either by a date certain set by the Court or as expeditiously as practicable;

(c)     Enjoining the Administrator from approving further regulations impacting employment in the coal industry and from continuing its New Source Review enforcement campaign against coal-fired power plants for work done after the expiration of the applicable statute of limitations until EPA has completed its evaluation;

(d)     Awarding Plaintiffs the costs of this action, including attorney's fees;

(e)     Retaining jurisdiction of this action to ensure compliance with this Court's decree; and

(f)     Granting such other relief as this Court deems appropriate.

Respectfully submitted this 24th day of March, 2014.

s/ Jacob A. Manning_____

Geoffrey K. Barnes (Ohio Bar # 0005767)
    (*pro hac vice application pending*)
J. Van Carson (Ohio Bar # 0001324)
    (*pro hac vice application pending*)
John Lazzaretti (Ohio Bar # 0080780)
    (*pro hac vice application pending*)
Squire Sanders (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
Tel:  216.479.8500
Fax:  216.479.8780
Geoffrey.Barnes@squiresanders.com
Van.Carson@squiresanders.com
John.Lazzaretti@squiresanders.com

John E. Jevicky (Ohio Bar # 0012702)
    (*pro hac vice application pending*)
Dinsmore & Shohl LLP
255 E. Fifth St., Suite 1900
Cincinnati, Ohio 45202
Tel:  513.977.8301
Fax:  513.977.8141
John.Jevicky@dinsmore.com

Jacob A. Manning (West Virginia Bar # 9694)
Dinsmore & Shohl LLP
2100 Market St.
Wheeling, West Virginia 26003
Tel:  304.230.1604
Fax:  304.230.1610
Jacob.Manning@dinsmore.com