**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING DIVISION**

| | | |
|---|---|---|
| **MURRAY ENERGY CORPORATION,** | ) | |
| *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 5:14-cv-00039-JPB** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GINA McCARTHY, Administrator,** | ) | |
| **U.S. EPA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN OPPOSITION TO UNITED STATES' MOTION FOR**
**PROTECTIVE ORDER AND MOTION TO STAY ADMINISTRATOR MCCARTHY'S**
**DEPOSITION**

Plaintiffs file this memorandum, pursuant to L.R. Civ. P. 7.02, in opposition to the

Motion for Protective Order filed by the EPA on October 16, 2015.  The Plaintiffs request that

this Court deny this Motion because the Administrator Gina McCarthy is an irreplaceable

witness in this case and should not be entitled to avoid her deposition when she has admittedly

disclaimed her legal duty under Section 321(a) of the Clean Air Act.

Additionally, the Plaintiffs request that this Court deny the EPA's Motion to Stay

Administrator McCarthy's deposition because this request is premature and unsupported by any

substantive explanation.

**INTRODUCTION**

Administrator Gina McCarthy has served as a pivotal figure in the EPA's ongoing and

deliberate refusal to consider the job losses and shifts associated with the EPA's war on coal.

Her deposition is critical to this case for two reasons.

First, she has unique and superior personal knowledge of the key facts involved. She is the public official specifically delegated with the responsibility to comply with Section 321(a). The government's own discovery responses indicate that she has been "personally involved" with Section 321(a), a factor that courts have routinely used to justify the deposition of a high-ranking government official. She has testified before Congress on Section 321(a), and was assigned responsibility for responding to letters on Section 321(a) from members of Congress when she served as an Assistant Administrator for the Office of Air and Radiation. In that role, she worked in the primary division of the EPA that is responsible for compliance with the Clean Air Act and led that division during the critical period when the majority of the documents that the EPA now claims indicate compliance with Section 321(a) were created. Additionally, the responses that the EPA has provided in depositions and discovery emphasize her critical role, and show that the Administrator is an irreplaceable witness in this litigation.

Second, Ms. McCarthy has led EPA during a period of deliberate recalcitrance with respect to Section 321(a). The Administrator's failure to follow her legal duty under Section 321(a) must be weighed in the analysis because high-ranking officials are not entitled to the deliberative process privilege when those officials have neglected to perform their statutory duties. This case goes beyond mere failure to follow the law, however. The Administrator has publicly disclaimed a duty that this Court has ruled is non-discretionary. Discovery to date indicates that Ms. McCarthy took this position knowingly and in contradiction to past statements of the agency. This deliberate recalcitrance is an additional and fundamental component of Plaintiffs' case, and separately justified Ms. McCarthy's deposition.

**LEGAL STANDARD**

A court may issue a protective order to protect a party from "annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1).  An order must be supported by a demonstration that is sufficient to overcome litigants' legitimate and important interests in trial preparation.  *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985) ("[T]rial preparation and defense. . . are important interests, and great care must be taken to avoid their unnecessary infringement.")).  Because of the importance of these legitimate and important interests in trial preparation, a protective order completely prohibiting a deposition should be granted only as an "extraordinary measure which should be resorted to only in rare occasions."  *Byrd v. District of Columbia*, 259 F.R.D. 1, 7 (D.D.C. 2009).

Trial court orders pursuant to Rule 26(C) will not be disturbed on appeal unless the court has abused its discretion.  *Keyes v. Lenoir Rhyne College*, 552 F.2d 579, 581 (4th Cir. 1977).  A party can demonstrate abuse by a clear showing that the denial of discovery has caused substantial prejudice.  *Otis Clapp & Sons, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985).

**ARGUMENT**

**I.      The *Morgan* doctrine excuses only high-ranking government officials from appearing for a deposition when those officials do not possess personal, relevant information.**

A protective order would not be appropriate here because high-ranking government officials are excused from testifying only when those officials are personally unaware of relevant information.  *United States v. Morgan*, 313 U.S. 409, 422 (1941).  This carves out an exception to the general rule that a party may "depose any person, including a party, without leave of court. . . ." Fed. R. Civ. P. 30(a)(1).

3

The primary rationale for this doctrine, which was announced in *Morgan*, is that parties litigating against federal agencies should generally not be permitted to obtain discovery on the mental processes of the government official.  *United States v. Morgan*, 313 U.S. 409, 422 (1941).  In light of this concern, courts have restricted parties from compelling testimony of high-ranking officials regarding their mental processes in reaching a decision absent "extraordinary circumstances."  *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991).

In some cases, courts have cited a secondary rationale—that, as a practical matter, if high-level government officials could be deposed in every civil action involving their agency, then officials would be impeded from exercising their official duties.  *See United States Bd. of Parole v. Merhige*, 487 F.2d 25, 29 (4th Cir. 1973); *see In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995) ("High ranking government officials have greater duties and time constraints than other witnesses.")  However, courts have evaluated this rationale in light of the nature of the litigation and the elected official.  *Id*. at 29 (4th Cir. 1973).  In a case in which prisoners sued the parole board after the board denied an early parole release, the Fourth Circuit acknowledged the onslaught of depositions that the board would face if courts do not carefully restrict discovery against the board: "With unrestricted access to the nearest Federal Court and the ease with which denial of broad constitutional claims can be asserted, the prison-parole authorities might have to answer almost daily the complaints of numberless prisoners dissatisfied with the progress or lack of progress with their current requests."  *Id*.

On the other hand, courts have allowed depositions of high-ranking officials when those officials have been personally involved in the subject of the litigation.  *United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309, 322 (D.N.J. 2009) ("Courts have time and again allowed the deposition of current and former high-ranking government officials upon a showing that the

4

official has personal involvement or knowledge relevant to the case."); *Am. Broad. Cos. v. United States Info. Agency*, 599 F. Supp. 765, 769 (D.D.C. 1984) (Director of United States Information Agency); *In re Kessler*, 321 U.S. App. D.C. 401 (1996) (Commissioner of Food and Drug Administration); *Byrd v. District of Columbia*, 259 F.R.D. 1, 7 (D.D.C. 2009) (Former Directors of District of Columbia Department of Parks and Recreation); *Libertarian Party v. Husted*, 33 F. Supp. 3d 914, 920 (S.D. Ohio 2014) (Hearing Officer and General Counsel for Secretary of State); *Energy Capital Corp. v. United States*, 60 Fed. Cl. 315, 318 (Fed. Cl. 2004) (former Secretary of Housing and Urban Development); *Gibson v. Carmody*, 1991 U.S. Dist. LEXIS 11225, at *2 (S.D.N.Y. Aug. 14, 1991) (former New York Police Commissioner).  These holdings acknowledge that the protections for high-ranking officials vary between an official who has been personally involved and one who has been dragged into the case by a misguided opposing party on a fishing expedition.

In *American Broadcasting Companies*, the court noted two unique circumstances to justify the deposition.  First, the high-ranking official was the sole person responsible for the creation of the documents in question.  599 F. Supp. at 769.  Second, as a factual matter, the high-ranking official contrived the procedures implemented for development, maintenance, and distribution of the transcripts at issue.  *Id.*  The Court noted that the Director was involved personally, setting the case apart from an agency head who is only involved in a supervisory role:

> [T]he plaintiffs are not seeking to depose [the Director] regarding why his or his agency's statutory discretion was exercised in a particular manner; neither are plaintiffs interested in [the Director's] 'deliberative thought process.'  Plaintiffs simply seek to question [the Director] with respect to facts that only he can answer.  [The Director] is a crucial fact witness whose testimony is essential for the plaintiffs to oppose defendants' motion.

*Id*.  Because the Director was personally responsible for the subject of the litigation and personally participated in the procedures that were under review, the court held that unique circumstances justified the deposition of the agency's head.

Courts have prohibited depositions when a high-ranking official has not been personally involved.  *United States v. Sensient Colors, Inc*., 649 F. Supp. 2d 309, 318 (D. N.J. 2009) (explaining that the party seeking to depose the high-ranking official "submitted no evidence suggesting [the official] had any personal involvement in or knowledge relevant" to the site that was the subject of the litigation).  However, in the same case, the court permitted deposition of another high-ranking official who had been personally involved because the official (1) approved requests to increase spending above statutory limits; (2) communicated via letter regarding the dispute; and (3) was identified as a crucial person in the case.  *Id*. at 323-25.

Here, there can be no serious dispute that the Administrator is personally involved in this litigation.  First, by statute, she is responsible for conducting the evaluations in question: "The Administrator shall conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provision of the [Clean Air Act] and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement."  42 U.S.C. § 7621(a).  The Administrator has not delegated that responsibility to anyone else within the EPA.  She has issued no instructions, orders, or guidance for subordinate to comply with Section 321(a) or ensure that others do so.  In short, unlike most cases involving statutory nondiscretionary duties, the Administrator is the only person with actual responsibility to comply with Section 321(a).  Consequently, like the government official in *American*

*Broadcasting Companies*, the Administrator's personal responsibility for compliance with Section 321(a) makes her uniquely involved in this litigation.

Second, the government itself has said that she has personally been involved with discussions about Section 321(a).  United States' Objections and First Supplemental Responses to Plaintiffs' First Set of Discovery Requests, June 12, 2015 Supplemental Response to Interrogatory No. 9 (responding that the Administrator and her staff have discussed Section 321(a) with three individuals).

Third, Ms. McCarthy has personally testified to the fact that EPA has not conducted Section 321(a) evaluations.  As early as 2009, Ms. McCarthy wrote to Congress that "[i]n light of the terms and purpose of section 321, EPA has not conducted a section 321 investigation . . ." Letter from Gina McCarthy, Assistant Adm'r, EPA, to Sen. Orrin G. Hatch, U.S. Senate (Oct. 26, 2009) (Exhibit 2).[1]  In her nomination hearing in 2013, Ms. McCarthy similarly stated that "EPA has found no records indicating that any Administration since 1977 has interpreted Section 321 to require job impacts analysis for rulemaking actions."  Hearing on the Nomination of Gina McCarthy to be Adm'r of the EPA: Hearing Before the S. Comm. on Env't & Pub. Works, 113th Cong. 113-701 (2013) (statement of David Vitter), Member, H. Comm. on Env't & Pub. Works). (Exhibit 12).  Additionally, when asked whether a 321(a) analysis, or even any employment analysis at all, had been done specifically for major rulemakings relevant to this case, Ms. McCarthy stated that none had been done.  *See Id*. at 384 (agreeing that no 321(a) evaluation had been done for Utility MACT); Letter from Gina McCarthy, Assistant Adm'r, EPA, to Rep. Joe Barton, Ranking Member, H. Comm. on Energy & Commerce (Aug. 3, 2010) (stating that no

---

[1] *See also* Letter from Gina McCarthy, Assistant Adm'r, EPA, to Sen. John Ensign, U.S. Senate (Oct. 26, 2009) (Exhibit 3); Letter from Gina McCarthy, Assistant Adm'r, EPA, to Sen. Mike Johanns, U.S. Senate (Oct. 26, 2009) (Exhibit 4); Letter from Gina McCarthy, Assistant Adm'r, EPA, to Sen. James E. Risch, U.S. Senate (Oct. 26, 2009) (Exhibit 5); Letter from Gina McCarthy, Assistant Adm'r, EPA, to Sen. David S. Vitter, U.S. Senate (Oct. 26, 2009) (Exhibit 6).

analysis of potential employment impacts had been done for the Ozone NAAQS) (Exhibit 9). Several of Ms. McCarthy's statements were part of the basis for Plaintiffs' Complaint.

Fourth, the Administrator has been publicly notified about her responsibilities pursuant to Section 321(a), and she has publicly disclaimed the EPA's responsibility for evaluating job losses and shifts. In response to a letter from U.S. Representatives inquiring about what the EPA is doing to comply with Section 321(a), then-Assistant Administrator McCarthy disclaimed any obligation of EPA to evaluate the employment impacts of its greenhouse gas regulations, on the coal industry or anyone else, writing that "there was no statutory requirement or purpose for conducting economic analysis as part of the development of [EPA's endangerment and cause or contribute] findings," and that "EPA has not interpreted CAA section 321 to require EPA to conduct employment investigations in taking regulatory actions." Enclosure with Letters from Gina McCarthy, Assistant Administrator, EPA to Representatives Barton and Walden, at 1, 3 (January 12, 2010). These considerations would have "limited utility," the letter states. *Id.* at 3. At her confirmation hearing, Ms. McCarthy testified that "EPA has not interpreted this provision to require EPA to conduct employment investigations in taking regulatory actions" and that "Section 321 was instead intended to protect employees in individual companies by providing a mechanism for EPA to investigate allegations that specific requirements, including enforcement actions, as applied to those individual companies, would result in lay-offs." Senator David Vitter, Questions for the Record, Gina McCarthy Confirmation Hearing, Environment and Public Works Committee, at 17-18 (April 11, 2013) (Exhibit 14).

Fifth, Gina McCarthy has consistently distinguished the limited employment discussions in EPA's regulatory impact analyses ("RIAs") from the requirements of Section 321(a), speaking directly to, and undermining, the United States' primary defense in this case. *See* Letter from

Gina McCarthy, Assistant Adm'r, EPA, to Sen. David Vitter, U.S. Senate (Mar. 06, 2012)

(distinguishing RIAs from 321(a) evaluations) (Exhibit 11); Letter from Gina McCarthy,

Assistant Adm'r, EPA, to Rep. Darrell E. Issa, Chairman, H. Comm. on Oversight & Gov't

Reform (June 22, 2011) (same) (Exhibit 10).

 The Administrator's numerous letters to members of Congress and repeated testimony at

hearings on both Section 321(a) itself and the United States' arguments in this case demonstrate

Ms. McCarthy's personal involvement in and knowledge of Section 321(a).  Her involvement is

similar to the Regional Administrator in *Sentient Colors*, where the court held that

correspondence identifying the Regional Administrator supported the conclusion that the

Regional Administrator was sufficiently personally involved to justify a deposition.

 As the former Assistant Administrator for the Office of Air and Radiation, Administrator

McCarthy is also uniquely positioned to discuss compliance with Section 321(a) during her

tenure as deputy over that division, because she was the Assistant Administrator of the Office of

Air and Radiation during the period when the EPA claims it evaluated potential loss or shifts of

employment.  *See* Declaration of James DeMocker in Support of the United States' Motion for

Summary Judgment (April 10, 2015).  Attached to its Declaration, the EPA provides a large

group of exhibits that purport to demonstrate the EPA's evaluation of potential loss or shifts of

employment which may result from the administration or enforcement of the Clean Air Act and

applicable implementation plans.  *Id*. at 2.  The EPA identified  various documents as evaluations

of employment impacts associated with specific regulatory actions authorized by the Clean Air

Act, presumably as support for the EPA's argument that it has complied with Section 321(a)

even though it did not specifically intend to do so.  *Id*.  The majority of these documents were

created between 2009 and 2013, the period when McCarthy served as Assistant Administrator.

*See id.* at 2-20 (exhibits 5-8, 9-12, 13-16, 18, 21-22, 24, 26-30, 32-35, and 38-39). Her prior position at EPA as the Assistant Administrator during a key period relevant to this litigation makes the circumstances of this case similar to *In re United States*, where the EPA *voluntarily* provided an Assistant Administrator to be deposed on issues related to EPA's fulfillment of certain responsibilities under the Clean Water Act. 624 F.3d 1368, 1373 (11th Cir. 2010).

Viewed as a whole, the available information demonstrates that Administrator McCarthy has played a central role in the EPA's deliberate and knowing failure since 2009 to comply with Section 321(a) by conducting continuing evaluations of the loss and shifts in employment caused by the agency. Consequently, the factual circumstances do not support the EPA's claim that she is entitled to avoid the deposition pursuant to the *Morgan* doctrine, and this court should deny the EPA's motion for a protective order.

## II. Administrator McCarthy's unique position with respect to Section 321(a) of the Clean Air Act makes her an irreplaceable witness who cannot be excused from a deposition.

In light of the Administrator's central role in the EPA's response to Section 321(a), her deposition cannot be replaced by alternative witnesses or sources.

As a preliminary matter, EPA misstates the standard for depositions of high-ranking officials. In general, a party may depose a high-ranking government official when "extraordinary circumstances" justify the deposition. *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991). However, parties seeking to depose government officials are not *required* to show that the information sought from the official is not available through other sources. *See Morgan*, 313 U.S. at 422 (no discussion of requirement that party must show unavailability through other sources); *Franklin Sav. Ass'n*, 922 F.2d at 211 (4th Cir. 1991) (discussion of "extraordinary circumstances," but no discussion of any requirement to exhaust all potential

alternative sources); *In re Office of Inspector Gen., R. Ret. Bd.*, 933 F.2d 276, 278 (5th Cir. 1991)

(describing standard as "extraordinary circumstances," but not stating any requirement to show

that information is unavailable from all other possible sources); *Simplex Time Recorder Co. v.*

*Sec'y of Labor*, 247 U.S. App. D.C. 85 (D.C. Cir. 1985) (not stating this as requirement, but

considering availability of alternative sources as a factor in determining whether extraordinary

circumstances were present); *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993)

(not stating that this is a requirement, but considering the availability of testimony from other

witnesses as a factor in determining whether extraordinary circumstances were present).

　　Instead, the cases cited by the EPA reveal that a minority of courts treat this as a

requirement.  *In re United States* (Reno and Holder), 197 F.3d 310, 314 (explaining that for high-

ranking officials, discovery sought must be relevant and that it cannot otherwise be obtained);

*Bogan v. City of Boston*, 489 F. 3d 417, 423 (1st Cir. 2007).

　　This Court does not need to resolve this legal question, though, because the Plaintiffs can

demonstrate that the discovery cannot be obtained elsewhere.  The depositions and discovery to

date have not provided an adequate substitute for a deposition of the Administrator with regard

to several key topics.

　　First, EPA has provided documents in response to the Plaintiffs' requests for explanations

as to how the EPA is continuously evaluating losses and shifts in employment caused by the

EPA's administration and enforcement of the Clean Air Act, but these documents fall short of

explaining how the EPA now claims it is actually complying with Section 321(a).  United States'

Objections and First Supplemental Responses to Plaintiffs' First Set of Discovery Requests, June

12, 2015 Supplemental Response to Interrogatory No. 1-2.  None of these documents purport to

be a Section 321(a) evaluation, and the documents do not provide an adequate response to the

basic question of how the EPA is continually evaluating job loss and shifts.

Furthermore, a deposition would provide the Plaintiffs an opportunity to impeach the

Administrator on apparent inconsistencies in her previous statements and discovery responses.

For example, the Administrator has stated that "[p]rior to September 16, 2014, she did not

interpret Section 321(a) as requiring the Agency to conduct employment evaluations."  United

States' Objections and First Supplemental Responses to Plaintiffs' First Set of Discovery

Requests, June 12, 2015 Supplemental Response to Interrogatory No. 7.  This statement is

inconsistent with the EPA's prior statements that Section 321(a) of the Clean Air Act requires

the EPA to conduct employment evaluations:

> Under section, 321(a), EPA is required to investigate threatened plant closures or
> reductions in employment undertaken by EPA to assess characteristics of firms in
> industries likely to be affected by the [Clean Air Act], including financial and
> economic information on firms in the industry and identification of key trends that
> may influence the response of firms to implementation and enforcement of the
> [Clean Air Act].

United States Environmental Protection Agency, Analysis of the Impact of Environmental

Compliance on Plant Operations: Draft Final Report ES-1 (March 1994) (Exhibit 1).  Recently,

the EPA appears to have changed its position a third time, now suggesting that Regulatory

Impact Analyses and Economic Impact Assessments comply with Section 321(a).  *See* United

States' Objections and First Supplemental Responses to Plaintiffs' First Set of Discovery

Requests, Response to Interrogatory No. 5 ("The United States identified, provided, and

described the documents that demonstrate EPA's performance of evaluations described in

Section 321(a) of the Clean Air Act [and] the Declaration of James B. DeMocker . . .

summarizes EPA's evaluations.").  The EPA makes this claim even though a former leader of the

Air Economics Group who was asked about Section 321(a) evaluations stated that "[t]o her

knowledge we have never done an analysis of this type."  Email from L. Chappell, Acting Group

Leader, EPA, to C. Fitzmaurice, EPA (Feb. 13, 2013 11:10 AM).  Absent instructions or

delegated authority from the Administrator, no one but the Administrator is in a position to

reconcile or clarify these positions.  These inconsistent statements would also provide an

opportunity for the Plaintiffs to inquire about whether the Administrator was aware of the EPA's

previous position with respect to Section 321(a), what the EPA did as a result of this 1994

Analysis of the Impact of Environmental Compliance on Plant Operations, when the EPA

changed its position, and what the EPA is doing now as a result of apparent changes, among

other topics.

     Additionally, the Plaintiffs could ask the Administrator about apparent inconsistencies in

prior statements that the Administrator has made about the extent to which employment impacts

can be evaluated prospectively.  The Administrator has publicly commented that any duty to

evaluate employment impacts may be limited "to the extent" that EPA believes "peer reviewed

science and modeling allows."  *See* Senate Environment & Public Works Committee Recording,

http://www.c-span.org/video/?317244-1/administration-defends-climate-change-plan (Jan. 16,

2014).  However, the EPA previously attempted to identify job losses in a much more

comprehensive manner.  United States' Response to Plaintiffs' Second Set of Discovery

Requests, Response to Interrogatory No. 3 ("In the Economic Dislocation Early Warning

System . . ., EPA attempted to identify potential or actual industrial plant closings or curtailments

and employment dislocations resulting from Federal, State, or local pollution control regulation .

. . . EPA currently cannot identify information regarding when and why the program ended.")

The EPA's comprehensive efforts to evaluate job losses and shifts, via the defunct Economic

Dislocation Early Warning System, are inconsistent with Administrator McCarthy's suggestion

that when EPA currently evaluates job impacts, it does so the extent allowable by current science and modeling.

The EPA's actions taken in consideration of the limitations of current science and modeling will be a critical factual issue for the Plaintiffs' requested injunctive relief.  *See* First Amended Complaint, Prayer for Relief ¶ (b) (requesting that this Court issue an injunction "[o]rdering the Administrator to evaluate whether its administration and enforcement of the Clean Air Act over the past six years has resulted in job losses or shifts in the coal industry and to complete its evaluation either by a date certain set by the Court or as expeditiously as practicable").  The Plaintiffs should be permitted to seek clarification from the Administrator regarding the EPA's actions—again, a factual issue based on the Administrator's personal involvement—with regard to  her claims that peer reviewed science and modeling only permit limited identification and evaluation of job losses and shifts because this question will be pertinent to the Plaintiff's requested relief.

Previous deponents could not explain whether, as a factual matter, anything prevented the EPA today from gathering data to  identify plant and mine closures EPA has caused and how many job losses have resulted, and that the Plaintiffs would "have to ask her [the Administrator]."  Tr. Weatherhead 150-51.  The EPA's deponents have not been able to answer why Administrator McCarthy distinguished between economic analyses required under Section 321(a) and regulatory impact analyses.  Tr. Evans 50-54.  Previous deponents could not testify as to whether the Administrator believes that the work of AEG qualifies as complying with Section 321(a).  Tr. Evans 72.  Additionally, previous deponents have not been aware of the Economic Dislocation Early Warning System.  Tr. Evans 54.  Previous deponents have been unable to comment on whether their division within the EPA would be the one responsible for significant

job losses within an industry.  Tr. Weatherhead 196 (answering, in response to the question "if there was a significant number of job losses within an industry . . . attributing them to EPA regulations that would be . . . something that your group would want to look into would it not?" that "I can't necessarily agree it would be solely my group.")  Administrator McCarthy would be uniquely positioned to answer these and other questions and to provide admissions regarding the EPA's compliance or noncompliance with Section 321(a).

Discovery has been ongoing now for over a year.  First Order and Notice Regarding Discovery and Scheduling Conference (Sept. 17, 2014).  The EPA's failure to provide key requested information demonstrates Administrator McCarthy's necessity as a deponent, especially when she has personally commented or worked on many of the topics that the Plaintiffs have been unable to discover from others.

**III.    The *Morgan* doctrine does not apply because this Court has held that Administrator McCarthy has violated her legal duty to comply with Section 321(a).**

Administrator McCarthy is not entitled to the protections of the *Morgan* doctrine.  The Fourth Circuit has explained that deference to administrative officials stops when "there is a clear showing of misconduct or wrongdoing."  *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991).  When a prima facie case of misconduct is shown, justice requires not only that the government official must be subject to a deposition, but also that the mental process rule is inapplicable altogether.  *Singer Sewing Machine Co. v. NLRB*, 329 F.2d 200, 208 (4th Cir. 1964).

The reason for this is because the *Morgan* doctrine is "one facet of the general presumption of regularity which attaches to decisions of administrative bodies."  *Singer Sewing Machine Co.*, 329 F.2d at 208.  But "where there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied."  *Libertarian Party v. Husted*, 33 F. Supp. 3d 914, 919-20 (S.D. Ohio 2014) (quotations omitted); *see also In re Sealed*

*Case*, 121 F.3d 729, 738 (D.C. Cir. 1997) ("[T]he privilege disappears altogether when there is any reason to believe government misconduct occurred.") (quoting *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995) (additional citations omitted)); *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 903 F. Supp. 2d 59, 66 (D.D.C. 2012) (quoting *In re Sealed Case*, 121 F.3d at 738). The rationale behind this rule is based on fairness to the litigant who is impacted by the unlawful government action. *See Bank of Dearborn v. Saxon*, 244 F.Supp. 394, 401-03 (E.D. Mich. 1965) ("the real public interest under such circumstances is not the agency's interest in its administration but the citizen's interest in due process"), aff'd 377 F.2d 496 (6th Cir. 1967); *Singer Sewing Machine*, 329 F.2d at 208 (concluding that the policy of protecting government officials was not as important as the "search for truth").

In *Singer Sewing Machine Co.*, the Fourth Circuit found a prima facie case of misconduct in a dispute regarding the appropriate bargaining unit for the representation of certain employees. 329 F.2d at 201. The National Labor Relations Board ordered that one union should be certified as the appropriate bargaining unit, and the company argued that another union should have been certified. *Id*. The company argued that the Board improperly considered the extent that the union had organized as the controlling factor, and that the Board is prohibited by statute from considering the extent of organization as the controlling factor. *Id*. at 205. The company attempted to call a representative of the Board to inquire about whether he participated in a violation of this law on the Board's behalf, but the Board excluded the evidence at hearing. *Id*. The company proffered that the testimony would show that the Board had considered the extent of organization as the controlling factor. *Id*. The Fourth Circuit effectively reversed the Board's

16

order, explaining that the determination was invalid if the Board had improperly considered the controlling factor.  *Id*. at 208.

Similarly, courts have discarded the deliberative process privilege when the I.R.S. has targeted specific groups.  *See Tax Reform Research Group v. I.R.S.*, 419 F. Supp. 415, 426 (D.D.C. 1976) (documents relating to White House efforts to use Internal Revenue Service against its political enemies "simply cannot be construed as being part of any proper governmental process"); *Hearnes v. I.R.S.*, 1979 WL 1428, at *6 (E.D. Mo. July 2,1979) ("Plaintiff argues correctly that he is entitled to papers and documents which indicate that political abuses were committed by the Internal Revenue Service.") (footnote omitted).

Here, the Administrator's failure to perform her duty pursuant to Section 321(a)—or even to acknowledge that this duty exists—constitutes misconduct.  As this Court has recognized, Section 321(a) required that the Administrator "shall conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provision of [the Clean Air Act] and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement."  42 U.S.C. § 7621(a); Order Denying Motion to Dismiss Complaint and Motion to Strike Prayer for Injunctive Relief (Sept. 16, 2014). This Court emphasized that the statute's plain language commands that the Administrator "shall conduct continuing evaluations . . . ." and that the "use of 'shall' creates a mandatory obligation" on the Administrator."  *Id*.  Furthermore, this Court noted the Supreme Court's statements about the unambiguous nature of the word "shall": "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied."  *United States v. Monsanto*, 491 U.S. 600, 607 (1989)."  *Id*.

17

Despite this unambiguous language, the Administrator concedes that she did not fulfill

her duty, stating that "[p]rior to September 16, 2014, she did not interpret Section 321(a) as

requiring the Agency to conduct employment evaluations."  United States' Objections and First

Supplemental Responses to Plaintiffs' First Set of Discovery Requests, June 12, 2015

Supplemental Response to Interrogatory No. 7.  Like the company in *Singer Sewing Machine*,

the plaintiffs have demonstrated that the Administrator has behaved unlawfully and improperly.

Here, however, the prima facie case is even stronger because the Administrator has affirmatively

disclaimed her legal duty.  *See* Enclosure with Letters from Gina McCarthy, Assistant

Administrator, EPA to Representatives Barton and Walden, at 1, 3 (January 12, 2010) (in

response to letter from United States Representatives alerting Administrator McCarthy to Section

321 and its requirement to conduct continuing evaluations of potential loss or shifts of

employment which may result from the administration or enforcement of provisions with the

Act, the Administrator explained that the EPA has not interpreted the Section to require EPA to

conduct employment investigations in taking regulatory actions).  Even after this Court's ruling

that the Administrator is subject to a nondiscretionary duty to comply with Section 321(a), her

counsel peppers its discovery responses and briefs with disclaimers that she does not agree that

Section 321(a) is nondiscretionary.  *See* United States' Responses to Plaintiffs' Second Set of

Discovery Requests, at 24, fn. 1 ("EPA acknowledges this Court's decision as the law of the case

for purposes of this litigation, subject to appeal, but reserves its argument that the duty set forth

in Section 321(a) is discretionary, for the reasons set forth in its Memorandum in Support of

Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction [ECF No. 35]") (Exhibit

17).  Consequently, the prima facie case for the Administrator's misconduct is even more

egregious than the Board's in *Singer Sewing Machine*, where the party seeking testimony of the

government official did not show that the Board was aware of the statute that the Board appeared

to have violated.  Here, the misconduct cannot be dismissed as oblivious nonfeasance; the

Administrator was aware of Section 321(a) and exhibited deliberate recalcitrance to compliance.

Plaintiffs are not only seeking discovery on the Administrator's deliberate recalcitrance,

however, but also on the targeting of the coal industry and suppression of job loss data

specifically with respect to coal.  Prior to the current Administration's declaration of a priority

shift away from coal, the EPA had stated that Section 321(a) requires the EPA to evaluate

potential losses of employment or shifts of employment that may result from implementation of

the Clean Air Act and that the EPA is required to investigate threatened plant closures or

reductions of employment.  United States Environmental Protection Agency, Analysis of the

Impact of Environmental Compliance on Plant Operations: Draft Final Report ES-1 (March

1994).  Even before that, EPA was generating quarterly reports on the job losses resulting from

its enforcement of the Clean Air Act through the EDEWS program.  As late as 2009, people

within EPA were taking the position that the parallel provision to Section 321(a) in the Clean

Water Act "drives the assessment of plant closures and reductions/shifts in employment."  Draft

Response to Congressional Letter (undated) (Exhibit 18).  After the Administration's decision to

target coal, however, Ms. McCarthy wrote to Congress that "[in] keeping with congressional

intent, EPA has not interpreted CAA section 321 to require EPA to conduct employment

investigations in taking regulatory actions,"[2] and, even after reviewing the 1994 report, EPA

represented in a FOIA response that, "neither the Office of Air and Radiation nor the Office of

Policy were able to find any documents pertaining to" a request for "all draft, interim final and

final reports and/or evaluations prepared by the U.S. Environmental Protection Agency or its

---

[2] Letter from Gina McCarthy, Assistant Adm'r, EPA, to Sen. Orrin G. Hatch, U.S. Senate (Oct. 26, 2009) (Exhibit 2).

contractor(s) pursuant to section 321 of the Clean Air Act."  Response to Freedom of
Information Request No. EPA-I IQ-2012-001 352 (Exhibit 15).

Plaintiffs have a right to investigate whether the Administrator's position with respect to
Section 321(a) reflects merely a lack of awareness about the Act's requirements or a change of
position in order to assist the Administration in waging a war on coal.  The Administrator may
have an explanation for these inconsistencies, but the available evidence demonstrates a prima
facie case of misconduct sufficient to justify the Administrator's deposition.

And the injury here is greater: as a result of the EPA's regulatory actions, numerous coal-
fired power plants have recently been idled, shut down, or converted to other fuels.  First
Amended Complaint ¶¶ 37-46.  They have cited the costs of environmental compliance as reason
for the change in operations.  *Id*.  Additionally, the EPA's regulations have made it unlikely that
any new coal-fired power plants will be constructed so long as the EPA fails to evaluate the
adverse impact that its actions are having on the coal industry.  *Id*. at ¶ 49.  The result is that tens
of thousands of coal mining jobs have been lost in the past five years, *id*. at ¶ 59, an
exponentially more egregious result of misconduct than the bargaining unit selection in *Singer
Sewing Machine*.

Given the stakes and the Administrator's conduct, the policy of protecting government
officials is outweighed by the search for the true impact that these regulations have had on the
tens of thousands of members of an industry.

## IV.     Any burden on Administrator McCarthy would be minimal.

The inconvenience to Administrator McCarthy is not sufficient to shield the
Administrator entirely from being deposed.  Plaintiffs are seeking discovery into a years-long
course of conduct that has costs Plaintiffs dearly and costs tens of thousands of employees of the

coal industry their jobs.  Plaintiffs seek discovery to not only establish EPA's liability but also

their entitlement to injunctive relief to protect Plaintiffs from further harm and to preserve the

status quo pending the Administrator's compliance.  The Administrator's deliberate recalcitrance

and potential willful avoidance of her duty is both highly relevant and greatly outweighs the

burden on the Administrator of a deposition.

The Plaintiffs have also offered to limit the deposition of the Administrator to reduce the

burden and inconvenience to the extent possible.  Plaintiffs have, for example, offered to limit

the deposition of the Administrator and other apex officers on both sides to at most three hours.

(Sept. 24, 2015, 2015 email from J. Lazzaretti).  They have also offered to allow the

Administrator to select a time, date, and location of her choosing.  *Id*.  Finally, the Administrator

would be able to assert any applicable privileges during a deposition to prevent any unnecessary

intrusion.  Of course, the Administrator's assertion of these privileges may and should be limited

by the Administrator's deliberate refusal to comply with the requirements of Section 321(a).  The

burden on the Administrator would not be disproportionate to her significant role in this critical

litigation.

### V.     A stay pending appeal is premature and unsupported by EPA's memorandum in support.

This Court should reject the EPA's Motion to Stay Administrator McCarthy's deposition

because it is too early to determine whether the factual circumstances will necessitate or support

a stay.  Plaintiffs have already agreed to reschedule the Administrator's deposition to a time and

date convenient to her.  The only grounds for an additional stay is to allow Defendant to appeal

this Court's decision, which hasn't been issued yet, on grounds EPA does not have yet.  If the

EPA is not granted a protective order, EPA may be able to identify some basis for a stay, but if it

does, it can move then for a stay pending appeal and support its motion with the appropriate grounds, which Plaintiffs can then respond to.  Seeking a stay now puts the cart before the horse.

The EPA has also not provided any meaningful reason to grant a stay of the Administrator's deposition at this stage.  Additionally, as discussed above, it is unlikely that the circumstances would require a stay because the Plaintiffs are willing to accommodate the Administrator's schedule by limiting the duration of the deposition and deferring to her choice of location.  At this stage, the EPA has not shown good cause for a stay and its motion should be denied.

## CONCLUSION

Administrator McCarthy has failed to take the time to perform her duties pursuant to Section 321(a) of the Clean Air Act, and now that a court has found that she is bound to act pursuant to Section 321(a), she is responding by stating that she does not have enough time to testify in a deposition regarding her conduct, even though the Plaintiffs have offered to keep the deposition at or under three hours at a location of her choosing.  Because Administrator McCarthy has been at the center of the EPA's refusal to perform its legal duty, Plaintiffs respectfully request that this Court deny the EPA's Motion for a Protective Order.

Additionally, the EPA is not entitled to a stay.  Because the EPA has provided no meaningful reason for a stay of the Administrator's deposition, the Plaintiffs request that this Court deny the Motion for a Stay of Administrator McCarthy's deposition.

Dated October 30, 2015                  Respectfully submitted,

    *s/ Jacob A. Manning*
Geoffrey K. Barnes (Ohio Bar # 0005767)
J. Van Carson (Ohio Bar # 0001324)
John D. Lazzaretti (Ohio Bar # 0080780)
Squire Patton Boggs (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
Tel:  216.479.8500
Fax:  216.479.8780
Geoffrey.Barnes@squirepb.com
Van.Carson@squirepb.com
John.Lazzaretti@squirepb.com

John E. Jevicky (Ohio Bar # 0012702)
Dinsmore & Shohl LLP
255 E. Fifth St., Suite 1900
Cincinnati, Ohio  45202
Tel:  513.977.8301
Fax:  513.977.8141
John.Jevicky@dinsmore.com

Jacob A. Manning (West Virginia Bar # 9694)
Dinsmore & Shohl LLP
2100 Market St.
Wheeling, West Virginia  26003
Tel:  304.230.1604
Fax:  304.230.1610
Jacob.Manning@dinsmore.com

23

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

MURRAY ENERGY CORPORATION, et al.,    )
                                      )
    Plaintiffs,                       )
                                      )
    v.                                )    **Civil Action No. 5:14-CV-00039**
                                      )    **Judge Bailey**
GINA McCARTHY, Administrator,         )
UNITED STATES ENVIRONMENTAL           )
PROTECTION AGENCY, acting in her      )
official capacity,                    )
                                      )
    Defendants.                       )
_____)

**CERTIFICATE OF SERVICE**

    I, Jacob A. Manning, hereby certify that on this 30th day of October, 2015, I

electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which

will cause a copy to be served upon counsel of record.

                        /s/ *Jacob A. Manning*
                        Jacob A. Manning (West Virginia Bar # 9694)
                        Dinsmore & Shohl LLP
                        2100 Market St.
                        Wheeling, West Virginia  26003
                        Tel:  304.230.1604
                        Fax:  304.230.1610
                        Jacob.Manning@dinsmore.com