**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

**MURRAY ENERGY CORPORATION,
MURRAY AMERICAN ENERGY, INC.,
THE AMERICAN COAL COMPANY,
AMERICAN ENERGY CORPORATION,
THE HARRISON COUNTY COAL COMPANY,
KENAMERICAN RESOURCES, INC., THE
MARION COUNTY COAL COMPANY, THE
MARSHALL COUNTY COAL COMPANY,
THE MONONGALIA COUNTY COAL
COMPANY, OHIOAMERICAN ENERGY
INC., THE OHIO COUNTY COAL COMPANY,
and UTAHAMERICAN ENERGY, INC.,**

                Plaintiffs,

        v.                                      **Civil Action No. 5:14-CV-39**
                                                                     Judge Bailey

**GINA McCARTHY**, Administrator,
United States Environmental Protection
Agency, in her official capacity,

                Defendant.

**MEMORANDUM ORDER DENYING MOTION FOR
PROTECTIVE ORDER AND MOTION TO STAY DEPOSITION**

Pending before this Court are United States' Emergency Motion for Protective Order Precluding the Deposition of EPA Administrator McCarthy [Doc. 147] and United States' Motion to Stay Administrator McCarthy's Deposition [Doc. 155]. Both Motions have been fully briefed and are ripe for decision.

This civil action was filed on March 24, 2014, by Murray Energy Corporation and a

1

number of its subsidiary or affiliated companies[1] (hereinafter collectively "Murray") seeking declaratory and injunctive relief for the EPA's alleged failure to perform its duties required under 42 U.S.C. § 7621, which requires the EPA to "conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provision of [the Clean Air Act] and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement."

The plaintiffs contend that the EPA's enforcement of the Clean Air Act, combined with the EPA's refusal "to evaluate the impact that its actions are having on the American coal industry and the hundreds of thousands of people it directly or indirectly employs" is irreparably harming the plaintiffs [Amended Complaint, Doc. 31, p. 2].

By Order entered September 16, 2014 [Doc. 40], this Court denied the Motion and found, as a matter of law, that the EPA had a non-discretionary duty to undertake an ongoing evaluation of job losses and that this Court had and has subject matter jurisdiction to hear the case.

The plaintiffs have filed a notice of deposition setting the deposition of EPA Administrator Gina McCarthy for November 24, 2015, leading to the EPA's motion to preclude the deposition. The EPA sets forth two arguments why this Court should grant the protective order:

1.  That depositions of senior government officials, such as Administrator

---

[1] According to the Amended Complaint, the plaintiffs collectively employ over 7,200 and comprise the largest underground coal mining operations in the United States [Doc. 31, ¶ 76].

McCarthy, are barred absent extraordinary circumstances; and

  2. That the plaintiffs have not established extraordinary circumstances sufficient to justify Administrator McCarthy's deposition.

## DISCUSSION

Any discussion of the deposition of a high ranking Government official must begin with ***United States v. Morgan***, 313 U.S. 409 (1941). "As a general principle, a party can conduct the deposition of any other person who possesses information relevant to a claim or defense.

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, . . .. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to discovery of admissible evidence.

Fed.R.Civ.P. 26(b)(1).

"As a person likely to possess relevant information 'reasonably calculated to lead to discovery of admissible evidence,' [EPA Administrator McCarthy] would generally be subject to a discovery deposition. However, the Supreme Court has created an exception to this rule as it applies to high-ranking officials holding public office in the case of ***United States v. Morgan***, 313 U.S. 409 (1941). The ***Morgan*** doctrine recognizes that, left unprotected, high-ranking government officials would be inundated with discovery obligations involving scores of cases where the public official would have little or no

personal knowledge of material facts. Left unchecked, the litigation-related burdens placed upon them would render their time remaining for government service significantly diluted or completely consumed." **United States v. Wal Mart Stores, Inc.**, 2002 WL 562301, at *1 (D. Md. Mar. 29, 2002).

"The ***Morgan*** doctrine arose in the context of a quasi-legislative proceeding where the Secretary of Agriculture issued an order setting rates for market agencies at the Kansas City Stockyards. Under the operative statute, the regulated agencies were entitled to a full hearing with procedural safeguards. However, due to unusual and unique circumstances, the Secretary was required to be an arbiter of rates for past years. The lower court allowed the parties to conduct a deposition of the Secretary which the Supreme Court found was inappropriate due to the proceeding before the Secretary having a quality of a judicial proceeding. Accordingly, ***Morgan*** stands for the principle that when the Secretary's duties take on a judicial quality there is no right to conduct a deposition of such a decision maker in the absence of extraordinary circumstances. *See also* **Simplex Time Recorder Co. v. Secretary of Labor***,* 766 F.2d 575 (D.C. Cir. 1985). ***Morgan*** has come to stand for the notion that as for high-ranking government officials, their thought processes and discretionary acts will not be subject to later inspection under the spotlight of deposition. Decision-makers enjoy a mental process privilege. **United States v. Miracle Recreation Equip. Co.***,* 118 F.R.D. 100 (S.D. Iowa 1987); **Kyle Eng'g Co. v. Kleppe***,* 600 F.2d 226 (9th Cir. 1979); **In re Office of Inspector General***,* 933 F.2d 276 (5th Cir. 1991); **United States v. Merhige***,* 487 F.2d 25 (4th Cir.), *cert. denied,* 417 U.S. 918 (1974); and **In re United States of America***,* 985 F.2d 510 (11th Cir. 1993)." *Id*.

"Since *Morgan,* federal courts have consistently held that, absent 'extraordinary circumstances,' a government decision-maker will not be compelled to testify about his mental processes in reaching a decision, 'including the manner and extent of his study of the record and his consultations with subordinates.' [313 U.S. at 422]. *See Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985); *Sweeney v. Bond,* 669 F.2d 542, 546 (8th Cir.), *cert. denied,* 459 U.S. 878 (1982); *Kyle Engineering Co. v. Kleppe,* 600 F.2d 226, 231–32 (9th Cir. 1979); *Warren Bank v. Camp,* 396 F.2d 52, 56 (6th Cir. 1968); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 325–26 (D.D.C. 1966), *aff'd,* 384 F.2d 979 (D.C. Cir.), *cert. denied,* 389 U.S. 952 (1967)." *Franklin Sav. Assn. v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991). *See also Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007); *In re United States (Holder)*, 197 F.3d 310, 313 (8th Cir. 1999); and *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995).

A review of the case law surrounding the issue discloses that a deposition of a high ranking Government official will not be permitted unless (1) that official has personal knowledge of the facts at issue; (2) extraordinary circumstances or a "special need" exists for the deposition; and (3) the information is not available from an alternate source. *In re:USA, U.S. Environmental Protection Agency*, 624 F.3d 1368, 1372 (11th Cir. 2010); *Franklin Sav. Assn. v. Ryan*, 922 F.2d at 211; *United States Parole Board v. Merhige*, 487 F.2d 25, 29 (4th Cir. 1973); *Byrd v. District of Columbia*, 259 F.R.D. 1, 7 (D.D.C. 2009); *United States v. Sensient Colors, Inc.*, 649 F.Supp.2d 309, 316, 321-22 (D.N.J. 2009); *United States v. Wal-Mart Stores*, 2002 WL 562301, *3 (D. Md. March 29, 2002); and *Energy Capital Corp. v. United States*, 60 Fed. Cl. 315, 318 (U.S. Ct. Fed. Claims

2004).

In addition, the deposition may not delve into the mental processes or deliberative processes of the deponent unless there is a prima facie showing of misconduct or wrongdoing. **Franklin Sav. Assn. v. Ryan**, 922 F.2d at 211; **Singer Sewing Mach. Co. v. N.L.R.B.**, 329 F.2d 200, 208 (4th Cir. 1964); **Texaco Puerto Rico, Inc. v. Dept. of Consumer Affairs**, 60 F.3d 867, 885 (1st Cir. 1995); **Libertarian Party of Ohio v. Husted**, 33 F.Supp.3d 914, 919 (S.D. Ohio 2014).

The deliberative process privilege is (1) qualified, **Texas Puerto Rico**, *supra*, at 885, citing **FTC v. Warner Communications Inc.**, 742 F.2d 1156, 1161 (9th Cir. 1984); (2) not absolute, **Id**., citing **First Eastern Corp. v. Mainwaring**, 21 F.3d 465, 468 n. 5 (D.C. Cir. 1994); and (3) discretionary, **Id**., citing **In re Franklin Nat'l Bank Sec. Litig.**, 478 F.Supp. 577, 582 (E.D. N.Y. 1979). "'[W]here the documents sought may shed light on alleged government malfeasance,' the privilege is routinely denied. **Franklin,** 478 F.Supp. at 582; *see also* **Bank of Dearborn v. Saxon,** 244 F.Supp. 394, 401–03 (E.D. Mich. 1965) ('the real public interest under such circumstances is not the agency's interest in its administration but the citizen's interest in due process'), *aff'd,* 377 F.2d 496 (6th Cir. 1967)." **Texas Puerto Rico**, *supra*.

In **Libertarian Party**, *supra*, the Court set forth several factors for evaluating the deliberative process privilege:

> Many courts have held that the deliberative process privilege is a qualified privilege. See, e.g., **In re Sealed Case,** 121 F.3d 729, 737 (D.C. Cir. 1997); **Marriott Int'l Resorts, L.P. v. United States,** 437 F.3d 1302, 1307 (Fed. Cir.

6

2006); *F.T.C. v. Warner Commc'ns Inc.,* 742 F.2d 1156, 1161 (9th Cir. 1984); *E.E.O.C. v. Burlington N.,* 615 F.Supp.2d 717, 720 (W.D. Tenn. 2009), *objections overruled sub nom.* *E.E.O.C. v. Burlington N. & Santa Fe Ry. Co.,* 621 F.Supp.2d 603 (W.D. Tenn. 2009). There are several factors to consider in determining whether the deliberative process privilege should be overcome, including (1) the relevance of the evidence sought, (2) the availability of other evidence, (3) the role of the government in the litigation, and (4) the potential consequences of disclosure of the information. *See, e.g., F.T.C. v. Warner Commc'ns Inc., supra* at 1161 (9th Cir. 1984) ("Among the factors to be considered in making this determination are: 1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions") (citations omitted); *see also* *E.E.O.C. v. Burlington N., supra* at 720–21 ("In balancing these competing interests, the court should consider several factors, including (1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the seriousness of the litigation and the issues involved; (4) the role of the government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable") (citations omitted); *see also* **United States v. Farley,** 11 F.3d 1385, 1389 (7th Cir. 1993) (deliberative process privilege can be overcome if the party requesting

7

the documents can make "a showing that his need for the documents outweighed the government's interest in not disclosing them" (citation omitted)).

Plaintiffs are correct that possible government misconduct or deficiencies in the deliberative process are factored into any analysis and, where present, weigh in favor of denying the privilege. "[W]here there is reason to believe the documents sought may shed light on government misconduct, 'the privilege is routinely denied,' on the grounds that shielding internal government deliberations in this context does not serve 'the public's interest in honest, effective government.'" **In re Sealed Case**, 121 F.3d 729, 738 (D.C. Cir. 1997) (*quoting* **Texaco Puerto Rico, Inc. v. Department of Consumer Affairs**, 60 F.3d 867, 885 (1st Cir. 1995) (additional citations omitted)); **Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.**, 903 F.Supp.2d 59, 66 (D.D.C. 2012) (*quoting* **In re Sealed Case**, 121 F.3d at 738); *see also* **Bank of Dearborn v. Saxon**, 244 F.Supp. 394, 401–03 (E.D. Mich. 1965) ("the real public interest under such circumstances is not the agency's interest in its administration but the citizen's interest in due process"), *aff'd* 377 F.2d 496 (6th Cir. 1967). However, a showing of misconduct is not required in order for the privilege to be overcome.

33 F.Supp.3d at 919-20 (S.D. Ohio 2014).

In examining the alternatives to deposition, this Court agrees with Judge Peen that "Depositions are the most efficient means of discovery for the plaintiffs in the context of the instant case. Moreover, depositions are the preferred means of discovery in the Rule 56(f)

context. "Because the exigencies of time are paramount; discovery [under Rule 56(f)] through the use of depositions is appropriate." *Murphy v. Federal Bureau of Investigation,* 490 F.Supp. 1134, 1138 (D.D.C. 1980). "Depositions are also more reliable, as they are taken under oath, and the deponents' responses are relatively spontaneous." *Am. Broad. Companies, Inc. v. U.S. Info. Agency*, 599 F.Supp. 765, 769 (D.D.C. 1984).

Finally, this Court notes that in *Byrd v. District of Columbia*, 259 F.R.D. 1, 7 (D.D.C. 2009), the District Court stated that "[a]lthough 'common sense seems to suggest that administration heads ... should not be called to testify personally unless a clear showing is made that such a proceeding is essential to prevent prejudice or injustice to the party who would require it,' *Davis* [*v. United States*]*,* 390 A.2d at 981 [(D.C. 1978)] (citing *Wirtz v. Local 30, Int'l Union of Operating Eng'rs,* 34 F.R.D. 13 (S.D. N.Y. 1963)), protective orders that completely prohibit a deposition should be granted only as an 'extraordinary measure which should be resorted to only in rare occasions,' *Jennings* [*v. Family Mgmt*], 201 F.R.D. at 275 [(D.D.C. 2001)]."

Having reviewed the law applicable to the issue, this Court must next examine the reasons given by the plaintiffs to support extraordinary circumstances and to overcome the deliberative privilege.

First, by statute, the Administrator is responsible for conducting the evaluations in question: "The Administrator shall conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provision of the [Clean Air Act] and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from

such administration or enforcement." 42 U.S.C. § 7621(a).

The Administrator has not delegated that responsibility to anyone else within the EPA. She has issued no instructions, orders, or guidance for subordinate to comply with Section 321(a) or ensure that others do so. In short, unlike most cases involving statutory nondiscretionary duties, the Administrator is the only person with actual responsibility to comply with Section 321(a). Consequently, like the government official in **American Broadcasting Companies**, *supra,* the Administrator's personal responsibility for compliance with Section 321(a) makes her uniquely involved in this litigation.

Second, the Government itself has said that she has personally been involved with discussions about Section 321(a). United States' Objections and First Supplemental Responses to Plaintiffs' First Set of Discovery Requests, June 12, 2015 Supplemental Response to Interrogatory No. 9 (responding that the Administrator and her staff have discussed Section 321(a) with three individuals).

Third, in her communications with Congress, Ms. McCarthy has discussed § 321(a). In a letter to Senator Orrin Hatch and other Senators dated October 26, 2009, Ms. McCarthy, then Assistant Administrator, responding to a request for the results of continuing Section 321(a) evaluation of potential loss or shift of employment which may result from the suite of regulations the U.S. EPA has proposed or finalized, stated that "EPA has not conducted a section 321 investigation of its greenhouse gas actions." [Docs. 157-3, 157-4, 157-5, 157-6, 157-7].

In a letter to Congressman Greg Walden and other Congressmen dated January 12, 2010, and the answers appended thereto, Ms. McCarthy, then Assistant Administrator, in

response to the question, "With regard to Section 321 of the Clean Air Act, does EPA comply with this provision? If yes, how does EPA comply? If no, please explain," provided the following answer:

> CAA section 321 authorizes the Administrator to investigate, report and make recommendations regarding concerns raised by employers or employees that requirements under the Clean Air Act will adversely affect employment. Section 321(a) provides for "continuing evaluations potential loss or shifts of employment which may result from the administration or enforcement of the provision of the Act and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administrative enforcement." . . .
>
> CAA section 321 was added in the 1977 CAA Amendments. Both the House and Senate Committee Reports for the 1977 amendments describe the purpose of section 321 as addressing situations where employers make allegations that environmental regulations will jeopardize employment possible in order to stimulate union or other public opposition to environmental regulations. The section was intended to create a mechanism to investigate and resolve those allegations. The section was also designed to provide individual employees whose job was threatened or lost allegedly due to environmental regulations with a mechanism to have EPA investigate those allegations. The committee reports do not describe the provision as applying broadly to all regulations or implementation plans under the CAA.
>
> In keeping with congressional intent, EPA has not interpreted CAA

11

section 321 to require EPA to conduct employment investigations in taking regulatory actions. Conducting such investigations as part of rulemakings would have limited utility since section 321(d) expressly prohibits EPA (or the States, in case of applicable implementation plans) from "modifying or withdrawing any requirement imposed or proposed to be imposed under the Act" on the basis of such investigations. As noted above, section 321 was instead intended to protect employees in individual companies by providing a mechanism for EPA to investgate allegations - typically made by employers - that specific requirements, including enforcement actions, as applied to those individual companies, would result in layoffs.[2]

[Docs. 157-8, 157-9].

In a letter to Congressman Joe Barton and another Congressman dated August 3, 2010, Ms. McCarthy, then Assistant Administrator, stated that no analysis of potential employment impacts of the ozone NAAQS (National Ambient Air Quality Standards) was conducted. [Doc. 157-10].

In a letter to Congressman Darrell Issa dated June 22, 2011, and the answers appended thereto, Ms. McCarthy, then Assistant Administrator, included the following:

Section 321 of the Clean Air Act authorizes the Administrator to investigate, report and make recommendations regarding employer or employee concerns that requirements under the Clean Air Act will adversely affect

---

[2] While a masterpiece of wholly unresponsive "government-speak," this Court takes the response as an admission that as of January 12, 2010, the EPA had conducted NO section 321 investigations.

12

employment.  Section 321(a) provides for "continuing evaluations potential loss or shifts of employment which may result from the administration or enforcement of the provision of the Act and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administrative enforcement." . . .

Section 321 was added in the 1977 CAA Amendments.  Both the House and Senate Committee Reports for the 1977 amendments describe the purpose of section 321 as addressing situations where employers make allegations that environmental regulations will jeopardize employment possible in order to stimulate union or other public opposition to environmental regulations.  The section was intended to create a mechanism to investigate and resolve those allegations.  The section was also designed to provide individual employees whose jobs were threatened or lost allegedly due to environmental regulations with a mechanism to have EPA investigate those allegations.  The legislative history makes clear that Congress intended to provide a mechanism to respond to specific allegations in particular cases:

> "In any particular case in which a substantial job loss is threatened, in which a plant closing is blamed on Clean Air Act requirements, or possible new construction is alleged to have been postponed or prevented by such requirements, the committee recognizes the need to determine the truth of these allegations.  For this reason, the committee agreed to section

> 304 of the bill [which became section 321 of the Act], which establishes a mechanism for determining the accuracy of any such allegation." H.R. Rep. 95-294, at 317; *see also* S. Rep. 95-127, at 1474-76.
>
> The committee reports do not describe the provision as applying broadly to all regulations or implementation plans under the CAA.
>
> In keeping with congressional intent, EPA has not interpreted section 321 to require the Agency to conduct employment investigations in taking regulatory actions. Conducting such investigations as part of rulemakings would have limited utility since section 321(d) expressly prohibits EPA (or the States, in case of applicable implementation plans) from "modifying or withdrawing any requirement imposed or proposed to be imposed under the Act" on the basis of such investigations. As noted above, section 321 was instead intended to protect employees in individual companies by providing a mechanism for EPA to investigate allegations - typically made by employers - that specific requirements, including enforcement actions, as applied to those individual companies, would result in layoffs. The EPA has not received any request for any such investigation with regard to its GHG [Green House Gas] regulations.[3]

[Doc. 157-11].

---

[3] Again, a masterpiece of wholly unresponsive "government-speak," which this Court takes the response as an admission that as of June 22, 2011, the EPA had conducted NO section 321 investigations.

In a letter to Senator Vitter dated March 6, 2012, and the answers appended thereto, Ms. McCarthy, then Assistant Administrator, in response to the request, "Please provide the results of your continuing Section 321(a) evaluation of potential loss or shifts of employment which may result from the suite of regulations EPA has proposed or finalized that address CSAPR and Utility MACT under provisions of the Clean Air Act, including threatened plant closures or reductions in employment that may result from the administration or enforcement of such regulations. As you know, Section 321(a) of the Act (42 U.S.C. § 7621(a)) states: The Administrator shall conduct continuing evaluations potential loss or shifts of employment which may result from the administration or enforcement of the provision of the Act and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement, stated:

> Clean Air Act section 321 does not require the EPA to provide any further employment impact analyses of the clean air rules. In keeping with congressional intent, EPA has not interpreted section 321 to require the EPA to conduct employment investigations in taking regulatory actions. Conducting such investigations as part of rulemakings would have limited utility since section 321(d) expressly prohibits EPA (or the States, in case of applicable implementation plans) from "modifying or withdrawing any requirement imposed or proposed to be imposed under the Act" on the basis of such investigations. Section 321 was instead intended to protect employees in individual companies by providing a mechanism for EPA to investigate allegations - typically made by employers - that specific

15

requirements, including enforcement actions, as applied to those individual companies, would result in layoffs. The EPA has not received any request for any such investigation with regard to these regulations.

[Doc. 157-12].

In the hearing on the nomination of Ms. McCarthy to be Administrator of the EPA, in the written comments by Senator Vitter, Ms. McCarthy was asked whether the EPA had ever investigated a plant closure or reduction in employment to see what role, if any, the administration or enforcement of the Clean Air Act played. Her response was:

> CAA section 321 authorizes the Administrator to investigate, report and make recommendations regarding employer or employee allegations that requirements under the Clean Air Act will adversely affect employment. In keeping with congressional intent, EPA has not interpreted this provision to require EPA to conduct employment investigations in taking regulatory actions. Section 321 was instead intended to protect employees in individual companies by providing a mechanism for EPA to investigate allegations that specific requirements, including enforcement actions, as applied to those individual companies, would result in layoffs. EPA has found no records indicating that any Administration since 1977 has interpreted section 321 to require job impacts analysis for rulemaking actions. . .. The Agency could not find any records of any requests for section 321 investigation of job losses alleged to be related to regulation-induced plant closure.

[Doc. 157-13, p. 5].

In the written comments by Senator Inhofe, Ms. McCarthy was asked as follows:

16

Section 321

Section 321 of the Clean Air Act (42 U.S.C. § 7621) requires the Administrator to "conduct continuing evaluations potential loss or shifts of employment" which may result from the administration or enforcement of regulations issued under the Act, "including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement." Most other major environmental statutes contain similar language to Section 321.

17. Inhofe 17. Do you believe the Agency has an obligation to conduct continuing evaluations of the impact its regulations could have on jobs?

> CAA section 321 authorizes the Administrator to investigate, report and make recommendations regarding employer or employee concerns that requirements under the Clean Air Act will adversely affect employment. In keeping with congressional intent, EPA has not interpreted this provision to require EPA to conduct employment investigations in taking regulatory actions. Section 321 consistently has been interpreted by EPA to provide a mechanism for investigating specific allegations by particular employers or employees that specific requirements applied to individual companies would result in layoffs. EPA has found no records indicating that any Administration since 1977 has interpreted section 321 to require job impacts analysis for rulemaking actions.

[Doc. 157-13].

In a series of emails collected as Document 157-14, the contributors agree that no analyses under the authority of Section 321 of the Clean Air Act have ever been performed

17

by EPA.

In response to a Freedom of Information request made by William Kovacs of the U.S. Chamber of Commerce on September 14, 2012, seeking records pertaining to all draft, interim final and final reports and/or evaluations prepared by the EPA pursuant to section 321 of the Clean Air Act, the EPA responded:

> After conducting searches, neither the Office of Air and Radiation nor the
> Office of Policy were able to find any documents pertaining to your request.

[Doc. 157-16].

Finally, in the United States' Response to Plaintiffs' Second Set of Discovery Requests, the EPA states that "the United States has conceded both that 'it did not interpret Section 321(a) as imposing a non-discretionary duty until this Court so held on September 16, 2014' and that 'none of the documents upon which it relies to demonstrate its performance of the duty in Section 321(a) were prepared explicitly for that purpose or labeled as Section 321(a) evaluations." [Doc. 157-18].

The fair reading of these statements, many of which were made by Administrator McCarthy, is that the EPA has never made any evaluations of job losses under § 321(a). This is directly contrary to the position of the EPA in this case. In its Memorandum in Support of the United States' Motion for Summary Judgment [Doc. 76], the EPA states: "EPA is entitled to summary judgment because it has conducted 'continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provision of this chapter and applicable implementation plans,' as required by Section 321(a) of the Clean Air Act ("CAA" or the "Act"), 42 U.S.C § 7621(a)."

The plaintiffs are entitled to explore these divergent positions. The Administrator

clearly has personal knowledge of the facts, the dichotomy in positions constitutes extraordinary circumstances, and the apparent refusal of the Administrator to comply with the terms of Section 321(a) provides sufficient prima facie evidence of wrongdoing such that the plaintiffs will be able to probe her deliberative processes. Finally, this Court finds that there is no viable alternative to the deposition of the Administrator.

With respect to the Motion to Stay, this Court will order that the deposition of Ms. McCarthy may not be taken prior to December 4, 2015.[4]

For the reasons stated above, the United States' Emergency Motion for Protective Order Precluding the Deposition of EPA Administrator McCarthy [**Doc. 147**] is **DENIED**. The United States' Motion to Stay Administrator McCarthy's Deposition [**Doc. 155**] is **DENIED**. This Court will, however, stay the deposition of Administrator McCarthy until December 4, 2015.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** November 12, 2015.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

---

[4] Inasmuch as the defendant has filed a separate mandamus proceeding with the United States Court of Appeals for the Fourth Circuit, No. 15-2390, and imposed a deadline of November 20, 2015, the stay granted should be sufficient.