**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

MURRAY ENERGY CORPORATION, et al.,   )
                                            )
      Plaintiffs,                        )
                                            )
      v.                              )     **Civil Action No. 5:14-CV-00039**
                                            )     **Judge Bailey**
GINA McCARTHY, Administrator,       )
UNITED STATES ENVIRONMENTAL    )
PROTECTION AGENCY, acting in her    )
official capacity,                     )
                                            )
      Defendants.                 )
_____)

**[REDACTED] MEMORANDUM IN SUPPORT OF THE UNITED STATES'
NEW MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................v

INDEX OF EXHIBITS .....................................................................................................x

INTRODUCTION ..............................................................................................................1

STATUTORY BACKGROUND .........................................................................................2

STANDARD OF REVIEW .................................................................................................2

     A.    Rule 56(c) Motion for Summary Judgment ...........................................2

     B.    Plaintiffs Bear the Burden of Demonstrating Standing ...........................3

     C.    Scope of Review for Alleged Failure to Perform a
          Non-Discretionary Duty.........................................................................3

BACKGROUND ...............................................................................................................4

     A.    Procedural History ................................................................................4

     B.    Statement of Facts ................................................................................7

          1.    Discovery of EPA .....................................................................7

          2.    Discovery of Plaintiffs .............................................................8

               a.    Plaintiffs' Finances, Recent Acquisitions, and
                    Associated Credit Downgrades.....................................8

               b.    Plaintiffs' Alleged Reduced Market for Coal ...............11

               c.    Causes of the Alleged Reduced Market for
                    Coal, Loss of Coal Jobs, and Closure of Coal Mines ...................12

               d.    Plaintiffs' Knowledge and Contentions Regarding
                    EPA's RIAs.................................................................17

          3.    EPA's Continuing Evaluations of
               Potential Employment Impacts .................................................18

ARGUMENT ...................................................................................................................20

I.     SECTION 321(A) DOES NOT IMPOSE A
      NON-DISCRETIONARY DUTY ON EPA. .................................................20

II.    THIS COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE
       PLAINTIFFS HAVE FAILED TO DEMONSTRATE ARTICLE III STANDING
       TO CHALLENGE EPA'S ALLEGED NON-PERFORMANCE OF THE
       EVALUATIONS DESCRIBED IN SECTION 321(A). ...................................................22

       A.    Plaintiffs Have Not Demonstrated a Concrete, Particularized Injury. .................23

       B.    Plaintiffs' Alleged Economic Injury Is Not Fairly
             Traceable to EPA's Alleged Non-Performance of the
             Evaluations Described in Section 321(a). .............................................................24

       C.    Plaintiffs Have Not Demonstrated That Their Alleged
             Injury Will Likely Be Redressed by an Order From This Court. .........................28

       D.    Plaintiffs Have Not Demonstrated an Informational or
             Procedural Injury Fairly Traceable to EPA's Alleged
             Non-Performance of the Evaluations Described in
             Section 321(a) That Is Likely to Be Redressed by This Court. ...........................30

III.   THE AGENCY HAS PERFORMED THE EVALUATIONS
       DESCRIBED IN SECTION 321(a) AS A MATTER OF LAW. .....................................32

       A.    EPA Has Conducted Continuing Evaluations of Potential Loss
             or Shifts of Employment That May Result from the
             Administration and Enforcement of the Act and
             Applicable Implementation Plans. .......................................................................32

             1.    EPA Has Evaluated the Employment Impacts
                   That May Result From the Agency's Administration
                   and Enforcement of Specific Regulations and
                   Implementation Plans. ..............................................................................33

             2.    EPA Has Conducted Evaluations of the Overall
                   Employment Impact of Its Administration and
                   Enforcement of the Act. ............................................................................39

             3.    EPA Is Continuing to Evaluate the Employment Impacts
                   That May Result From Its Administration and
                   Enforcement of the Act. ............................................................................41

       B.    Employment Evaluations Need Not Be Labeled as "Section 321(a)"
             Evaluations to Constitute Performance of Any Duty in Section 321(a). ..............44

       C.    The Sufficiency of EPA's Evaluations Is Not Before This Court. .......................45

IV.    IF THE COURT FINDS THAT EPA VIOLATED A DUTY
       FOUND IN SECTION 321(a), THEN IT SHOULD ENTER
       JUDGMENT AGAINST EPA AND ORDER EPA TO PERFORM
       THAT DUTY AND NOTHING MORE. ........................................................................46

CONCLUSION.........................................................................................................................49

# TABLE OF AUTHORITIES

## CASES

*Alaska Ctr. for the Env't v. Browner*,
   20 F.3d 981 (9th Cir. 1994) ................................................................................ 33, 45

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................ 3

*Beller v. Middendorf*,
   632 F.2d 788 (9th Cir. 1980) ................................................................................ 48

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................... 3, 46, 48

*Bensman v. U.S. Forest Serv.*,
   408 F.3d 945 (7th Cir. 2005) ................................................................................ 31

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................................... 3, 24

*City of Las Vegas v. Clark Cty.*,
   755 F.2d 697 (9th Cir. 1985) ................................................................................ 46

*Coal. for Responsible Regulation, Inc. v. EPA*,
   684 F.3d 102 (D.C. Cir. 2012) ...................................................................... 29, 30

*Common Cause v. Dep't of Energy*,
   702 F.2d 245 (D.C. Cir. 1983) ...................................................................... 26, 27

*Cross Timbers Concerned Citizens v. Saginaw*,
   991 F. Supp. 563 (N.D. Tex. 1997) ...................................................................... 21

*Defenders of Wildlife v. Browner*,
   888 F. Supp. 1005 (D. Ariz. 1995) ....................................................................... 21

*Envtl. Def. v. EPA*,
   Civil No. 08-6254 (RMB), 2009 U.S. Dist. LEXIS 2747 (N.D. Cal. Jan 12, 2007) ................ 21

*Envtl. Def. Fund v. Thomas*,
   870 F.2d 892 (2d Cir. 1989) ................................................................................. 21

*EPA v. Nat'l Crushed Stone Ass'n,*
   449 U.S. 64 (1980) ................................................................ 49

*Fayetteville Investors v. Commercial Builders, Inc.,*
   936 F.2d 1462 (4th Cir. 1991) ................................................ 20

*Fla. Audubon Soc'y v. Bentsen,*
   94 F.3d 658 (D.C. Cir. 1996) ................................................. 30

*Frank Krasner Enters.v. Montgomery Cty., Md.,*
   401 F.3d 230 (4th Cir. 2005) ................................................. 26

*Frey v. EPA,*
   751 F.3d 461 (7th Cir. 2014), *cert. denied,* 135 S. Ct. 494 (2014) ............... 3, 33, 46

*Friends for Ferrell Parkway, LLC v. Stasko,*
   282 F.3d 315 (4th Cir. 2002) ................................................. 23, 28

*In re McCarthy,*
   No. 15-2390, 2015 WL 8286143 (4th Cir. Dec. 9, 2015) ............... 6, 32. 33, 45

*In re Murray Energy Corp.,*
   788 F.3d 330 (D.C. Cir. 2015) ............................................... 48

*Kennecott Copper Corp. v. Costle,*
   572 F.2d 1349 (9th Cir. 1978) ............................................... 22

*Laing v. Fed. Express Corp.,*
   703 F.3d 713 (4th Cir. 2013) ................................................ 3

*Lane v. Holder,*
   703 F.3d 668 (4th Cir. 2012), *cert. denied,* 134 S. Ct. 1273 (2014) ............... 26

*Lane v. Pena,*
   518 U.S. 187 (1996) ......................................................... 47

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ................................................. 3, 23, 25, 27, 28

*Maine v. Thomas,*
   874 F.2d 883 (1st Cir. 1989) ................................................ 21

*Marshall v. Meadows,*
   105 F.3d 904 (4th Cir. 1997) ................................................ 26

*McMellon v. United States,*
　387 F.3d 329 (4th Cir. 2004) ...................................................................................... 47

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n,*
　453 U.S. 1 (1981) ................................................................................................... 47, 48

*Mirant Potomac River, LLC v. EPA,*
　577 F.3d 223 (4th Cir. 2009) ...................................................................................... 26

*Monongahela Power Co. v. Reilly,*
　980 F.2d 272 (4th Cir. 1992) .............................................................................. 3, 22, 46

*N.Y. Reg'l Interconnect, Inc. v. FERC,*
　634 F.3d 581 (D.C. Cir. 2011) .................................................................................... 30

*Pa. Dep't of Envtl. Res. v. EPA,*
　618 F.2d 991 (3d Cir. 1980) ....................................................................................... 46

*Pancakes, Biscuits & More, LLC v. Pendleton Cty. Comm'n,*
　996 F. Supp. 2d 438 (N.D. W. Va. 2014) ................................................................... 49

*Rhodes v. E.I. du Pont de Nemours & Co.,*
　636 F.3d 88 (4th Cir. 2011) .......................................................................................... 3

*San Diego Gun Rights Comm. v. Reno,*
　98 F.3d 1121 (9th Cir. 1996) ...................................................................................... 26

*Scott v. City of Hammond,*
　741 F.2d 992 (7th Cir. 1984) ...................................................................................... 46

*Sierra Club v. Browner,*
　130 F. Supp. 2d 78 (D.D.C. 2001), *aff'd,* 285 F.3d 63 (D.C. Cir. 2002) ........................... 44, 47

*Sierra Club v. Johnson,*
　No. C 08-01409 WHA, 2009 U.S. Dist. LEXIS 68436 (N.D. Cal. Aug. 5, 2009) ................ 21

*Sierra Club v. Thomas,*
　828 F.2d 783 (D.C. Cir. 1987) ............................................................................... 21, 46

*Steel Co. v. Citizens for a Better Env't,*
　523 U.S. 83 (1998) .................................................................................................. 3, 22

*Stephens v. Cty. of Albemarle,*
　524 F.3d 485 (4th Cir. 2008) ........................................................................................ 3

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................ 24

*Sun Enters. v. Train*,
    532 F.2d 280 (2d Cir. 1976) ..................................................................... 46

*United States v. Hoechst Celanese Corp.*,
    128 F.3d 216 (4th Cir. 1997) ..................................................................... 2

*United States v. Kubrick*,
    444 U.S. 111 (1979) ................................................................................. 47

*United States v. Nordic Village*,
    503 U.S. 30 (1992) ................................................................................... 47

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ................................................................................. 48

*United States v. Sherwood*,
    312 U.S. 584 (1941) ................................................................................. 47

*Utility Air Regulatory Grp. v. EPA*,
    134 S. Ct. 2427 (2014) ............................................................................. 29

*Venkatraman v. REI Systems, Inc.*,
    417 F.3d 418 (4th Cir. 2005) ................................................................... 48

*Virginian R. Co. v. Railway Employees*,
    300 U.S. 515 (1937) ................................................................................. 48

*Wilmington Sav. Fund Soc'y FSB v. Foresight Energy, LLC, et al.*,
    C.A. No. 11059-VCL (Del. Ct. Chancery Dec. 4, 2015) ......................... 10

*Zen-Noh Grain Corp. v. Jackson*,
    943 F. Supp. 2d 657 (E.D. La. 2013) ....................................................... 21

## STATUTES

5 U.S.C. § 552 ................................................................................................ 5

33 U.S.C. § 1251 *et seq.* ............................................................................. 16

42 U.S.C. §§ 7401-7671q ............................................................................ 2

42 U.S.C. § 7401(b)(1) ................................................................................ 2

42 U.S.C. § 7407(d) ............................................................................................ 34

42 U.S.C. § 7502(c) ............................................................................................ 34

42 U.S.C. § 7513a ............................................................................................... 34

42 U.S.C. § 7514a ............................................................................................... 34

42 U.S.C. § 7604(a) ............................................................................................. 2

42 U.S.C. § 7604(a)(2) ................................................................................ 2, 4, 47

42 U.S.C. § 7607(b) ............................................................................................ 48

42 U.S.C. § 7617 ................................................................................................ 19

42 U.S.C § 7621(a) ..................................................................................... 1, 2, 7, 32

42 U.S.C. § 7621(d) ................................................................................... 2, 31, 49

42 U.S.C. § 9659 .................................................................................................. 3

42 U.S.C. § 9659(a)(2) ....................................................................................... 46

## RULES

Fed. R. Civ. P. 30(b)(6) ...................................................................................... 7

Fed. R. Civ. P. 56(c) ........................................................................................... 2

## FEDERAL REGISTER

58 Fed. Reg. 51,735 (Oct. 4, 1993) .............................................................. 18, 19

74 Fed. Reg. 6113 (Feb. 4, 2009) ...................................................................... 18

76 Fed. Reg. 3821 (Jan. 21, 2011) ..................................................................... 18

77 Fed. Reg. 9304 (Feb. 16, 2012) ..................................................................... 12

79 Fed. Reg. 6899 (Feb. 5, 2014) ...................................................................... 43

## LEGISLATIVE HISTORY

H.R. Rep. 95-294 (1977) ..................................................................................... 49

# INDEX OF EXHIBITS

| Exhibit | Document | Sealed / Redacted |
|---|---|---|
| A | Excerpted Dep. Tr. Darryl Weatherhead (Oct. 15, 2015) | |
| B | Excerpted Dep. Tr. Albert McGartland (Nov. 5, 2015) | |
| C | Excerpted Dep. Tr. James DeMocker (Apr. 5, 2016) | |
| D | Excerpted Dep. Tr. Ann Ferris (Nov. 4, 2015) | |
| E | Excerpted Dep. Tr. Ronald Evans (Oct. 16, 2015) | |
| F | Pls.' Initial Disclosures (Nov. 19, 2014) | |
| G | Pls.' Revised Initial Disclosures (Mar. 4, 2016) | |
| H | Presentation of Robert E. Murray Chairman, President and Chief Exec. Officer Murray Energy Corp., The New York Coal Trade Association (Mar. 30, 2007) | |
| I | Excerpt from Murray Energy Corp., Annual Report (Dec. 31, 2009) | Sealed |
| J | Excerpt from Murray Energy Corp., Annual Report (Dec. 31, 2015) | Sealed |
| K | Excerpted Dep. Tr. Robert Eugene Murray (Mar. 31, 2016) | Sealed |
| L | Moody's Investors Service, *Rating Action: Moody's downgrades Murray Energy to Caa1, outlook negative* (Nov. 19, 2015) | |
| M | Slip op., *Wilmington Sav. Fund Soc'y FSB v. Foresight Energy, LLC, et al.*, C.A. No. 11059-VCL, 23 (Del. Ct. Chancery Dec. 4, 2015) | |
| N | Moody's Investors Service, *Rating Action: Moody's downgrades Murray Energy to Ca, outlook stable* (Feb. 26, 2016) | |
| O | Excerpted Dep. Tr. Pls.' Rule 30(b)(6) Witness Ryan Murray (Apr. 7, 2016) | Partially redacted |
| P | United States' First Set of Disc. Requests (Aug. 26, 2015) | |
| Q | Pls.' Answers to the United States' First Set of Disc. Requests (Nov. 9, 2015) | |
| R | Excerpted Dep. Tr. Paul Piccolini (Mar. 30, 2016) | |
| S | U.S. Energy Info. Admin., *Natural gas expected to surpass coal in mix of fuel used for U.S. power generation in 2016* (Mar. 16, 2016) | |
| T | Email from Robert Moore to Bob Murray re AEP / Ohio Shipments / TACC Shipments (Mar. 21, 2009, 10:33:50) | Sealed |
| U | Excerpted Dep. Tr. Robert Edward Murray (Apr. 1, 2016) | |
| V | Marshall County Coal Co., *Awareness Meeting Marshall County Mine* | Sealed |
| W | Presentation of Robert E. Murray Chairman, President and Chief Exec. Officer Murray Energy Corp., Does the West Virginia Government Want to Retain What Is Left of the State's Coal Industry and the Jobs In It? (Jan. 27, 2016) | |
| X | Alex Wiederspiel, *Murray Energy CEO livid over mine idling and severance taxes*, MetroNews (Feb. 25, 2016) | |

| Y | Presentation of Robert E. Murray Chairman, President and Chief Exec. Officer Murray Energy Corp., Before the Republican Attorneys General Association Summer National Meeting (Aug. 2, 2015) | Sealed |
| Z | Excerpted Dep. Tr. Michael T.W. Carey (Mar. 29, 2016) | |
| AA | Updated Decl. of James B. DeMocker in Support of the United States' New Motion for Summary Judgment (Apr. 29, 2016) | |
| 1 | EPA, *Regulatory Impact Analysis for the Proposed Carbon Pollution Guidelines for Existing Power Plants and Emission Standards for Modified and Reconstructed Power Plants* (June 2014) | |
| 2 | EPA, *Regulatory Impact Analysis for the Carbon Pollution Emission Guidelines Supplemental Proposal* (Oct. 28, 2014) | |
| 3 | EPA, *Regulatory Impact Analysis for the Clean Power Plan Final Rule* (Aug. 2015) | |
| 4 | EPA, *Regulatory Impact Analysis for the Proposed Federal Plan Requirements for Greenhouse Gas Emissions from Electric Utility Generating Units Constructed on or before January 8, 2014; Model Trading Rules; Amendments to Framework Regulations* (Aug. 2015) | |
| 5 | EPA, *Regulatory Impact Analysis for the Proposed Standards of Performance for Greenhouse Gas Emissions for New Stationary Sources: Electric Utility Generating Units* (Mar. 2012) | |
| 6 | EPA, *Regulatory Impact Analysis for the Proposed Standards of Performance for Greenhouse Gas Emissions for New Stationary Sources: Electric Utility Generating Units* (Sept. 2013) | |
| 7 | EPA, *Regulatory Impact Analysis for the Final Standards of Performance for Greenhouse Gas Emissions from  for New, Modified and Reconstructed Stationary Sources Electric Utility Generating Units* (Aug. 3, 2015) | |
| 8 | EPA, *Regulatory Impact Analysis of the Proposed Toxics Rule: Final Report* (Mar. 2011) | |
| 9 | EPA, *Regulatory Impact Analysis for the Final Mercury and Air Toxics Standards* (Dec. 2011) | |
| 10 | EPA, *Regulatory Impact Analysis: National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial, and Institutional Boilers and Process Heaters* (Draft Report Apr. 2010) | |
| 11 | EPA, *Regulatory Impact Analysis:  National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial, and Institutional Boilers and Process Heaters* (Feb. 2011) | |
| 12 | Memorandum from T. Walton, EPA, to B. Shrager, EPA, Regarding Regulatory Impact Results for the Reconsideration Proposal for National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial, and Institutional Boilers and Process Heaters at Major Sources (Dec. 1, 2011) | |
| 13 | Memorandum from T. Walton, EPA, to J. Eddinger, EPA, Regarding Regulatory Impact Results for the Reconsideration Final Rule for National Emission Standards for Hazardous Air Pollutants for | |

| | | |
|---|---|---|
| | Industrial, Commercial, and Institutional Boilers and Process Heaters at Major Sources (Dec. 19, 2012) | |
| 14 | EPA, *Regulatory Impact Analysis: Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Commercial and Industrial Solid Waste Incineration Units* (Draft Report Apr. 2010) | |
| 15 | EPA, *Regulatory Impact Analysis: Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Commercial and Industrial Solid Waste Incineration Units* (Feb. 2011) | |
| 16 | Memorandum from T. Walton, EPA, to T. Jones, EPA, Regarding Regulatory Impact Results for the Reconsideration Proposal for Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Commercial and Industrial Solid Waste Incineration Units (Nov. 7, 2011) | |
| 17 | Memorandum from T. Walton, EPA, to T. Jones, EPA, Regarding Regulatory Impact Results for the Reconsideration Final Rule for Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Commercial and Industrial Solid Waste Incineration Units (Dec. 20, 2012) | |
| 18 | EPA, *Regulatory Impact Analysis, Proposed New Source Performance Standards and Amendments to the National Emissions Standards for Hazardous Air Pollutants for the Oil and Natural Gas Industry* (July 2011) | |
| 19 | EPA, *Regulatory Impact Analysis, Final New Source Performance Standards and Amendments to the National Emissions Standards for Hazardous Air Pollutants for the Oil and Natural Gas Industry* (Apr. 2012) | |
| 20 | EPA, *Regulatory Impact Analysis of the Proposed Emission Standards for New and Modified Sources in the Oil and Natural Gas Sector* (Aug. 2015) | |
| 21 | EPA, *Proposed Revisions to the Emission Guidelines for Existing Sources and Supplemental Proposed New Source Performance Standards in the Municipal Solid Waste Landfills Sector* (Aug. 2015) | |
| 22 | EPA, *Regulatory Impact Analysis for the Federal Implementation Plans to Reduce Interstate Transport of Fine Particulate Matter and Ozone in 27 States; Correction of SIP Approvals for 22 States* (June 2011) | |
| 23 | EPA, *RIA for the Proposed Cross-State Air Pollution Rule (CSAPR) Update for 2008 Ozone National Ambient Air Quality Standards (NAAQS)* (Nov. 2015) | |
| 24 | EPA, *Draft Regulatory Impact Analysis: Tier 3 Motor Vehicle Emission and Fuel Standards* (Mar. 2013) | |
| 25 | EPA, *Regulatory Impact Analysis, Control of Air Pollution from Motor Vehicles: Tier 3 Motor Vehicle Emission and Fuel Standards Final Rule* (Mar. 2014) | |

| | | |
|---|---|---|
| 26 | EPA, *Regulatory Impact Analysis: Final Rulemaking for 2017-2025 Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards* (Aug. 2012) | |
| 27 | EPA, *Regulatory Impact Analysis of the Proposed Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone* (Nov. 2014) | |
| 28 | EPA, *RIA for the Final Revisions to the National Ambient Air Quality Standard (NAAQS) for Ground-Level Ozone* (Sept. 2015) | |
| 29 | EPA, *Regulatory Impact Analysis: Proposed Brick and Structural Clay Products National Emissions Standards for Hazardous Air Pollutants* (July 2014) | |
| 30 | EPA, *Regulatory Impact Analysis: Final  Brick and Structural Clay Products National Emissions Standards for Hazardous Air Pollutants* (July 2015) | |
| 31 | EPA, *Regulatory Impact Analysis: Amendments to the National Emission Standards for Hazardous Air Pollutants and New Source Performance Standards (NSPS) for the Portland Cement Manufacturing Industry* (Aug. 2010) | |
| 32 | EPA, *Regulatory Impact Analysis, Petroleum Refineries New Source Performance Standards Ja* (June 2012) | |
| 33 | EPA, *Economic Impact Analysis Petroleum Refineries Proposed Amendments to the National Emissions Standards for Hazardous Air Pollutants and New Source Performance Standards* (Feb. 2014) | |
| 34 | EPA & Nat'l Highway Traffic Safety Admin., U.S. Dep't of Transp., *Regulatory Impact Analysis, Final Rulemaking to Establish Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles* (Aug. 2011) | |
| 35 | EPA, *Proposed Rulemaking for Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2* (July 2015) | |
| 36 | EPA, *Regulatory Impact Analysis: Proposed National Emission Standards for Hazardous Air Pollutants (NESHAP) for Mercury Emissions from Mercury Cell Chlor Alkali Plants* (Nov. 2010) | |
| 37 | EPA, *Regulatory Impact Analysis: Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Sewage Sludge Incineration Units* (Draft Report Sept. 2010) | |
| 38 | EPA, *Cost and Benefit Changes Since Proposal for Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Sewage Sludge Incineration Units* (Jan. 2011) | |
| 39 | EPA, *Regulatory Impact Analysis (RIA) for the Proposed Manganese Ferroalloys RTR* (Nov. 2011) | |
| 40 | EPA, *Economic Impact Analysis (EIA) for the Manganese Ferroalloys RTR Supplemental Proposal Final Report* (Sept. 2014) | |
| 41 | EPA, *Economic Impact Analysis (EIA) for the Manganese Ferroalloys RTR* (May 2015). | |

| | | |
|---|---|---|
| 42 | EPA, *Regulatory Impact Analysis (RIA) for Proposed Reconsideration Existing Stationary Spark Ignition RICE NESHAP* (Final Report May 2012) | |
| 43 | EPA, *Regulatory Impact Analysis (RIA) for Reconsideration of Existing Stationary Spark Ignition (SI) RICE NESHAP* (Final Report Jan. 2013) | |
| 44 | EPA, *Regulatory Impact Analysis (RIA) for Proposed Reconsideration of Existing Stationary Compression Ignition (CI) Engines NESHAP* (Final Report May 2012) | |
| 45 | EPA, *Regulatory Impact Analysis (RIA) for the Reconsideration of the Existing Stationary Compression Ignition (CI) Engines NESHAP* (Final Report Jan. 2013) | |
| 46 | EPA, *Regulatory Impact Analysis (RIA) for Proposed Residential Wood Heaters NSPS Revision* (Final Report Jan. 2014) | |
| 47 | EPA, *Regulatory Impact Analysis (RIA) for Residential Wood Heaters NSPS Revision* (Final Report Feb. 2015) | |
| 48 | EPA, *Regulatory Impact Analysis for the Proposed Revisions to the National Ambient Air Quality Standards for Particulate Matter* (June 2012) | |
| 49 | EPA, *Regulatory Impact Analysis for the Final Revisions to the National Ambient Air Quality Standards for Particulate Matter* (Dec. 2012) | |
| 50 | EPA, *Empirical Evidence Regarding the Effects of the Clean Air Act on Jobs and Economic Growth* (2011) | |
| 51 | EPA, *Impacts of the Acid Rain Program on Coal Industry Employment* (Mar. 2001) | |
| 52 | EPA, *The Benefits and Costs of the Clean Air Act: 1970-1990* (Oct. 1997) | |
| 53 | Dale W. Jorgenson, Richard J. Goettle, Daniel E. Gaynor, Peter J. Wilcoxen, & Daniel T. Slesnick, *The Clean Air Act and the U.S. Economy: Final Report of Results and Findings* (Aug. 1993) | |
| 54 | EPA, *The Benefits and Costs of the Clean Air Act: 1990-2010* (Nov. 1999) | |
| 55 | Dale W. Jorgenson & Richard J. Goettle, *An Economic Analysis of the Benefits and Costs of the Clean Air Act 1970 to 1990: Revised Report of Results and Findings* (Aug. 2001) | |
| 56 | EPA, *Guidelines for Preparing Economic Analyses* (Dec. 17, 2010, updated May 2014) | |
| 57 | Cary Coglianese et al., Preface to *Does Regulation Kill Jobs?* (2013) | |
| 58 | Wayne B. Gray & Ronald J. Shadbegian, *Do the Job Effects of Regulation Differ with the Competitive Environment?* Ch. 3 to *Does Regulation Kill Jobs?* (2013) | |
| 59 | Rolf Fare, Shawna Grosskopf, Carl A. Pasurka, Jr., & Ronald J. Shadbegian, *Environmental Regulatory Rigidity and Employment in the Electric Power Sector,* Ch. 5 to *Does Regulation Kill Jobs?* (2013) | |

| 60 | Ann E. Ferris & Al McGartland, *A Research Agenda for Improving the Treatment of Employment Impacts in Regulatory Impact Analysis,* Ch. 9 to *Does Regulation Kill Jobs?* (2013) | |
| 61 | Ann E. Ferris, Ronald J. Shadbegian & Ann Wolverton, *The Effect of Environmental Regulation on Power Sector Employment: Phase I of the Title IV SO$_2$ Trading Program* (Dec. 2014) | |
| 62 | Wayne Gray, Ronald J. Shadbegian, Chunbei Wang & Merve Meral, *Do EPA Regulations Affect Labor Demand? Evidence from the Pulp and Paper Industry* (2014). | |
| 63 | Memorandum from Al McGartland, Director, National Center for Environmental Economics, Office of Policy, EPA to Holly Stallworth, Designated Federal Office, Science Advisory Board Staff Office, EPA, Regarding Transmittal of Charge to the Science Advisory Board Advisory Panel on Economy-Wide Modeling of the Benefits and Costs of Environmental Regulation (Feb. 26, 2015). | |
| 64 | EPA, *Economy-Wide Modeling: Social Cost and Welfare White Paper* (Sept. 22, 2015). | |

## INTRODUCTION

Plaintiffs allege a single claim that the United States Environmental Protection Agency ("EPA" or "the Agency") has not fulfilled an alleged duty to perform the employment evaluations described in Section 321(a) of the Clean Air Act ("CAA" or the "Act"), 42 U.S.C § 7621(a).  The United States has repeatedly asked this Court to resolve that claim on the pleadings, without discovery, and based on a legal interpretation that the Fourth Circuit has now deemed "eminently reasonable."  The United States has expended millions of dollars of public funds to review and produce hundreds of thousands of documents and privilege logs over the course of tens of thousands of hours.  The parties have taken a dozen depositions.  Fact discovery consumed nearly eleven months.  Trial is scheduled to begin on July 19, 2016, to address a "non-discretionary" duty claim that should be decided as a matter of law.

Trial is not necessary in this case because no material facts are in dispute.  The United States moves for summary judgment on three alternative bases.  First, EPA is entitled to summary judgment as a matter of law because Section 321(a) does not set forth a non-discretionary duty enforceable through the CAA citizen-suit provision.  Second, EPA is entitled to summary judgment as a matter of law because Plaintiffs have not met their burden at the summary-judgment stage to establish facts demonstrating Article III standing.  Third, EPA is entitled to summary judgment because it has, in fact, conducted "continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of [the Act] and applicable implementation plans," as described in Section 321(a).  The Court need not consider any documents or testimony developed in discovery; rather, the United States submits that EPA's Regulatory Impact Analyses ("RIAs"), Economic Impact Assessments ("EIAs") and other documents and actions constitute EPA's performance of any duty in Section 321(a).  If the Court finds that the documents upon which EPA relies do not satisfy a non-discretionary duty, then the Court should enter judgment against EPA and award Plaintiffs the only relief authorized by Congress:  an order for EPA to perform the duty.

## STATUTORY BACKGROUND

The Act, 42 U.S.C. §§ 7401-7671q, is intended to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." *Id.* § 7401(b)(1). Congress gave EPA broad authority to implement the provisions of the Act and accomplish its objectives. *United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 220 (4th Cir. 1997).

Section 321 of the Act, titled "Employment effects," authorizes EPA to evaluate the potential loss or shifts of employment that may result from the administration or enforcement of the Act and investigate specific allegations of adverse employment effects:

> The Administrator shall conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provision of this chapter and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement.

42 U.S.C. § 7621(a).   Section 321(d), titled "Limitations on construction of section," clarifies that: "Nothing in this section shall be construed to require or authorize the Administrator, the States, or political subdivisions thereof, to modify or withdraw any requirement imposed or proposed to be imposed under [the Act]." *Id.* § 7621(d).

Section 304 of the Act provides a limited waiver of sovereign immunity for citizen suits that allege EPA's failure to perform a non-discretionary duty under the Act:

> [A]ny person may commence a civil action on his own behalf —
> . . . .
> (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator[.]

*Id.* § 7604(a)(2).   The citizen-suit provision provides that, in such cases, "district courts shall have jurisdiction[] . . . to order the Administrator to perform such act or duty." *Id.* § 7604(a).

## STANDARD OF REVIEW

### A.   Rule 56(c) Motion for Summary Judgment

Summary judgment is appropriate if the pleadings, discovery and disclosure materials on file, and other evidence show that "there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   Once a defendant moves for summary judgment, the burden shifts to the plaintiff to set forth specific

facts showing a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but required.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Laing v. Fed. Express Corp*., 703 F.3d 713, 722 (4th Cir. 2013) (holding that a non-moving party must establish a "genuine, triable issue"); *accord*, *Rhodes v. E.I. du Pont de Nemours & Co*., 636 F.3d 88, 94 (4th Cir. 2011).

### B.      Plaintiffs Bear the Burden of Demonstrating Standing

"[E]ach element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'"  *Bennett v. Spear*, 520 U.S. 154, 167–68 (1997) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  "In response to a summary judgment motion, . . . the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'"  *Lujan*, 504 U.S. at 561 (citations omitted); *see also Stephens v. Cty. of Albemarle*, 524 F.3d 485, 491–93 (4th Cir. 2008) (denying summary judgment because the appellant's "allegations of injury [we]re simply too speculative to support standing" and she "ha[d] not provided any factual support for [her] conjecture").  Where subject matter jurisdiction does not exist, "the court cannot proceed at all in any cause."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citation omitted).

### C.      Scope of Review for Alleged Failure to Perform a Non-Discretionary Duty

The scope of judicial review in a citizen suit alleging that EPA has failed to perform a non-discretionary duty is "much narrower than the scope of judicial review under the Administrative Procedure Act, which allows judicial review of the substance of an agency's action under a deferential abuse-of-discretion standard."  *Frey v. EPA*, 751 F.3d 461, 469–70 (7th Cir. 2014) (interpreting citizen-suit language in the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9659, that is identical to the language in Section 304(a)(2) of the CAA), *cert. denied*, 135 S. Ct. 494 (2014); *cf., e.g.*, *Monongahela Power Co. v. Reilly*, 980 F.2d 272, 276 n.3 (4th Cir. 1992) (interpreting Section

304(a)(2) narrowly).  Thus, a reviewing court is limited to deciding whether EPA has performed the duty in question, "not claims regarding the substance of the EPA's decisions, which is a matter of discretion for the agency."  *Frey*, 751 F.3d at 469–70.

## BACKGROUND

### A.   Procedural History

Plaintiffs' Complaint pleads a single claim under the Act's citizen-suit provision, 42 U.S.C. § 7604(a)(2), asserting that EPA has failed to perform a "nondiscretionary duty" under Section 321(a).  Am. Compl. ¶¶ 81–83.  Plaintiffs allege three types of harm.  First, Plaintiffs allege that they have been "directly impacted by the reduced market for coal caused by EPA's administration and enforcement of the Clean Air Act," *id.* ¶ 78, and that EPA has "pressure[d] the electric power sector and other major consumers of coal to switch to other fuels, to the detriment of Plaintiffs."  *Id.* ¶ 79(a).  Second, Plaintiffs contend that EPA's alleged failure to perform evaluations in Section 321(a) has resulted in harm to third parties, including "public welfare and the environment," "people currently employed in the coal industry," and "families and local economies."  *Id.* ¶ 79.  Third, Plaintiffs allege a deprivation of their "right to obtain . . . information and use it in [their] own efforts to inform the public, comment on pending and future rulemakings, and lobby Congress for changes to the Administrator's administration and enforcement of the Clean Air Act."  *Id.* ¶ 79(b).  Plaintiffs' Complaint requests declaratory relief that the Administrator has violated Section 321(a); an order for the "Administrator to evaluate whether its administration and enforcement of the Clean Air Act over the past six years has resulted in job losses or shifts in the coal industry" by a date certain or as soon as practicable; and an order "[e]njoining the Administrator from approving further regulations impacting employment in the coal industry and from continuing its New Source Review enforcement campaign against coal-fired power plants . . . until EPA has completed its evaluation."  *Id.* at Prayer for Relief.

The United States moved to dismiss this suit on two grounds.  First, the United States maintained that the "continuing evaluations of potential loss or shifts of employment" described

in Section 321(a) is not the sort of clear-cut, ministerial act that is justiciable under the Fourth Circuit's narrow construction of the Act's citizen-suit provision. ECF No. 35 at 4, 10 (citations omitted). The United States further argued that, "to impose a clear-cut nondiscretionary duty," a statute "must 'categorically mandat[e]' that all specified action be taken by a date-certain deadline." *Id.* at 11 (citation omitted). This Court denied the United States' motion, relying principally on cases where other district courts had interpreted citizen-suit provisions in other statutes. ECF No. 40 at 11–13.

The United States then filed a Motion to Dismiss for Lack of Article III Standing. ECF No. 59–60, 70. Because no discovery had occurred at that time, the United States argued only that Plaintiffs' allegations were facially deficient. Specifically, the United States argued that Plaintiffs' alleged economic harms were not traceable to EPA's alleged failure to conduct employment evaluations or redressable by an order directing the Agency to perform them. The United States contested Plaintiffs' claim of procedural injury because an employment evaluation is not a prerequisite to any substantive agency action. Lastly, the United States disputed Plaintiffs' alleged "informational injury" on the ground that Section 321(a) does not confer a clear legal right to information generated under that provision.

This Court denied the United States' facial challenge to Plaintiffs' standing. ECF No. 71. The Court deemed Plaintiffs' allegation "that the actions of the EPA have had a coercive effect on the power generating industry" an injury-in-fact that "may also be fairly traceable to the failure of the EPA to conduct the evaluations." *Id.* at 11. The Court also found that the alleged injury was redressable because "the [Section 321(a)] inquiry may have the effect of convincing the EPA, Congress, and/or the American public to relax or alter EPA's prior decisions." *Id.* The Court further held that "[t]he denial of the benefit of the evaluations . . . is sufficient to support procedural standing," and that Plaintiffs "may be entitled to the information which has not been collected or analyzed" by the Agency through the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. *Id.* at 16–17.

The United States next moved for summary judgment on the ground that EPA had complied with any duty imposed by Section 321(a).  ECF Nos. 75–80.  The United States submitted 53 documents demonstrating EPA's performance, along with an explanatory declaration from an Agency official.  The United States stipulated that the documents were not prepared for the express purpose of complying with Section 321(a).  ECF No. 76 at 18.  The United States asked that summary judgment be entered in EPA's favor or, if the Court were to decide that the proffered documents did not demonstrate performance under Section 321(a), that summary judgment be entered in Plaintiffs' favor.  *Id.* at 18–19; *see also* ECF No. 90 at 3–4.  Based on the same reasoning, the United States moved for a protective order foreclosing any further discovery.  ECF No. 88.  Nevertheless, Plaintiffs asked this Court not to enter judgment in their favor "before the completion of fact and expert discovery," ECF No. 85 at 21, and moved this Court to compel discovery and hold EPA's summary judgment motion in abeyance, ECF No. 82.  On May 29, 2015, this Court granted the motion to compel, denied the motion for a protective order, and held the summary judgment motion in abeyance pending completion of discovery.  ECF No. 93.  On February 19, 2016, the Court denied the United States' initial Motion for Summary Judgment without prejudice and instructed that the United States may refile its motion or file a new motion on or before May 2, 2016.  ECF No. 178 at 2.

During fact discovery, Plaintiffs sought to depose EPA's Administrator, and the United States moved for a protective order, which this Court denied.  ECF No. 164.  The Fourth Circuit granted the United States' petition for a writ of mandamus to order this Court to enter a protective order precluding the noticed deposition of EPA's Administrator.  *In re Gina McCarthy*, No. 15-2390, 2015 WL 8286143 (4th Cir. Dec. 9, 2015).  In the opinion, the unanimous panel stated that:

> Here, the district court found . . . an apparent conflict between EPA's position in its summary judgment motion and its position before Congress. . . .
>
> [W]e fail to see the contradiction.  EPA did not claim that the documents submitted with its summary judgment motion were prepared "under" or "pursuant to" Section 321(a), or for the purpose of complying with that section.  Indeed, EPA explicitly conceded that "none of the documents upon which it relies to demonstrate its performance of the duty in Section 321(a) were prepared explicitly for that

purpose or labeled as Section 321(a) evaluations." *It is not contradictory for EPA to argue that the documents nevertheless satisfy whatever obligation is imposed by Section 321(a).  Such a position seems eminently reasonable in light of the fact that no court, including the district court here, has ever explicated what Section 321(a) requires.*  Indeed, the district court may yet determine that EPA's documents satisfy Section 321(a).

*Id.* at *2 (emphasis added) (citation and footnotes omitted).

### B.  Statement of Facts

#### 1.  Discovery of EPA

Despite its continuing objection to discovery in this suit,[1] the United States has complied with this Court's order and engaged in fact discovery, including written discovery, document production, and depositions.  Plaintiffs have deposed seven current or former EPA employees primarily on the issues of EPA's interpretation of Section 321(a) and the RIAs.  The witnesses included four of the five individuals listed on the United States' Amended Initial Disclosures — Darryl Weatherhead, Ronald Evans, Albert McGartland, and James DeMocker, who was presented pursuant to Fed. R. Civ. P. 30(b)(6); Ann Ferris, an employment economist at EPA's National Center for Environmental Economics ("NCEE"); Jonathan Lubetsky, Policy Analyst; and Michael Goo, former Associate Administrator of EPA's Office of Policy.  These witnesses agreed that EPA conducts the evaluations described in Section 321(a).  *See, e.g.*, Dep. Tr. Weatherhead at 170:25–171:2 (Oct. 15, 2015) ("I believe that the work that we do within our RIAs and EIAs does constitute a continuing evaluation with respect to 321."), Ex. A; Dep. Tr. McGartland at 52:22–54:17 (Nov. 5, 2015), Ex. B; Dep. Tr. DeMocker at 102:13–20, 105:17–106:2 (Apr. 5, 2016), Ex. C; Dep. Tr. Ferris at 259:10–19 (Nov. 4, 2015) ("[M]y understanding is that the work I've been doing has contributed to employment impact evaluations on a regular basis through these RIA analyses."), Ex. D; Dep. Tr. Evans at 214:6–13 (Oct. 16, 2015), Ex. E.

---

[1] In discovery documents, the United States has included a footnote stating that:

> The United States maintains that discovery is neither necessary nor helpful in resolving the single claim in this case, which turns on the resolution of two purely legal questions:  (1) whether EPA has or has not performed the evaluations described in Section 321(a) of the Clean Air Act, 42 U.S.C. § 7621(a), and (2) if the Court finds that EPA has not performed such evaluations, the scope of relief to which Plaintiffs are entitled.

Ex. P at 1 n.1.  Counsel for the United States made similar statements on the record at depositions.

2.      <u>Discovery of Plaintiffs</u>

The United States undertook discovery to understand whether Plaintiffs had, in fact, suffered the injuries alleged, whether those injuries were fairly traceable to EPA's alleged non-performance of the evaluations described in Section 321(a), and whether those injuries would likely be redressed by an order from this Court.  The United States sought to depose the individuals listed in the first version of Plaintiffs' Initial Disclosures regarding their "knowledge of the injuries caused by the Administrator's failure to comply with § 321(a) of the Clean Air Act and the injuries likely to continue to occur in the absence of a court order."  Ex. F at 2–3. Ultimately, the United States deposed those individuals listed in Plaintiffs' March 4, 2016 Revised Initial Disclosures, who, according to the language in the revision, possessed "knowledge of the injuries caused by the administration and enforcement of the Clean Air Act, the Administrator's failure to comply with § 321(a) of the Clean Air Act and the injuries likely to continue to occur in the absence of a court order."  Ex. G at 2–3.  In total, Plaintiffs presented Michael T.W. Carey, Paul B. Piccolini, Robert Edward Murray ("Rob Murray"), Robert Eugene Murray (for four hours) ("Robert E. Murray" or "Mr. Murray"), and, as a Rule 30(b)(6) representative, Ryan Murray.  Depositions and documents produced by Plaintiffs establish a number of undisputed facts regarding Plaintiffs' finances, decisions to enter acquisitions, and associated credit downgrades; the undefined term "reduced market for coal"; independent causes of the reduced market for coal, loss of coal jobs, and mine closures; and Plaintiffs' knowledge and contentions regarding EPA's RIAs.

a.      *Plaintiffs' Finances, Recent Acquisitions, and Associated Credit Downgrades*

During discovery, the United States established undisputed facts regarding Plaintiffs' operations, finances, and employment over roughly the past seven years.  ██████████████

████████████████████████████████    ███████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████



Despite the alleged reduced market for coal,

 Since the

Foresight transaction, Moody's Investors Service has twice downgraded the Murray Energy

Corporation's credit rating, citing the effects of the Foresight transaction.  First, on November

19, 2015, in the "Ratings Rationale" for the downgrade, Moody's stated, in pertinent part:

> The downgrade reflects our expectation that the company's cash flow generation will be under additional stress due to the recent cut in dividends by Foresight Energy GP LLC. . . . If this dividend level by Foresight remains in place, it would result in no annual distributions to Murray, compared to our previous assumption of over $70 million. . . . It is unclear when dividend payout would return to prior levels.

Moody's Investors Service, *Rating Action: Moody's downgrades Murray Energy to Caa1,*

*outlook negative* (Nov. 19, 2015), Ex. L.  Three months later, Moody's issued another

downgrade of Murray Energy Corporation's credit, stating in pertinent part:

> In December 2015 Foresight announced that it was notified by the administrative agent of its secured credit agreement that it was in default under the terms of the agreement, as a result of the recent developments in the litigation by trustee for the bondholders of the company's 2021 Senior Notes.[2]  The company continues to negotiate with its lenders to cure the alleged default events, and the outcome is uncertain.  As of September 30, 2015, the company had $600 million of 2021 Senior Notes outstanding, and $673 million under its senior secured bank credit facility. The company does not have sufficient liquidity to repay its debt if it were to be accelerated.

Moody's Investors Service, *Rating Action: Moody's downgrades Murray Energy to Ca, outlook*

*stable* (Feb. 26, 2016), Ex. N. ███████████████      ███████████████

---

[2] The Foresight transaction was the subject of a legal action in the Court of Chancery in the State of Delaware, which issued an opinion on December 4, 2015 indicating that "[a] Change of Control occurred on April 16, 2015, when the Revised Deal [between Murray Energy Corporation and Foresight] closed." Slip op., *Wilmington Sav. Fund Soc'y FSB v. Foresight Energy, LLC, et al.*, C.A. No. 11059-VCL, 23 (Del. Ct. Chancery Dec. 4, 2015), Ex. M.  The effect of the Change in Control is that "the Trustee is entitled to an order compelling the Issuers to perform their obligations under the Redemption Clause."  *Id.* If such an order issued, Foresight Energy, LLC and Foresight Energy Finance Corporation would have to pay roughly $600 million on a series of notes.  *Id.* at 3–5.



Plaintiffs' Rule 30(b)(6) witness, Ryan Murray, indicated that, if the Foresight entities defaulted on the debt described in the February 26, 2016 Moody's report, then "[i]t could potentially drag Murray Energy into bankruptcy."  Tr. Dep. of Ryan Murray at 371:2–6 (April 7, 2016), Ex. O.  Ryan Murray further indicated that, if Murray Energy Corporation is unable to recoup the money it borrowed to acquire an interest in Foresight, then Murray Energy would likely need to close mines and lay off employees.  *Id.* at 378:24–379:20.

> b.   *Plaintiffs' Alleged Reduced Market for Coal*

In paragraph 78 of the Complaint, Plaintiffs allege an economic injury resulting from a "reduced market for coal," a phrase that is not defined in the Complaint or any documents filed or served in this case.  At the Rule 30(b)(6) deposition, counsel for the United States identified the phrase, *id.* at 119:4–120:3, and asked "what are the geographical parameters for the reduced market for coal?" *id.* at 120:15–17.  The witness answered that "[t]hey're pretty much unlimited" and that "wherever there is a reduced market for coal, we would refer to that as a reduced market for coal," *id.* at 120:18–21.  When asked whether the phrase includes the global market for coal, *id.* at 120:22–23, the witness answered, in pertinent part, "[t]ypically — yeah, it could," *id.* at 120:24.  When asked, "[w]hat are the time parameters of the reduced market for coal as the phrase is used here?" *id.* at 121:14–16, the witness responded that he was "not aware of time

parameters put on the phrase," *id.* at 121:17–18.  As for the participants in the market for coal, the witness listed "the coal industry," "coal mines," "utilities," "consumers," "regulators, state, local and federal agents, suppliers, contractors, vendors to the mining industry, transportation companies, such as the railroads, railroad companies," "people that may work intermittently in the coal industry with specialized duties," and "employees themselves."  *Id.* at 129:1–130:3.  He also confirmed that "any of these participants could take specific actions that would affect the market for coal."  *Id.*

> c.  *Causes of the Alleged Reduced Market for Coal, Loss of Coal Jobs, and Closure of Coal Mines*

Because Plaintiffs allege that EPA's regulation of the "electric power sector" has reduced the market for coal, thereby injuring Plaintiffs, Am. Compl. ¶¶ 78–79(a), the United States served written discovery to explore Plaintiffs' understanding of the causes of the alleged reduced market for coal and relationship to EPA's regulation of the power sector.  *See* United States' First Set of Discovery Requests, Ex. P.  In response to requests for admission ("RFAs"), Plaintiffs admitted that they:

- "do not own a coal-fired power plant or commercial coal-burning facility";
- "do not operate a coal-fired power plant or commercial coal-burning facility";
- "have never decided to shut down or close a coal-fired power plant or commercial coal-burning facility";
- "have no immediate plans to construct a coal-fired power plant or commercial coal-burning facility";
- "do not produce electricity";
- "do not sell electricity";
- "do not own a fossil fuel-fired electric utility steam generating unit subject to the Utility MACT rule";[3]
- "do not own a fossil fuel-fired electric generating unit subject to the Greenhouse Gas Rule";[4]
- "have never taken any actions to comply with EPA's Clean Air Act regulations concerning facilities that generate electricity";

---

[3] The United States defined the "Utility MACT Rule" as "the final rule, 'National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired Electric Utility Steam Generating Units,' 77 Fed. Reg. 9304 (Feb. 16, 2012)."  Ex. P at 5.

[4] The United States defined the "Greenhouse Gas Rule" as the final rule, "Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units," signed by the EPA Administrator on August 3, 2015, and effective as of 60 days after publication in the Federal Register."  Ex. P at 4.

> ➤ "have no immediate plans to take any actions to comply with EPA's Clean Air Act regulations concerning facilities that generate electricity";
> ➤ "have never been the subject of any enforcement action by EPA under the Clean Air Act concerning facilities that generate electricity";
> ➤ "have never owned or operated any of the coal-fired power plants referenced in paragraphs 38 through 44 of the Complaint"; and
> ➤ "have never owned or operated" the entities identified in paragraphs 52 through 54 and 56 through 57 of the Complaint.

Pls' Answers to the United States' First Set of Disc. Requests, Ex. Q, Responses to RFAs 1–11, 15, 20–25, 27, at 61–65, 69–72.  In addition, despite denying "that they have identified causes or potential causes of the alleged 'reduced market for coal,' . . . other than EPA's administration and enforcement of the Clean Air Act," Plaintiffs nevertheless stated in the same response that "coal markets can also be reduced for other reasons."  *Id.*  Responses to RFA 32, at 76.  Plaintiffs provided similar responses to RFAs 33 through 35 and 37, in which they identified the following "potential cause[s] for reductions in the market for coal":  "the increased use of natural gas to generate electricity"; "actions against coal mining by former New York City Mayor Michael Bloomberg"; "actions against coal mining by the Sierra Club"; and "the coal severance tax in West Virginia."  *Id.* at 76–79.

At deposition, Plaintiffs' witnesses identified a myriad of factors contributing to the reduced market for coal, other than EPA's actions.  The Rule 30(b)(6) witness could name only one EPA CAA action "pressuring" the electric power sector with any specificity.  *See, e.g.*, Tr. Ryan Murray at 135:1–139:8 (listing the Clean Power Plan, which became final in August 2015, as well as non-EPA CAA regulations, proposed legislation, and state rules).

███████████████████████████████████████████████

██████████████████████████████ [5]  As Robert E. Murray noted in a 2007 speech, "[t]he economic point of switching from coal to natural gas is in the range of $4.00 to $4.75 million Btu."  Presentation of Robert E. Murray Chairman, President and Chief Exec. Officer Murray Energy Corp., New York Coal Trade Association (Mar. 30, 2007), Ex. H.

---

[5] Other witnesses also identified the increased use, and reduced cost, of natural gas as a cause of layoffs undertaken by Plaintiffs.  *See, e.g.*, Dep. Tr. Piccolini at 152:1–152:4 (Mar. 30, 2016) ("Q. Has the increased use and cost of natural gas caused Murray Energy to eliminate jobs?  A. Yes."), Ex. R.

Natural gas reached a competitive price point at some time in 2009.  *See, e.g.*, U.S. Energy Info. Admin., *Natural gas expected to surpass coal in mix of fuel used for U.S. power generation in 2016* (Mar. 16, 2016) ("[B]eginning in 2009, the gap between coal and natural gas prices narrowed, as large amounts of natural gas produced from shale formations changed the balance between supply and demand in U.S. natural gas markets."), Ex. S.



; *cf.* Tr. Piccolini at 152:5–8 ("Q. Has the consumer demand for electricity and changes in that demand caused Murray Energy to eliminate jobs? A. In my opinion, yes.").[6]

---

[6] The Executive Vice President of Sales and Marketing at Murray Energy Corporation, Robert Edward Murray, identified similar factors affecting the market for coal including:  "[e]conomic factors both domestic and global," competing fuel sources, the amount of coal produced in the United States, the amount of coal imported and exported, the amount of coal stockpiled at mines, the banking industry's attitude toward the coal industry, the pace of economic growth in the United States, shifts in manufacturing jobs in the United States, short-term weather patterns, and competition from other sources of energy.  Dep. Tr. Rob Murray at 137:10–141:11 (Apr. 1, 2016), Ex. U.



; *see also* Presentation of Robert E. Murray Chairman, President and Chief Exec. Officer Murray Energy Corp., Does the West Virginia Government Want to Retain What Is Left of the State's Coal Industry and the Jobs In It? 2 (Jan. 27, 2016) ("On New Year's Eve, Murray Energy Corporation made a $7,562,542.69 coal severance tax payment to West Virginia and simultaneously was *forced* to lay off another six-hundred seventy-four (674) employees, the vast majority in West Virginia, from high-paying,

15

well-benefited jobs.  Is the State's government going to continue to *force* these actions on its coal producers?") (emphases added), Ex. W.  Mr. Murray indicated that repeal of the tax would save 2,200 coal jobs, and that otherwise, "[w]e will go down fast in West Virginia because of this excessive coal severance tax."  Alex Wiederspiel, *Murray Energy CEO livid over mine idling and severance taxes*, MetroNews (Feb. 25, 2016), Ex. X.



---

[8]  U.S. Dep't of Interior, Office of Surface Mining Reclamation and Enforcement, "Building a Stream Protection Rule," *at* http://www.osmre.gov/programs/rcm/streamprotectionrule.shtm.

[9] U.S. EPA, "Clean Water Rule Protects Streams and Wetlands Critical to Public Health, Communities, and Economy" (May 27, 2015), *at* https://yosemite.epa.gov/opa/admpress.nsf/0/62295CDDD6C6B45685257E52004FAC97.

[10] ████████████████████████████    ███████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

    d.  *Plaintiffs' Knowledge and Contentions Regarding EPA's RIAs*

At deposition, counsel for the United States sought to explore whether Plaintiffs had suffered an informational injury or how Plaintiffs were injured despite the existence of employment analyses in EPA's RIAs and other documents.  Two witnesses were generally unaware that EPA conducted employment analyses or even that EPA issued RIAs, including the RIA for the Clean Power Plan. Tr. Piccolini at 75:17–20, 77:3–11;[12] Tr. Rob Murray at 170:16–180:5.  One witness, Michael T. W. Carey,[13] was generally aware of EPA's RIAs and the employment analyses contained therein.  Dep. Tr. Carey at 20:22–24 (Mar. 29, 2016), Ex. Z. Plaintiffs' Rule 30(b)(6) witness, Ryan Murray, indicated that he was familiar with the Clean Power Plan RIA and the fact that it included an evaluation of employment impacts.  Tr. Ryan Murray at 226:18–227:24, 382:13–21.  Despite his familiarity, Ryan Murray contended that the employment analysis was insufficient.  *Id.* at 382:22–385:16, 387:19–23 ("Q. Again, it's your

---

████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████████████

██████████████.

[11] *See* United States Dep't of Labor, Mine Safety and Health Admin., "Respirable Dust Rule: A Historic Step Forward in the Effort to End Black Lung Disease," *at* http://www.msha.gov/news-media/special-initiatives/2016/09/28/respirable-dust-rule-historic-step-forward-effort-end.

[12] Mr. Piccolini is the Vice President, Human Resources & Employee Relations for Murray Energy Corporation and other Plaintiffs.  *See* Ex. G at 2.

[13] Mr. Carey is the Vice President — Government Affairs, Murray Energy Corporation.  *See* Ex. G at 2.

position that you're aware of the regulatory impact analysis conducted for the Clean Power Plan, but it's not sufficient; is that correct? A. That's correct.").

### 3.   EPA's Continuing Evaluations of Potential Employment Impacts

The Updated Declaration of James B. DeMocker ("Declaration"), submitted with EPA's New Motion for Summary Judgment as Exhibit AA, identifies, summarizes, and attaches 64 documents (Exhibits 1–64) that evaluate potential loss or shifts of employment that may result from the administration, enforcement, and implementation of the Act.  The documents include the 53 documents previously submitted with the Declaration of James B. DeMocker [ECF Nos. 77– 80] in support of United States' initial Motion for Summary Judgment [ECF Nos. 75], as well as 11 additional documents that post-date the original declaration.

The first 49 documents attached to the Declaration include relevant excerpts of RIAs, EIAs, and related memoranda associated with specific regulatory actions.  For "significant" rulemakings, EPA prepares an RIA that analyzes the benefits and costs of the rule, as well as specific economic impacts.  Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Oct. 4, 1993), *as amended by* Exec. Order No. 13497, 74 Fed. Reg. 6113 (Feb. 4, 2009) and Exec. Order No. 13563, 76 Fed. Reg. 3821 (Jan. 21, 2011).[14]  EPA includes an analysis of the potential employment impacts that may result from the administration and enforcement[15] of the rule in its

---

[14] "'Significant regulatory action' means any regulatory action that is likely to result in a rule that may:"

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;
(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;
(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or
(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this Executive order.

58 Fed. Reg. at 51,738.

[15] Section 321(a) does not require EPA to evaluate potential employment impacts at the time that EPA undertakes individual enforcement initiatives.  When EPA conducts an employment analysis as part of an RIA, the analysis assumes that the rule in question will be enforced.  Absent compliance, a regulation would have no impact.

18

RIAs.  *See, e.g.*, Decl. at Ex. 3, RIA for the Clean Power Plan Final Rule (Oct. 2015), Ch. 6,

"Employment Impact Analysis"; *id.* at Ex. 9, RIA for the Final Mercury and Air Toxics

Standards (Dec. 2011), Ch. 6, "Employment and Economic Impact Analysis."  For rules that do

not require an RIA because they are not deemed "significant,"[16] EPA often prepares an EIA that

may include an evaluation of the rule's potential impacts on employment.  *See* 42 U.S.C. § 7617.

*See, e.g.*, Decl. at Ex. 41, EIA for the Manganese Ferroalloys RTR (May 2015), Section 5.8

"Employment Impact Analysis."  In addition to the RIAs and EIAs prepared in connection with

proposed and final regulations, EPA has prepared subsequent memoranda that provide further

evaluation of potential employment impacts when EPA makes significant changes to those

regulations in response to petitions for reconsideration.  *See, e.g.*, *id*. at Ex. 12, Mem. from

T. Walton, EPA, to B. Shrager, EPA, Regarding Regulatory Impact Results for the

Reconsideration Proposal for National Emission Standards for Hazardous Air Pollutants for

Industrial, Commercial, and Institutional Boilers and Process Heaters at Major Sources (Dec. 1,

2011).  The Declaration briefly summarizes EPA's evaluation of potential employment impacts

included in the 49 RIAs, EIAs, and related memoranda.  Decl. at 2–25.  Examples of specific

employment impact analyses are discussed further in Part III.A.1.

The next six documents attached to the Declaration evaluate the employment impacts

associated with EPA's overall administration and enforcement of the Act.  *Id.* at 25–31.  These

documents include a 2011 "White Paper," titled *Empirical Evidence Regarding the Effects of the

Clean Air Act on Jobs and Economic Growth*, which evaluated the connection between the Act

and employment.  *Id.* at Ex. 50.  Additionally, in 2001, EPA published a report, *Impacts of the

Acid Rain Program on Coal Industry Employmen*t, which projected the impact of the Act's Title

IV Acid Rain Program on coal-mining employment through 2010.  *Id.* at Ex. 51.  EPA has also

prepared multi-decade reports evaluating the impact of the Act on the U.S. economy, including

---

[16] The final determination of whether a rule is "significant" is made by the Director of the Office of
Information and Regulatory Affairs ("OIRA") within the Office of Management and Budget.  58 Fed.
Reg. at 51,740–41.

the impact of the Act's implementation on employment. *Id.* at Exs. 52–55. The Declaration identifies and summarizes these reports and papers, *id.* at 29–31, and they are discussed in more detail in Part III.A.2.

The final nine documents attached to the Declaration describe EPA's continuing effort to refine its methodology for evaluating potential employment impacts. Decl. at 31–37. These documents include EPA's *Guidelines for Preparing Economic Analyses*, which describe EPA's past methodologies for evaluating potential employment impacts and current preferred approaches, *id.* at Ex. 56, and documents related to EPA's recent request to its Science Advisory Board ("SAB") for advice on issues related to the use of certain economic modeling techniques to predict, among other things, the potential employment impacts of regulations, *id.* at Ex. 63. The Declaration identifies and summarizes these documents, *id.* at 31–37, and they are discussed in more detail below in Part III.A.3.

## ARGUMENT

### I.      Section 321(a) Does Not Impose a Non-Discretionary Duty on EPA.

In this Court's previous ruling on whether Section 321(a) describes a non-discretionary duty, the Court was "mindful that the term nondiscretionary duty has been construed narrowly" and recognized EPA's "discretion as to the timing of [employment] evaluations," but found that "at this stage of the proceedings, the plaintiffs' allegations are sufficient to provide this Court with jurisdiction to hear this case" because "the lack of a 'date-certain deadline' [was not] fatal" to the claim. ECF No. 40 at 7, 13–14.

The United States respectfully requests that this Court reconsider its decision for two reasons.[17] First, the two cases upon which this Court relied to hold that a date-certain deadline is not necessary to establish a non-discretionary duty under Section 304(a)(2) were non-binding district court decisions interpreting statutes other than the CAA. *Cross Timbers Concerned Citizens v. Saginaw*, 991 F. Supp. 563 (N.D. Tex. 1997) (CWA); *Sierra Club v. Johnson*, No. C

---

[17] *See Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment.").

08-01409 WHA, 2009 U.S. Dist. LEXIS 68436 (N.D. Cal. Aug. 5, 2009) (CERCLA).  In contrast, courts that have considered the issue in the context of a CAA citizen suit have held that a date-certain deadline is required.  *Envtl. Def. Fund v. Thomas*, 870 F.2d 892, 899 (2d Cir. 1989); *Maine v. Thomas*, 874 F.2d 883, 888 (1st Cir. 1989); *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987); *Zen-Noh Grain Corp. v. Jackson*, 943 F. Supp. 2d 657, 661–63 (E.D. La. 2013); *Envtl Def. v. EPA*, Civil No. 08-6254 (RMB), 2007 U.S. Dist. LEXIS 2747, *6 (N.D. Cal. Jan. 12, 2007); *Defenders of Wildlife v. Browner*, 888 F. Supp. 1005, 1008–09 (D. Ariz. 1995).  Even the district court cases this Court relied upon do not support its decision.  The *Saginaw* court expressly declined to "decide applicability of EPA's 'date-certain' test to the CWA . . . because no mandatory EPA duty arises by any analysis under the circumstances of this case," 991 F. Supp. at 568, while the *Johnson* court held "that the duty to promulgate and impose financial responsibility regulations under CERCLA *is discretionary based on the combination of the absence of a date-certain deadline* and CERCLA's legislative history," 2009 U.S. Dist. LEXIS 68436, at *3 (emphasis added).  Thus, neither case stands for the proposition that a non-discretionary duty can be established *without* a date-certain deadline under the statutory schemes of the CWA or CERCLA, let alone under the CAA's unique citizen-suit provision that distinguishes between non-discretionary duty suits and claims for unreasonable delay.

Second, without a date-certain deadline, the Court cannot determine whether EPA has violated the purported duty or whether the duty is not yet due.  The lack of a date-certain deadline means that EPA could be subject to repeated citizen suits asserting violations of the purported duty, continually disrupting EPA's important work in contravention of the narrow purpose and intent of the citizen-suit provision.[18]  *See Kennecott Copper Corp. v. Costle*, 572

---

[18] Discovery in this matter has been extremely time-consuming and costly.  EPA has dedicated five attorneys to manage and work on EPA's response to this case, including responding to discovery obligations.  *See* Decl. of Sara Hertz Wu (Oct. 16, 2015), ECF. No. 148-6 ¶ 6.  Dozens of EPA staff have conducted hundreds of hours of document review to respond to Plaintiffs' requests for production.  *Id.* By the end of October 2015 — with five months of discovery still remaining — EPA had already obligated more than $1 million dollars to obtain contract attorneys to assist with document review and production.  *Id.* Also, by mid-October 2015, approximately 217 employees from the (*footnote cont'd...*)

F.2d 1349, 1353 (9th Cir. 1978) ("[T]he non-discretionary duty requirement imposed by § 304 must be read in light of the Congressional intent to use this phrase to *limit* the number of citizen suits which could be brought against the Administrator and to *lessen* the disruption of the Act's complex administrative process.") (emphases added).  Plaintiffs ask this Court to order EPA to perform the evaluations described in Section 321(a) "either by a date certain or as expeditiously as practicable."  Am. Compl., Prayer for Relief (b).  By asking the Court to write a deadline into the Act that does not exist, Plaintiffs further demonstrate that Section 321(a) is not the type of clear-cut, ministerial duty that Congress intended the district courts to enforce.  Therefore, the United States respectfully requests that the Court reconsider this question, find that Section 321(a) does not impose a non-discretionary duty justiciable under the Act's "narrowly-construed" citizen-suit provision, *Monongahela Power*, 980 F.2d at 276 n.3, and dismiss Plaintiffs' claim for lack of subject matter jurisdiction.

## II.    This Court Lacks Subject Matter Jurisdiction Because Plaintiffs Have Failed to Demonstrate Article III Standing to Challenge EPA's Alleged Non-Performance of the Evaluations Described in Section 321(a).

The "irreducible constitutional minimum of standing" requires an injury-in-fact, together with "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant" and "a likelihood that the requested relief will redress the alleged injury." *Steel Co.*, 523 U.S. 83 at 102–03 (citation omitted).  Injury-in-fact requires demonstration of "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical"; redressability requires that a plaintiff show that it is likely, and not "merely speculative," that the alleged injury will be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560–61 (citations and internal quotations omitted); *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (citations omitted).  At the

---

Department of Justice, EPA, and three contractor firms had spent approximately 12,451 hours (the equivalent of 311 40-hour weeks) reviewing the documents that had been collected for this litigation. Decl. of Bethanne Walinskas (Oct. 16, 2015), ECF No. 148-5 ¶ 6.

summary judgment stage, a plaintiff cannot rest on "mere allegations." *Lujan*, 504 U.S. at 561 (citations omitted).

As demonstrated below, Plaintiffs have failed to demonstrate:  (1) a concrete, particularized injury to their financial interests; (2) that their alleged injury is fairly traceable to EPA's alleged non-performance of employment evaluations; or (3) that their alleged injury would be redressed by an order compelling EPA to undertake the non-binding evaluations. Plaintiffs have also failed to establish an informational or procedural injury.

### A.    Plaintiffs Have Not Demonstrated a Concrete, Particularized Injury.

Plaintiffs have failed to demonstrate a concrete, particularized injury to their own interests for two reasons.  First, their theory of economic injury is based on the vague notion of a "reduced market for coal" that is undefined and lacks any parameters.  *See* Am. Compl. ¶¶ 78–79(a).  Plaintiffs' Rule 30(b)(6) witness stated that the phrase "reduced market for coal" included the global market for coal, Tr. Ryan Murray at 120:15–24, and included a seemingly endless list of participants, all of whom could impact the market for coal:  utilities; mines; consumers; state, local, and federal regulators; suppliers; contractors; third-party vendors to the mining industry; transportation companies, such as railroad companies; "people that may work intermittently in the coal industry with specialized duties"; and Plaintiffs' employees, *id.* at 129:1–130:3.  The witness was "not aware of time parameters put on the phrase [reduced market for coal]."  *Id.* at 121:17–18.  In short, Plaintiffs' alleged economic injury from the reduced market for coal is not limited to entities within the United States subject to EPA regulations; instead, it involves any and all plausible participants within the global supply-and-demand chain for coal during an unspecified time period.  Such an amorphous and ill-defined injury to a global industry is neither concrete nor particularized.

Second, even if Plaintiffs had established specific parameters for the alleged reduced market for coal, they have nevertheless failed to meet their burden to demonstrate a concrete, particularized injury to their own financial interests, as opposed to the coal-mining industry generally.  Plaintiffs have not even attempted to quantify any lost profits, layoffs, or mine

23

closures allegedly resulting from the reduced market for coal in a filing or discovery document in this case.



Having illustrated that "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp.*, 477 U.S. at 325, the United States should be awarded summary judgment on the ground that Plaintiffs lack standing.

> **B.      Plaintiffs' Alleged Economic Injury Is Not Fairly Traceable to EPA's Alleged Non-Performance of the Evaluations Described in Section 321(a).**

Even if their alleged economic injury were concrete and particularized, Plaintiffs have not demonstrated that it is fairly traceable to EPA's alleged failure to perform non-binding employment evaluations under Section 321(a).  Plaintiffs' alleged injury does not stem from EPA requiring Plaintiffs to take any action under Section 321(a); rather, their alleged injury is derived from EPA's regulation of Plaintiffs' customers and a reduced market for coal.  Am. Compl. ¶¶ 78–79(a).  Section 321(a) "neither require[s] nor forbid[s] any action on the part of [Plaintiffs]," and Plaintiffs are not "the object[s] of the government action or inaction [they] challenge[]," so while "standing is not precluded," "it is ordinarily 'substantially more difficult to establish.'" *Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009) (quoting *Lujan*, 504 U.S. at 562).  Likewise, because Plaintiffs' alleged injuries "arise[] from the government's . . . regulation (or lack of regulation) of *someone else*" — the electric power sector — causation and redressability "hinge on the response of the regulated (or regulable) third party to the government action or inaction — and perhaps on the response of others as well."  *Lujan*, 504 U.S. at 562 (citations omitted).  To overcome this difficult burden, Plaintiffs must establish a clear causal

connection between the challenged inaction and their alleged injury.  *See Lujan*, 504 U.S. at 560–61 (requiring a "causal connection between the injury and the conduct complained of").

Plaintiffs have failed to make such a demonstration.  Indeed, Plaintiffs' documents indicate that their alleged injury is caused by EPA's regulation of power plants, not EPA's alleged non-performance of the evaluations described in Section 321(a).  For example, in the November 19, 2014 version of Plaintiffs' Initial Disclosures, they listed individuals who possessed "knowledge of the injuries *caused by the Administrator's failure to comply with § 321(a) of the Clean Air Act* and the injuries likely to continue to occur in the absence of a court order."  Ex. F at 2–3 (emphasis added).  On March 4, 2016, Plaintiffs revised their Initial Disclosures to state that their injuries were principally caused by EPA's CAA regulations and enforcement.  *See* Ex. G at 2–3 (identifying individuals with "knowledge of the injuries *caused by the administration and enforcement of the Clean Air Act*") (emphasis added).

Plaintiffs have now admitted in written discovery that they are not directly regulated under EPA's CAA regulations that apply to electric utilities — the very regulations that Plaintiffs allege have caused a reduced market for coal.  Plaintiffs "do not own a coal-fired power plant or commercial coal-burning facility"; "do not operate a coal-fired power plant or commercial coal-burning facility"; "have never decided to shut down or close a coal-fired power plant or commercial coal-burning facility"; "have no immediate plans to construct a coal-fired power plant or commercial coal-burning facility"; "do not produce electricity"; "do not sell electricity"; "do not own a fossil fuel-fired electric utility steam generating unit subject to the Utility MACT rule"; "do not own a fossil fuel-fired electric generating unit subject to the Greenhouse Gas Rule"; "have never taken any actions to comply with EPA's Clean Air Act regulations concerning facilities that generate electricity"; "have no immediate plans to take any actions to comply with EPA's Clean Air Act regulations concerning facilities that generate electricity"; and "have never been the subject of any enforcement action by EPA under the Clean Air Act concerning facilities that generate electricity."  Ex. Q at 61–65.  Because Plaintiffs' alleged injuries are not fairly traceable to EPA's alleged inaction under Section 321(a), but instead are

allegedly caused by separate and distinct EPA actions regulating entities other than Plaintiffs, they have not demonstrated Article III standing.  *See Mirant Potomac River, LLC v. EPA*, 577 F.3d 223, 229 n.6 (4th Cir. 2009) (finding a lack of traceability where the alleged injury was directly caused by existing state regulations, not the challenged EPA action); *Marshall v. Meadows*, 105 F.3d 904, 906 (4th Cir. 1997) (finding a lack of traceability because the challenged action was not the cause of the alleged injury).

Courts have repeatedly declined to recognize indirect, market-based economic harm, such as Plaintiffs' allegation that they are injured by the "reduced market for coal," as a legally protected interest sufficient to demonstrate standing.  *See, e.g.*, *Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983) ("[W]here injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses.") (citations omitted); *see also Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012), *cert. denied*, 134 S. Ct. 1273 (2014) (citing *Common Cause* for the same principle in affirming the district court's rejection of standing).  The Fourth Circuit has rejected standing even where the laws at issue had a far more direct impact on a market than the non-binding employment evaluations at issue here.  *E.g.*, *Frank Krasner Enters. v. Montgomery Cty., Md.*, 401 F.3d 230, 235 (4th Cir. 2005) ("Even granting that the law restricted supply and that the purported economic injury was an 'injury in fact,' [the] court found it to be a 'fatal flaw' in the plaintiff's standing argument that 'nothing in the Act directs manufacturers or dealers to raise the price of regulated weapons.'") (quoting *San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996)).

Notwithstanding the innate difficulty of demonstrating causation for alleged market-based injuries, Plaintiffs have rendered such a demonstration impossible by identifying a seemingly endless list of causes — other than EPA — for the reduced market for coal.  As a result, their theory of causation is "nebulous and subject to contradictory, and . . . unprovable, analyses."  *Common Cause*, 702 F.2d at 251 (citations omitted); *see also Lujan*, 504 U.S. at 562 (noting the difficulty of demonstrating standing when causation and redressability "hinge on the

response of the regulated (or regulable) third party to the government action or inaction—*and perhaps on the response of others as well*") (emphasis added) (citations omitted).  For example, at deposition, ██████████████████ witnesses identified several key factors allegedly causing a reduced market for coal: ████████████████████████████████████████



.[21]  It is Plaintiffs' burden to demonstrate that their alleged injury is traceable to the challenged inaction, not some endless list of other causes.  Plaintiffs' all-encompassing theory of causation for the reduced market for coal does not even demonstrate that their alleged injury to their financial interests is fairly traceable to EPA's CAA regulation or enforcement activities, let alone Section 321(a).

---

[19] *See, e.g.*, █████████████████████████████; █████████████████ Tr. Rob Murray at 137:10–141:11; *see also* ██████

[20] *See, e.g.*, ██████████████████████████████████ *see also* Ex. Q at 76–79; █████████████; Ex. W at 2; Ex. X.

[21] *See, e.g.*, ████████████████████████████████████; *see also* ██████

Finally, to the extent that Plaintiffs attempt to blame Moody's reduction of Murray Energy Corporation's credit in November 2015 and February 2016 on the reduced market for coal, the Moody's reports reflect that Plaintiffs' credit woes are self-inflicted. ████████

████████████████████████████████████████████████████████

████████.[22] ████████████████████████████████████████████

████████████████████████,[23] or other negative financial implications were the result of poor business decisions made by Plaintiffs, not EPA.

### C.   Plaintiffs Have Not Demonstrated That Their Alleged Injury Will Likely Be Redressed by an Order From This Court.

Plaintiffs have not demonstrated redressability as a matter of law or fact.  Redressability requires that a plaintiff show that it is likely, and not "merely speculative," that the alleged injury will be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560–61 (citations and internal quotations omitted); *Stasko*, 282 F.3d at 320 (citations omitted).  On March 27, 2015, the Court held that Plaintiffs had *alleged* a redressable injury, reasoning that "[i]f this Court were to grant the requested injunctive relief to require the EPA to perform its duty under 42 U.S.C. § 7621, the results of the inquiry may have the effect of convincing the EPA, Congress, and/or the American public to relax or alter EPA's prior decisions."  ECF No. 71 at 11.  The United States requests that the Court reconsider its decision because the holding is not consistent with the plain language of Section 321(d), which the Court never referenced in its opinion, or relevant case law.  Regardless of whether the Court reconsiders its holding, however, Plaintiffs have not demonstrated that an order compelling EPA to perform the evaluations described in Section 321(a) will redress their alleged injuries.

The first hurdle to Plaintiffs establishing redressability is Section 321(d) of the CAA, which provides that "[n]othing in [Section 321] shall be construed to require or *authorize* the Administrator, the States, or political subdivisions thereof, to modify or withdraw any

---

[22] *See, e.g.,* ████████████████████████████████████████.
[23] ████████████████████████████████████████.

requirement imposed or proposed to be imposed under [the Act]."  42 U.S.C. § 7621(d) (emphasis added).  Because Congress did not authorize EPA to alter its existing or proposed regulations based on Section 321(a) employment evaluations, it is implausible that EPA would nevertheless modify or withdraw an existing or proposed regulation based on a judicial order requiring EPA to perform such evaluations.  In light of Section 321(d), Plaintiffs cannot establish that a ruling in their favor will actually redress their alleged injury.

Nor can Plaintiffs establish redressability based on hypothetical future legislation that Congress could adopt were the Court to rule in Plaintiffs' favor.  The D.C. Circuit rejected precisely that argument in *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 146–47 (D.C. Cir. 2012), *aff'd in part and rev'd in part on other grounds*, *Util. Air Regulatory Group v. EPA*, 134 S. Ct. 2427 (2014).  There, state petitioners attempted to demonstrate standing in a challenge to EPA's Tailoring Rule for greenhouse gases, arguing that, if the court granted the petition and vacated the rule, then "Congress will be forced to enact 'corrective legislation' to relieve the overwhelming permitting burdens on permitting authorities and sources, thus mitigating their purported injuries."  *Id.* at 146–47 (citations omitted).  The D.C. Circuit rejected this attempt to "simply hypothesize that Congress will enact 'corrective legislation'" as speculative:

> We have serious doubts as to whether, for standing purposes, it is *ever* "likely" that Congress will enact legislation at all.  After all, a proposed bill must make it through committees in both the House of Representatives and the Senate and garner a majority of votes in both chambers—overcoming, perhaps, a filibuster in the Senate.  If passed, the bill must then be signed into law by the President, or go back to Congress so that it may attempt to override his veto.

*Id.* (emphasis added).  The court further reasoned that, even if Congress acted, such action could take "many forms" and that "[a]ll of this is guesswork, which is precisely the point."  *Id.*  As in *Coalition for Responsible Regulation*, Plaintiffs' "faith that Congress will alleviate their injury is inherently speculative" in this case.  *Id.*  Accordingly, Plaintiffs have failed to allege a redressable injury, and EPA's Motion should be granted.

Regardless of whether the Court reconsiders its earlier ruling, Plaintiffs' claim must still be dismissed because they have failed to demonstrate that their alleged injuries are redressable. In its motion to dismiss, the United States argued that Plaintiffs had failed to allege a redressable injury because Plaintiffs' "theory of redressability depends on 'a lengthy chain of conjecture,' *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 666 (D.C. Cir. 1996) (en banc), that piles 'speculation upon hypothetical upon speculation,' *N.Y. Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 587 (D.C. Cir. 2011)." ECF No. 60 at 14.  On summary judgment, the Court is no longer required to undertake assumptions based on pleadings; rather, Plaintiffs must demonstrate a likelihood that each of the events in the chain of conjecture will occur.  Plaintiffs have made no such demonstration.  To the contrary, Plaintiffs' witness Paul Piccolini testified that he did not know how performance of the evaluations described in Section 321(a) could have any impact on Plaintiffs.  Tr. Piccolini at 75:21–23 ("Q. How would an analysis of employment impacts by the EPA assist Murray Energy?  A. I don't know how that would help.").

Moreover, Plaintiffs have demonstrated the futility of any attempt by this Court to redress the reduced market for coal or the loss of coal jobs by identifying an infinite set of independent causes that would not be affected by an order requiring EPA to perform the evaluations described in Section 321(a).  *See* Part II.B, *supra*.  Plaintiffs have therefore failed to demonstrate any likelihood that their alleged injury from a reduced market for coal will be redressed by a favorable ruling.

> **D.   Plaintiffs Have Not Demonstrated an Informational or Procedural Injury Fairly Traceable to EPA's Alleged Non-Performance of the Evaluations Described in Section 321(a) That Is Likely to Be Redressed by This Court.**

In its March 27, 2015 opinion, this Court held that Plaintiffs had alleged informational and procedural standing sufficient to withstand a facial challenge under Article III.  ECF No. 71 at 16–17.  Specifically, the Court held that "[t]he denial of the benefit of the evaluations . . . is sufficient to support procedural standing," and that Plaintiffs "may be entitled [via FOIA] to the information which has not been collected or analyzed" by the Agency.  *Id.*  The United States respectfully requests that this Court reconsider these holdings.

First, the Court should reconsider its holding regarding procedural injury because the Court did not address Section 321(d). Because Section 321(d) does not "authorize [EPA] . . . to modify or withdraw any requirement imposed or proposed to be imposed under [the Act]," 42 U.S.C. § 7621(d), the employment evaluations described in Section 321(a) are independent of EPA's other statutory obligations. Congress did not intend to provide a connection between Section 321(a) and any substantive agency action that might impact a concrete interest of Plaintiffs; rather, Congress intended the opposite in Section 321(d). This Court's earlier holding reads Section 321(d) out of the statute and, therefore, should be reconsidered.

Second, the Court should reconsider its holding that Plaintiffs have alleged an informational injury. As the United States previously noted, "statutorily-derived informational standing must be limited to statutes with a basic goal of providing information or that implicate a fundamental right." ECF No. 70 at 13 (citations omitted). The Court did not, however, reconcile its holding with the many cases cited by the United States that demonstrate the difference between FOIA claims and claims made under substantive statutes. *See, e.g.*, *Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 958 (7th Cir. 2005) ("[S]tatutes like FOIA . . . that have served as the basis for informational standing have a goal of providing information to the public; the [Forest Service Decisionmaking and Appeals Reform Act]'s goal is simply to increase public participation in the decision-making process."). Taken to its logical conclusion, the Court's holding on informational injury would lead to the untenable result that anytime an agency generates information as part of its activities under a substantive statute, no matter how ministerial, a citizen would have an informational injury under the substantive statute merely due to the existence of FOIA. Congress did not intend for this Court to read the limited set of actionable FOIA claims into Section 321(a) and every other federal statute.

Regardless of whether the Court reconsiders its previous holdings, Plaintiffs have not demonstrated that they have been denied the benefit of employment evaluations or that EPA has not provided them information collected and analyzed by the Agency regarding employment impacts. Indeed, Plaintiffs, as well as the general public, have already received the benefit of

31

EPA's employment evaluations in the RIAs and other documents.  As described *infra* in Part III.A, EPA performs an employment impacts analysis for all of its significant CAA rules and that information is available to the public.  Indeed, Plaintiffs' Rule 30(b)(6) witness was generally aware of these documents and the analysis contained therein, including the fact that the RIAs evaluate employment impacts.  Tr. Ryan Murray at 226:18–227:24, 382:13–21.  Although the witness stated that the RIAs do not constitute the evaluations described in Section 321(a) because the analyses are not, in Plaintiffs' view, sufficient, *id.* at 382:22–385:16, 387:19–23, mere disagreement regarding the sufficiency of the procedure or information provided by a federal agency does not amount to injury-in-fact.  Thus, Plaintiffs have not met their burden to establish procedural and informational standing.

## III.    THE AGENCY HAS PERFORMED THE EVAUATIONS DESCIBED IN SECTION 321(a) AS A MATTER OF LAW.

### A.    EPA Has Conducted Continuing Evaluations of Potential Loss or Shifts of Employment That May Result from the Administration and Enforcement of the Act and Applicable Implementation Plans.

Even if Section 321(a) imposes a non-discretionary duty, EPA has performed that duty by "conduct[ing] continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of [the Act] and applicable implementation plans."  42 U.S.C. § 7621(a).  The 64 documents submitted with the Updated DeMocker Declaration demonstrate EPA's performance.

The language in Section 321(a) is broad and ambiguous.  Section 321(a) does not define the term "evaluation," prescribe with any specificity the scope, timing, frequency, form, or content of evaluations, require EPA to use any specific methodology when conducting an evaluation, or even speak to whether EPA must publish the results of an evaluation.  Indeed, as the Fourth Circuit noted, "no court, including the district court here, has ever explicated what Section 321(a) requires."  *In re McCarthy*, 2015 WL 8286143, at *2.  In the absence of statutory guidance, EPA has discretion in deciding how to carry out the duty in Section 321(a).  *See, e.g.*, *Frey*, 751 F.3d at 469–70 (recognizing discretion for "[t]he substance of the EPA's decisions [on

non-discretionary duties]"); *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986–87 (9th Cir. 1994) (holding that the "substance and manner of achieving" compliance with a non-discretionary duty is to be left "entirely to the EPA").

Although Section 321(a) does not require EPA to conduct employment evaluations for individual regulations, EPA has, in its discretion, evaluated the potential employment impacts of significant rulemakings and many non-significant rulemakings in its RIAs and EIAs. Although Section 321(a) does not prescribe any specific level of detail for the employment evaluations, EPA has, in its discretion, conducted detailed quantitative analyses that provide numerical estimates for potential job losses, shifts, and gains, where feasible. Finally, although Section 321(a) does not require EPA to evaluate potential employment impacts for any particular sector of the economy, EPA has, in its discretion, evaluated potential employment impacts on the coal-mining industry.

While Plaintiffs may not agree with EPA's policy choices or conclusions in its employment evaluations, those issues are not before this Court. The only issue before this Court is whether EPA has conducted the evaluations described in Section 321(a). It is undisputed that EPA conducted the employment evaluations attached to the Declaration. The Fourth Circuit recognized this fact when it stated that "the district court may yet determine that EPA's documents satisfy Section 321(a)." *In re McCarthy*, 2015 WL 8286143, at *2. Given the considerable discretion that Congress afforded EPA under the broad wording of Section 321(a), these evaluations constitute performance of any non-discretionary duty contained therein, and EPA is entitled to summary judgment as a matter of law.

       1.    <u>EPA Has Evaluated the Employment Impacts That May Result from the Agency's Administration and Enforcement of Specific Regulations and Implementation Plans.</u>

The 49 RIAs, EIAs, and associated memoranda[24] submitted with the Declaration demonstrate EPA's regular and continuing efforts to evaluate how the administration and

---

[24] Hereafter, EPA will generally refer to the RIAs, EIAs, and memoranda collectively as just "RIAs."

enforcement of specific regulations and implementation plans may impact employment.  Decl. Exs. 1–49.  In fact, for each of the rules that directly impose requirements on power plants that Plaintiffs cite in their Amended Complaint, EPA has prepared one or more RIAs that include a description of the methodologies used to evaluate potential employment impacts and the factors considered in the evaluation.  *See* Am. Compl. ¶ 36(a) and Exs. 10–13; Am. Compl. ¶ 36(b) and Exs. 8–9; Am. Compl. ¶ 36(e) and Exs. 5–7.[25]  Indeed, some of EPA's most robust evaluations of potential employment impacts are in the RIAs conducted for rules that affect the power sector.

When available data and appropriate methodologies make it feasible, EPA's RIAs include quantified estimates of employment gains, shifts, and losses in both the regulated sector and other affected sectors.[26]  For example, the RIA for the Final Mercury and Air Toxics Standards ("MATS"), one of the regulations cited by Plaintiffs (*see* Am. Compl. ¶ 36(b)), provides a detailed "Employment and Economic Impact Analysis."  *See* Ex. 9, at 6-1 to 6-17,

---

[25] Plaintiffs also cite two final agency actions designating areas under the 2006 24-hour fine particulate matter ("$PM_{2.5}$") and 2010 sulfur dioxide ("$SO_2$") NAAQS.  *See* Am. Compl. ¶ 36(c) & (d).  Those designations merely reflect the status of air quality; they do not impose any obligations on sources in a given area.  *See* 42 U.S.C. § 7407(d) (requiring EPA to designate areas of the country as attainment, nonattainment, or unclassifiable based on air quality monitoring data after EPA revises a NAAQS).  These actions neither "[s]electively target coal-fired emissions sources for additional regulation" nor "encourage states to develop state implementation plans that require reductions in the consumption of coal."  Am. Compl. ¶ 36(c) & (d).  Instead, following area designations under the Act, states retain discretion in developing implementation plans that address pollution sources impacting the air quality in such areas as needed to demonstrate attainment of ambient standards.  *See, e.g.*, 42 U.S.C. §§ 7502(c), 7513a, and 7514a.

[26] *See* RIAs for Clean Power Plan (Exs. 1–4), RIAs for Mercury and Air Toxics Standards, or "MATS" (Exs. 8–9), RIAs and related memoranda for the National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial, and Institutional Boilers and Process Heaters (Exs. 10–13), RIAs and related memoranda for Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Commercial and Industrial Solid Waste Incineration Unit (Exs. 14–17), RIAs for Proposed New Source Performance Standards and Amendments to the National Emissions Standards for Hazardous Air Pollutants for the Oil and Natural Gas Industry (Exs. 18–19), RIA for Federal Implementation Plans to Reduce Interstate Transport of Fine Particulate Matter and Ozone in 27 States (Ex. 22), RIA for the Proposed Cross-State Air Pollution Rule (CSAPR) Update for the 2008 Ozone NAAQS (Ex. 23), RIA for Final Rulemaking for 2017-2025 Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards (Ex. 26), RIAs for Tier 3 Motor Vehicle Emission and Fuel Standards (Exs. 24–25), and RIA for Amendments to the National Emission Standards for Hazardous Air Pollutants and New Source Performance Standards for the Portland Cement Manufacturing Industry (Ex. 31).

6A-1 to 6A-16.  In the RIA, EPA quantified potential employment impacts under three different

approaches, and specifically assessed the potential impact on the coal industry.  EPA identified a

one-time increase of 46,120 job-years due to construction and the installation of pollution-

control equipment.  *Id*. at 6A-2, tbl. 6A.  To evaluate potential employment impacts on the coal-

mining sector, EPA used the Integrated Planning Model ("IPM")[27] to estimate the effect on coal-

mining jobs from changes in overall demand for coal at electric utilities.  Using data provided by

the Energy Information Agency on regional coal-mining productivity, EPA projected coal-

mining employment impacts by region, and estimated a loss of 1,950 job-years in Appalachia, a

gain of 1,990 job-years in the Interior region, and a loss of 420 job-years in the West.  *Id*. at 6A-

10, tbl. 6A-6.  EPA also estimated a loss of 60 job-years for waste coal, for a net total loss of 430

job-years in coal mining, and projected the retirement of 4.7 gigawatts of coal-fired generation,

leading to an estimated loss of 2,500 job-years in the electric utility sector.  *Id*. at app. 6A, tbls.

6A-1 to 6A-6.  EPA identified a net effect on utility-sector employment ranging from a loss of

15,000 jobs to a gain of 30,000 jobs, with a central estimate of 8,000 jobs gained.  *Id*. at 6-12, tbl.

6-6.  Finally, the RIA estimated that MATS would yield annual monetized benefits (in 2007

dollars) of $37 to 90 billion using a 3% discount rate, reflecting, among other things, 4,200 to

11,000 fewer premature mortalities, and annual monetized social costs, approximated by the

compliance costs, of $9.6 billion (in 2007 dollars).  *Id*. at ES-1.

The RIA for the Clean Power Plan Final Rule, "Final Carbon Pollution Emission

Guidelines for Existing Stationary Sources: Electric Utility Generating Units" (Ex. 3), also

provides a quantitative analysis of potential employment impacts, including estimates for the

---

[27] The IPM is a detailed model of the U.S. electric power sector.  EPA uses the model to project changes
in the power sector and related upstream industries from the effect of air emission rules.  *See*
https://www.epa.gov/airmarkets/power-sector-modeling.  IPM includes a detail-rich representation of fuel
supply and consumption for the power sector, including coal supply and consumption.  EPA's latest
report on the assumptions, updates, and enhancements in IPM includes a chapter on coal that details how
the coal sector is modeled within IPM, including the bottom-up, mine-by-mine approach used to develop
coal supply curves.  *See* http://www.epa.gov/airmarkets/documents/ipm/Chapter9.pdf; full table of
contents at http://www.epa.gov/airmarkets/programs/ipm/psmodel.html.  The chapter also includes
detailed discussion of coal transportation, coal supply regions, coal demand regions, coal quality, coal
imports, exports, and non-electric sector coal demand.

electric-power industry and coal and natural-gas sectors.  As a result of demand-side energy-efficiency initiatives in response to the final rule, EPA estimated projected employment increases ranging from 37,570 to 59,700 full or part-time employees in 2020, from 52,590 to 83,590 jobs in 2025, and from 52,440 to 83,360 jobs in 2030.  Ex. 3 at 6-31, tbl. 6-6.  EPA also estimated a loss of 1,300 to 13,300 job-years per year in the coal-mining industry, depending on the year and other variables.  *Id.* at 6-24 to 6-25.  Finally, depending on the regional and state-specific compliance approaches used, the RIA estimated monetized climate and health benefits between $32 and 54 billion by 2030 (in 2011 dollars).  *Id.* at ES-20 to -21, tbls. ES-7 & ES-8.

In some instances, the RIAs demonstrate that the action under consideration will have no impact on baseline operations or will lead to cost savings.[28]  After considering the overall economic effects of the regulation at issue, these RIAs conclude that there will be no significant impacts on employment.  For example, the RIA for the Standards of Performance for Greenhouse Gas Emissions for New Stationary Sources:  Electric Utility Generating Units (referenced by Plaintiffs at Am. Compl. ¶ 36(e)), concluded that "there are no notable macroeconomic or employment impacts expected as a result of this proposed rule."  Ex. 5 at 5-37; *see also* Ex. 32 at 4-1 (concluding that "no national-level negative economic impacts are expected" to result from the implementation and enforcement of the Petroleum Refineries New Source Performance Standards).

While many of the RIAs provide a detailed, quantitative assessment of the employment impacts that may result from the administration and enforcement of the regulations, a quantitative assessment is not required by Section 321(a).  In instances where data limitations or a lack of scientifically defensible methodologies preclude a quantitative assessment, EPA has conducted a qualitative evaluation of potential employment impacts based on relevant peer-

---

[28] *See* RIA for Standards of Performance for Greenhouse Gas Emissions for New Stationary Sources: Electricity Utility Generating Units (Exs. 5–7), RIA for Carbon Pollution Emission Guidelines Supplemental Proposal for Indian Country and U.S. Territories (Ex. 2), RIA for Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium and Small Heavy-Duty Engines and Vehicles (Ex. 34), and RIA for Petroleum Refineries New Source Performance Standards Ja (Ex. 32).

reviewed literature.[29]  For example, the RIA for the Tier 3 Vehicle Emission and Fuel Standards (Ex. 24) provided a partial quantification of job losses and gains in the motor vehicle manufacturing sector, but was unable to quantify the impact on employment in less directly-affected sectors, including the auto parts manufacturing and retail sectors.  In the RIAs where EPA concluded that the available data were insufficient to quantify or estimate potential losses and gains in employment, EPA described the contingencies that limited the evaluation.[30]  *See, e.g.*, Ex. 39 at 5-9 to 5-12 (declining to quantify employment impacts for the ferroalloy industry due to a lack of data).

The RIAs associated with the revisions of two National Ambient Air Quality Standards ("NAAQS") demonstrate EPA's evaluation of potential employment impacts that may result from the plans that States will submit to implement those NAAQS.[31]  For example, in the RIA for the Final Revisions to the NAAQS for Ground-Level Ozone (Ex. 28), EPA evaluated the employment impacts related to the installation and maintenance of nitrogen oxide ($NO_X$) control equipment in various industries where state plans may require regulated facilities to install and operate various $NO_X$ control devices.  *Id.* at 5-9 to 5-10.

---

[29] *See* RIA for Proposed Revisions to the Emission Guidelines for Existing Sources and Supplemental Proposed New Source Performance Standards in the Municipal Solid Waste Landfills Sector  (Ex. 21), RIAs for Proposed Brick and Structural Clay Products National Emissions Standards for Hazardous Air Pollutants (Ex. 29, 30), EIA for Petroleum Refineries Proposed Amendments to the National Emissions Standards for Hazardous Air Pollutants and New Source Performance Standards (Ex. 33), RIA for Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles (Ex. 34), and RIAs for Proposed and Final Residential Wood Heaters New Source Performance Standards Revision (Exs. 46, 47).

[30] *See* RIA for Manganese Ferroalloys Risk and Technology Review (Exs. 39–41), RIA for Proposed National Emission Standards for Hazardous Air Pollutants for Mercury Emissions for Mercury Cell Chlor Alkali Plants (Ex. 36), RIAs for Cost and Benefit Changes Since Proposal For Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources:  Sewage Sludge Incineration Units (Exs. 37–38), RIAs for Existing Stationary Spark Ignition Reciprocating Internal Combustion National Emission Standards for Hazardous Air Pollutants (Exs. 42–43), and RIAs for Existing Stationary Compression Ignition Engines National Emission Standards for Hazardous Air Pollutants (Exs. 44–45).

[31] *See* RIAs for Revisions to the National Ambient Air Quality Standards for Particulate Matter (Exs. 48–49) and RIA for Revisions to the National Ambient Air Quality Standard for Ground-Level Ozone (Exs. 27–28).

Additionally, EPA has evaluated the potential employment impacts that may result from specific implementation plans.  In the RIA for EPA's 2011 Cross-State Air Pollution Rule (Ex. 22), which was comprised in part of federal implementation plans for 27 States, EPA assessed potential employment impacts for three different sectors.  *Id.* at 286.  EPA estimated impacts to the affected electricity sector at between 1,000 job losses and 3,000 job gains, with a central estimate of 700 jobs gained.  *Id.* at 287–91, tbls. 8-3, 8-7.  For impacts to the environmental protection sector, EPA estimated that the rule would support or create 2,230 job-years by 2014. *Id.* at 291–99, tbl. 8-7.  EPA also provided an estimate for non-regulated entities that included an increase of 2,650 job-years from "Changes to Demand in Materials," an increase of 2,320 job-years from ongoing annual retrofit operations, a decrease of 2,710 job-years from "Coal Capacity Retirements," and a net loss of 990 job-years from changes in fuel use, including an accounting for losses of job-years in the coal sector.  *Id.* at 295–98, tbl. 8-6, app. D.  Appendix D, "Employment Estimates of Direct Labor in Response to the Final Transport Rule in 2014," describes how EPA used the IPM to project employment shifts in the coal, natural gas, and natural gas pipeline sectors.  *See id.* at 371–90.  The RIA also estimated monetized annual health benefits in 2014 of $120 to 280 billion using a 3% discount rate (in 2007 dollars), reflecting, among other things, the prevention of 13,000 to 34,000 premature deaths, and annual monetized social costs of $810 million using a 3% discount rate (also in 2007 dollars).  *Id.* at 1–2.

Finally, the RIAs demonstrate EPA's commitment to "continuing" its evaluation of potential employment impacts throughout EPA's rulemaking process, including when significant changes are made after a rule has been finalized.  In most instances, a draft evaluation of potential employment impacts is included in the RIA associated with the proposed rule.  EPA then revises the evaluation as appropriate in a subsequent RIA supporting the final rule.  *See, e.g.*, Exs. 16 and 17 (revising the estimates of potential employment impacts).  EPA also revises the evaluation, as appropriate, in the event that reconsideration of the rule is granted or a supplemental rulemaking process is necessary.  *See, e.g.*, Exs. 12 and 13, 16 and 17.  Thus, EPA

continues to refine its estimates as new information and data become available during the rulemaking proceeding.

In sum, the detailed evaluations of employment impacts in the RIAs attached to the Declaration as Exhibits 1–49 demonstrate that EPA has performed any duty imposed by Section 321(a).

2.   EPA Has Conducted Evaluations of the Overall Employment Impact of Its Administration and Enforcement of the Act.

In addition to the detailed evaluations of potential employment impacts associated with individual regulatory actions, EPA has also conducted broad-scale evaluations of the impact of the administration and enforcement of the Act on employment, including an evaluation of the impacts of the Act's Title IV Acid Rain Program on employment in the coal industry.

EPA's "White Paper," titled "Empirical evidence regarding the effects of the Clean Air Act on jobs and economic growth" (2011) (Ex. 50), evaluated whether job losses or shifts result from EPA's programmatic administration and enforcement of the Act. Its stated purpose was to evaluate "the connection between environmental regulation — specifically, the Clean Air Act — and employment and economic growth in the United States" based on relevant findings from the economics literature. *Id.* at 1. The White Paper includes a section specifically addressing the "Impacts of the Clean Air Act on Employment," in which EPA examined relevant economic research. *Id*. at 3–4. One such study examined the effect of increased environmental compliance spending on four heavily regulated industries (pulp and paper, refining, iron and steel, and plastic) and concluded that such spending "generally does *not* cause a significant change in employment." *Id*. (citation omitted) (emphasis in original). In another section of the White Paper, EPA reviewed data on employment and revenue in the environmental technology and services sector since the early 1970s, following the passage of the Act and other environmental laws. *Id.* at 4–6. Other portions of the White Paper evaluated the overall effect of CAA pollution abatement costs on the U.S. manufacturing sector, *id*. at 7–9, and Gross Domestic Product, *id*. at 3.

39

EPA also prepares multi-decade studies that evaluate past impacts and project future impacts of EPA's administration and enforcement of the Act.  *See* Exs. 52, 54 (*The Benefits and Costs of the Clean Air Act*).  Although these analyses considered a variety of economic topics beyond potential employment impacts, EPA, in preparing the analyses, acknowledged and addressed the potential relevance of job losses and shifts in the Nation's economy.  The first of these multi-decade reports evaluated the benefits and costs of the Act during its first two decades of implementation.  *See The Benefits and Costs of the Clean Air Act 1970 to 1990* (Ex. 52).  EPA estimated that the total monetized benefits of the CAA, from 1970 to 1990, range from $5.6 to 49.4 trillion (in 1990 dollars) with compliance costs over the same time period of $500 billion (in 1990 dollars).  The central estimate of $22.2 trillion in benefits may be a significant underestimate due to the exclusion of large numbers of benefits from the monetized benefit estimate (e.g., all air toxics effects, ecosystem effects, and numerous human health effects).  *Id.* at ES-8.  The study concluded that the impact of CAA implementation on employment varied by sector, finding that CAA implementation was associated with decreasing employment in some sectors and increasing employment by "similar magnitudes" in other sectors.  *Id.* at 9.  An analysis prepared as part of the study, *The Clean Air Act and the U.S. Economy:  Final Report of Results and Findings* (Ex. 53), also concluded that:

> Twenty sectors experience reductions in the use of labor services.  Of these, eight also show output reductions while substitution effects dominate output effects in the remaining twelve.  Fourteen sectors show increases in labor input. Here, the output effects dominate so labor input rises while labor output ratios decline.

*Id.* at 4.12.

In November 1999, EPA published a prospective study estimating the benefits and costs of the CAA Amendments of 1990 through the year 2010.  *See The Benefits and Costs of the Clean Air Act: 1990 to 2010* (Ex. 54).  EPA estimated that the annual economic value of the human health and environmental benefits of the CAA Amendments would range from $26 to 270 billion (in 1990 dollars) with annualized costs of $26 billion (in 1990 dollars).  *Id.* at iii-iv, tbl. ES-1.  Two years later, EPA issued a revision to the 1993 Jorgenson analysis (Ex. 53), titled *An*

*Economic Analysis of the Benefits and Costs of the Clean Air Act 1970 to 1990: Revised Report of Results and Findings* (Ex. 55).  That report concluded:

> The net benefits of the CAA combine the early capital and productivity losses of compliance with the subsequent labor and capital gains associated with fewer deaths and workdays lost. . . . Ultimately, under the CAA, the economy is larger with a larger population, a larger pool of labor and a greater capital stock.

*Id*. at 25.

While EPA's White Paper and multi-decade studies evaluated employment impacts across all industries, EPA has also prepared reports specifically evaluating the coal-industry employment impacts of a significant CAA program.  A 2001 report on the *Impacts of the Acid Rain Program on Coal Industry Employment* (Ex. 51) projected the impact of the Act's Title IV Acid Rain Program on coal-mining employment through 2010.  EPA used the IPM model to calculate regional shifts in coal production that could be attributed to Title IV.  EPA then used productivity estimates for coal mining in different portions of the country to translate changes in coal demand into changes in coal-industry employment.  The report concluded that by 2010, Title IV could result in "a gross loss of 7,700 job slots" with a net loss of "4,100 coal miner job slots because 3,600 new job slots would be created."  *Id.* at 1.

3.     EPA Is Continuing to Evaluate the Employment Impacts That May Result From Its Administration and Enforcement of the Act.

EPA's RIAs demonstrate the Agency's on-going, continuing effort to assess the potential employment impacts of individual regulations, while its official reports, including the White Paper and the *Impacts of the Acid Rain Program on Coal Industry Employment* report, demonstrate the Agency's continuing broad-scale efforts to assess the employment impacts of the Act and its programs.  These evaluations clearly constitute performance under Section 321(a).  Nevertheless, other documents and initiatives demonstrate that EPA is going further to support continuous improvement in the methodology used for assessing potential employment impacts.  As part of that effort, EPA has issued Agency-wide guidelines for conducting such evaluations, and has conducted, sponsored, or participated in various research projects, studies, seminars, and workshops to assess and improve its analytical capabilities and methodologies.

EPA's *Guidelines for Preparing Economic Analyses* (*Guidelines*) (Ex. 56) provide direction to all EPA economists and analysts who conduct economic analyses, including RIAs prepared during the development of regulations.  *Id*. at 1-1 to 1-2.  The *Guidelines* are "part of a continuing effort" by EPA to improve its decision-making process and have been revised and updated several times to reflect new developments.  *Id*. at 1-1.  The *Guidelines* include a section on "Impacts on employment," which discusses preferred approaches.  *Id*. at 9-8 to 9-9.  The *Guidelines* caution that many extant employment analyses rely on simplifying assumptions that "are faulty and should not be used."  *Id*. at 9-8.  The *Guidelines* clarify that many different employment impacts must be taken into account if an analysis is to present "a complete picture" of the employment effects of an environmental policy.  *Id*.  These impacts include a demand effect, cost effect, and factor-shift effect on the regulated industry, as well as employment effects on pollution-control industries and industries that make substitute products.  *Id.* at 9-8 to 9-9.  The *Guidelines* demonstrate EPA's commitment to rigorous, consistent treatment of employment analysis across the Agency.

EPA has also convened workshops and seminars to advance the science and policy for evaluating employment impacts associated with environmental regulation.  EPA's NCEE, in consultation with Professor V. Kerry Smith of Arizona State University, convened a scientific workshop with academic experts to examine the theory and advance the available methods for understanding the employment effects of environmental regulation.  The purpose of the workshop was to consider additional research needed to improve the policy-evaluation practices to take better account of the state of the economy and the employment effects of regulations.  Technical papers were presented by academic experts with backgrounds in macroeconomics, labor economics, and environmental economics.  The agenda and the papers presented are available on NCEE's website.[32]

---

[32] Description of Workshop: Advancing the Theory and Methods for Understanding Employment Effects of Environmental Regulation, NCEE, http://yosemite.epa.gov/ee/epa/eed.nsf/82A1EF3ABDDDBFC085257600006BB562/F118D6A5DCEF3EE685257B570078FA3E?OpenDocument.

In 2012, EPA economists participated in a series of workshops hosted by the University of Pennsylvania Law School to "understand better which regulations have which specific effects on jobs and what are the conditions under which these effects occur."  Excerpt from *Does Regulation Kill Jobs?*, U. Pa. Press, http://www.upenn.edu/pennpress/book/toc/15183.html.  The workshop resulted in a published conference volume:  *Does Regulation Kill Jobs?*[33]  EPA economists co-authored several chapters of the conference volume.  *See* Exs. 58–60; *see also* Exs. 61–62 (additional research papers authored by EPA economists evaluating employment impacts).

In another effort to advance EPA's ability to evaluate the employment impacts associated with environmental regulation, EPA has formed a panel of experts as part of its SAB to advise the Agency on how best to model and estimate the economy-wide economic impacts of its regulations.  EPA requested public comment on specific questions regarding approaches to analyzing employment effects.  *See* "Comment Request; Draft Supporting Materials for the Science Advisory Board Panel on the Role of Economy-Wide Modeling in U.S. EPA Analysis of Air Regulations," 79 Fed. Reg. 6899 (Feb. 5, 2014).  Public comments were incorporated and addressed, and the resulting questions were submitted to the SAB on February 26, 2015 (Ex. 63).[34]  The SAB has already met on three occasions, in July and October of 2015 and March of 2016.[35]  In September 2015, EPA provided the SAB with a series of "White Papers" to inform its deliberations on the technical merits and challenges of economy-wide modeling for air regulations.  *See* Ex. 64.  In one of those white papers, *Economy-Wide Modeling: Social Cost and Welfare White Paper*, EPA discussed the treatment of labor markets and transition costs in

---

[33] The Preface to this volume is provided at Ex. 57.

[34] The latest information on Economy-Wide Modeling of the Benefits and Costs of Environmental Regulation is available at http://yosemite.epa.gov/sab/sabproduct.nsf/fedrgstr_activites/Economywide%20modeling!OpenDocument&TableRow=2.0#2.

[35] *See* Advisory Meetings and Report Development on the SAB webpage at https://yosemite.epa.gov/sab/sabproduct.nsf/LookupWebProjectsCurrentBOARD/07e67cf77b54734285257bb0004f87ed!OpenDocument&TableRow=2.2#2.

various computable general equilibrium models, *id.* at 41–43, and the measurement of employment impacts related to a policy's overall effect on economic welfare and distributional impacts, *id.* at 47–49.

In sum, the dozens of documents submitted with the Declaration demonstrate that EPA has conducted continuing evaluations of potential employment impacts that may result from its administration and enforcement of the Act and applicable implementation plans.  Accordingly, EPA has performed any duty set forth in Section 321(a).

### B.   Employment Evaluations Need Not Be Labeled as "Section 321(a)" Evaluations to Constitute Performance of Any Duty in Section 321(a).

As expressed in previous filings, the United States concedes that the documents attached to the Declaration were not prepared explicitly for purposes of Section 321(a), nor were they labeled as such.  However, the Act does not require EPA to label its employment evaluations as being performed under the auspices of Section 321(a), nor is the absence of labeling determinative in evaluating whether EPA fulfilled its alleged Section 321(a) duty.  *See, e.g.*, *Sierra Club v. Browner*, 130 F. Supp. 2d 78, 91 & 92 n.17 (D.D.C. 2001) (noting that agency letters and statements that did not expressly reference the statutory duty could collectively evidence fulfillment of that duty), *aff'd*, 285 F.3d 63 (D.C. Cir. 2002).[36]  The Fourth Circuit has already found this proposition to be "eminently reasonable."  *In re McCarthy*, 2015 WL 8286143, at *2.  Indeed, requiring an agency to formulaically invoke a particular statutory provision as a prerequisite to demonstrating compliance with any duty not only elevates form over substance, but also runs contrary to the well-established principle that the "substance and manner of achieving . . . compliance" with a non-discretionary duty is to be left "entirely to the EPA."  *Alaska Ctr. for the Env't*, 20 F.3d at 986–87.  Thus, in deciding whether the documents

---

[36] Although discovery was not necessary to decide this purely legal issue, the United States notes that EPA's economists testified that the RIAs and other documents constitute the evaluations described in Section 321(a).  *See, e.g.*, Tr. Weatherhead at 170:25–171:2 ("I believe that the work that we do within our RIAs and EIAs does constitute a continuing evaluation with respect to 321[a]."); Tr. McGartland at 52:22–54:17; Tr. DeMocker at 102:13–20, 105:17–106:2; Tr. Ferris at 259:10–19 ("[M]y understanding is that the work I've been doing has contributed to employment impact evaluations on a regular basis through these RIA analyses."); Tr. Evans at 214:6–13.

constitute performance under Section 321(a), it is immaterial that EPA undertook the evaluations without labeling them as "Section 321(a)" evaluations.

### C.     The Sufficiency of EPA's Evaluations Is Not Before This Court.

Plaintiffs cannot dispute that EPA has conducted the employment evaluations attached to the Declaration.  However, to the extent Plaintiffs argue that such evaluations are not sufficient to satisfy Section 321(a), that question is not before this Court.[37]  Assuming arguendo that this Court does not dismiss the case for lack of subject matter jurisdiction, the Court's role in this case is limited to determining whether EPA has *performed* the continuing evaluations described in Section 321(a).  It is not the role of the Court to examine those evaluations to determine, for example, whether EPA considered appropriate factors or applied appropriate methodologies.  Nor is it the role of this Court to determine whether EPA's administration and enforcement of the Act has negatively impacted the coal industry, which appears to be the gravamen of Plaintiffs' complaint.  As the Seventh Circuit explained in *Frey*:

> Our review of the EPA's actions is limited. [The citizen-suit provision] permits suits against the EPA only if they allege a failure to perform an act or duty under [the statute] "which is not discretionary.". . . The substance of the EPA's decisions, on the other hand, is at least partly discretionary, and therefore *beyond the scope of these citizen suit provisions*.  The scope of judicial review under these provisions is therefore *much narrower* than the scope of judicial review under the Administrative Procedure Act, which allows judicial review of the substance of an agency's action under a deferential abuse-of-discretion standard. . . .

> We thus read [the] citizen suit provision to allow review of claims regarding *whether* the EPA complied with required procedures under [the statute], *but not claims regarding the substance* of the EPA's decisions, which is a matter of discretion for the agency.

---

[37] Even if the sufficiency of the employment evaluations were before the Court, which it is not, Plaintiffs cannot demonstrate that EPA must do more to fulfill the duty than the Agency already has done.  While the United States maintains that discovery was not required to resolve the merits of the claim, it is worth noting that Plaintiffs have taken the position that the RIAs do not satisfy Section 321(a) because they do not provide information sufficient for their employees to determine whether the regulation will cause them to be laid off.  *See* Tr. Ryan Murray, at 383:16–384:11.  Plaintiffs have testified that their decision to lay off employees at their mines, by contrast, is based on a "complex" proprietary integrated financial planning model (that has multiple inputs), which is in the sole possession of Plaintiffs and is not provided to EPA.  *Id.* at 296:3–299:8; 384:12–385:1.  EPA witnesses testified that, to determine whether a regulation caused a facility to close or to predict whether a regulation might cause a facility to close, EPA would need the facility's confidential financial information, which EPA typically does not possess.  *See, e.g.*, DeMocker Tr. at 83:4–20.

751 F.3d at 469–70 (internal citations omitted) (emphases added);[38] *see also Thomas*, 828 F.2d at 792 (rejecting "the convoluted notion that EPA is under a nondiscretionary duty . . . not to abuse its discretion"); *cf. Monongahela Power Co.*, 980 F.2d at 276 n.3 (interpreting the CAA citizen-suit provision in Section 304(a)(2) narrowly).

The documents submitted with the Declaration demonstrate EPA's performance of the evaluations described in Section 321(a) and support entry of judgment in favor of EPA.  If this Court concludes that the documents upon which EPA relies do not constitute performance of the evaluations described in Section 321(a), then the Court should enter judgment for Plaintiffs and order EPA to perform the duty.

## IV.   IF THE COURT FINDS THAT EPA VIOLATED A DUTY FOUND IN SECTION 321(a), THEN IT SHOULD ENTER JUDGMENT AGAINST EPA AND ORDER EPA TO PERFORM THAT DUTY AND NOTHING MORE.

Plaintiffs request that this Court "[e]njoin[] the Administrator from approving further regulations impacting employment in the coal industry and from continuing its New Source Review enforcement campaign against coal-fired power plants for work done after the expiration of the applicable statute of limitations until EPA has completed its evaluation."  Am. Compl. at Prayer For Relief ¶ (c).  This request is barred by sovereign immunity, by the jurisdictional requirements for challenging agency actions, and by the plain language of the Act itself.[39] Therefore, if this Court finds that EPA has not performed the duty in Section 321(a), the Court should order EPA to perform that duty and nothing more.

---

[38] *Frey* arose under the citizen-suit provision of CERCLA, 42 U.S.C. § 9659(a)(2), whose non-discretionary language is identical to the non-discretionary duty language in the CAA at issue here.  The *Frey* court noted that identical language in the ESA and CWA citizen-suit provisions had been interpreted — as a matter of law — the same way.  *See Bennett*, 520 U.S. at 172 (ESA); *Scott v. City of Hammond*, 741 F.2d 992, 995 (7th Cir. 1984) (CWA); *accord City of Las Vegas v. Clark Cty.*, 755 F.2d 697, 704 (9th Cir. 1985); *Pa. Dep't of Envtl. Res. v. EPA*, 618 F.2d 991, 995–96 (3d Cir. 1980); *Sun Enters. v. Train*, 532 F.2d 280, 286–88 (2d Cir. 1976).

[39] This Court did not previously reach the issue of the proper scope of injunctive relief, acknowledging that "there may exist some question as to [the] scope of the injunctive relief which may be awarded by this Court."  ECF No. 40 at 15.  If the Court determines that Plaintiffs have demonstrate subject-matter jurisdiction, then the issue is now ripe for consideration and decision.

Plaintiffs bear the burden to show that their claim and requested relief fall within an applicable and unequivocal waiver of sovereign immunity. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Waivers of sovereign immunity "must be unequivocally expressed in [the] statutory text, and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted). Even when a statute provides an express waiver of sovereign immunity, that waiver is strictly construed in favor of the government. *See United States v. Nordic Village*, 503 U.S. 30, 34 (1992); *McMellon v. United States*, 387 F.3d 329, 340 (4th Cir. 2004). Moreover, when the United States consents to be sued, Congress may define the terms and conditions upon which it may be sued, *United States v. Kubrick*, 444 U.S. 111, 117–18 (1979), and those terms are jurisdictional. *See McMellon*, 387 F.3d at 340.

For the narrow waiver of sovereign immunity in CAA Section 304(a)(2), only limited injunctive relief is available. Specifically, courts are limited by Section 304(a)(2)'s express terms, which specify that, "district courts shall have jurisdiction . . . to order [EPA] to perform such act or duty, as the case may be." 42 U.S.C. § 7604(a)(2); *see also Sierra Club*, 130 F. Supp. 2d at 90 ("Under [Section 304(a)], the Court can only order EPA to take nondiscretionary actions required by the statute itself . . . . The Act expressly limits the Court's authority in this regard and does not envision other types of relief.") (citation omitted), *aff'd sub nom Sierra Club v. Whitman*, 285 F.3d 63 (D.C. Cir. 2002) (affirming "the district court's limited jurisdiction in a citizen suit to order only EPA's performance of non-discretionary duties"). "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14–15 (1981) (refusing to imply any additional remedies not expressly created by the citizen-suit provision in the CWA) (internal quotations and citation omitted). "In the absence of strong indicia of a contrary congressional intent," the Supreme Court continued, "we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." *Id* at 15; *Venkatraman v. REI Systems, Inc.*, 417 F.3d 418, 423 (4th Cir. 2005) (quoting *Middlesex*).

The Act's provision of a single remedy — an order to perform the non-discretionary duty in question — constitutes a limited waiver of sovereign immunity that precludes courts from imposing any other remedy.  Plaintiffs may not resort to equitable principles to avoid the jurisdictional bar of sovereign immunity.  *See Beller v. Middendorf*, 632 F.2d 788, 796 (9th Cir. 1980) ("Unless sovereign immunity has been waived or does not apply, it bars equitable as well as legal remedies against the United States.").  Nor can a court graft additional remedies for which there is no waiver of sovereign immunity onto those specifically provided by Congress. *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001) ("[A] court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'") (quoting *Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 551 (1937)).  Therefore, if this Court finds that EPA has failed to perform any duty in Section 321(a), the only relief to which Plaintiffs would be entitled is an order requiring EPA to do so.

Moreover, the relief requested by Plaintiffs constitutes an improper collateral attack on agency actions over which this Court has no jurisdiction.  To the extent Plaintiffs seek to bar the enforcement of final regulations promulgated long ago by EPA, the Act requires all such challenges to be brought in the courts of appeal within 60 days of the rule's promulgation.  42 U.S.C. § 7607(b).  Consequently, this is both the wrong time and the wrong forum for Plaintiffs to request such relief.  And, to the extent Plaintiffs seek to enjoin ongoing administrative rulemaking proceedings, the relief requested constitutes a challenge to non-final agency actions, which is also improper.  *Bennett*, 520 U.S. at 177–78 (discussing finality requirements); *see also In re Murray Energy Corp.*, 788 F.3d 330, 334–35 (D.C. Cir. 2015) (rejecting attempt to enjoin EPA from finalizing a proposed CAA rule because the Act only gives courts authority to review EPA's final agency actions, not ongoing rulemakings).

Finally, the text of Section 321 itself precludes the relief sought.  Section 321(d) of the Act provides that "[n]othing in this section shall be construed to require or authorize the Administrator[] . . . to modify or withdraw any requirement imposed or proposed to be imposed under [the Act]."  42 U.S.C. § 7621(d).  In the House Committee Report addressing Section 321,

Congress spoke in even more sweeping terms, explaining, "[n]or should this section be construed to authorize or require the postponement, withdrawal, modification, or nonenforcement of any requirement or proposed regulation under the Clean Air Act."  H.R. Rep. No. 95-294, at 318 (1977); *see EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 82 (1980) (describing a parallel statement in the CWA as constraining the effect of the provision).  The text and history of Section 321(d) leave no ambiguity as to Congress's intent:  Section 321 cannot be construed to "require or authorize" EPA to alter its administration of the Act.  Thus, EPA's alleged failure to comply with Section 321(a) cannot be the basis for enjoining the implementation or enforcement of existing regulations.  Nor can it be the basis for prohibiting proposed regulatory actions or ongoing enforcement proceedings.  Section 321(d) bars the requested injunctive relief.

At prior stages of this case, Plaintiffs urged this Court to postpone a dispositive decision to allow them to pursue extensive discovery.  *See, e.g.*, ECF No. 85 at 21.  With fact discovery completed, there is no reason to expend additional party and judicial resources on a trial of Plaintiffs' single claim.  This Court should complete the task that Congress assigned to it and enter judgment for EPA, or against EPA with an order to carry out the alleged duty and nothing more.  *See Pancakes, Biscuits & More, LLC v. Pendleton Cty. Comm'n*, 996 F. Supp. 2d 438, 444 (N.D. W. Va. 2014) (entering summary judgment in favor of the non-moving party when there was no genuine issue of material fact, and the non-movant was entitled to judgment as a matter of law) (Bailey, J.) (citations omitted).  Further district court litigation is unwarranted.

## CONCLUSION

For the foregoing reasons, EPA respectfully requests that summary judgment be entered in its favor on the alternative grounds that Section 321(a) does not include a non-discretionary duty, Plaintiffs have failed to demonstrate standing, or because EPA has performed the evaluations described in Section 321(a).  Alternatively, if this Court finds that subject-matter jurisdiction exists and that EPA has not performed the evaluations, then EPA requests that judgment be entered against it and that the Court order EPA to perform the duty and nothing more.  In any event, this case should be concluded.

DATED: May 2, 2016                  Respectfully Submitted,

                                      JOHN C. CRUDEN
                                      Assistant Attorney General
                                      U.S. Department of Justice
                                      Environment & Natural Resources Division

                                      */s/ Patrick R. Jacobi*_____
                                      PATRICK R. JACOBI
                                      RICHARD GLADSTEIN
                                      SONYA SHEA
                                      LAURA J. BROWN
                                      JUSTIN D. HEMINGER
                                      U.S. Department of Justice
                                      Environment & Natural Resources Division
                                      Environmental Defense Section
                                      601 D Street, N.W., Suite 8000
                                      Washington, D.C. 20004
                                      (202) 514-2398 (Jacobi)
                                      (202) 514-1711 (Gladstein)
                                      (202) 514-2741 (Shea)
                                      (202) 514-3376 (Brown)
                                      (202) 514-2689 (Heminger)
                                      patrick.r.jacobi@usdoj.gov
                                      richard.gladstein@usdoj.gov
                                      sonya.shea@usdoj.gov
                                      laura.j.s.brown@usdoj.gov
                                      justin.heminger@usdoj.gov

                                      WILLIAM J. IHLENFELD, II
                                      United States Attorney for the
                                      Northern District of West Virginia

                                      */s/ Erin C. Tison*_____
                                      ERIN CARTER TISON (WV Bar No. 12608)
                                      Assistant United States Attorney
                                      U.S. Courthouse & Federal Bldg.
                                      1125 Chapline Street Suite 3000
                                      Wheeling, W.V. 26003
                                      (304) 234-0100
                                      erin.tison@usdoj.gov

OF COUNSEL:
Matthew C. Marks
United States Environmental Protection Agency

Office of General Counsel
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460
(202) 564-3276
marks.matthew@epa.gov

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
**Wheeling**

| | |
|---|---|
| MURRAY ENERGY CORPORATION, et al., ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
|     v. ) | **Civil Action No. 5:14-CV-0039** |
| ) | **Judge Bailey** |
| GINA McCARTHY, Administrator, ) | |
| UNITED STATES ENVIRONMENTAL ) | |
| PROTECTION AGENCY, acting in her ) | |
| official capacity, ) | |
| ) | |
|     Defendants. ) | |
| _____) | |

## CERTIFICATE OF SERVICE

I, Erin Carter Tison, hereby certify that on this 2nd day of May, 2016, pursuant to the

Court's April 28, 2016 Order [ECF No. 201] granting the United States' Expedited Motion for

Leave to File Material Designated as "Confidential" or "Highly Confidential – Attorneys Eyes

Only" Under Seal, I served a redacted copy of the foregoing Memorandum in Support of the

United States' New Motion For Summary Judgment and supporting exhibits not designated

"Confidential" or "Highly Confidential – Attorneys Eyes Only," and slip sheets for those

supporting exhibits designated  "Confidential" or "Highly Confidential – Attorneys Eyes Only"

filed under seal with the Clerk of the court, using the CM/ECF system, which will cause a copy

to be served upon counsel of record.

I further certify that on the 2nd day of May, 2016, pursuant to the Court's April 28, 2016

Order [ECF No. 201], I also served unredacted copies of the foregoing Memorandum in Support

of the United States' New Motion For Summary Judgment and supporting exhibits, including

those exhibits designated "Confidential" or "Highly Confidential – Attorneys Eyes Only" on (1)

the Clerk of the Court via hand delivery to be filed under seal, and (2) Plaintiffs' counsel via

secure FTP server.


Dated: May 2, 2016                          */s Erin Carter Tison*_____
                                            ERIN CARTER TISON (WV Bar No. 12608)
                                            Assistant United States Attorney
                                            U.S. Courthouse & Federal Bldg.
                                            1125 Chapline Street Suite 3000
                                            Wheeling, W.V. 26003
                                            (304) 234-0100
                                            erin.tison@usdoj.gov

2