**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**

FILED

OCT 17 2016

U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

**MURRAY ENERGY CORPORATION,**
**MURRAY AMERICAN ENERGY, INC.,**
**THE AMERICAN COAL COMPANY,**
**AMERICAN ENERGY CORPORATION,**
**THE HARRISON COUNTY COAL COMPANY,**
**KENAMERICAN RESOURCES, INC., THE**
**MARION COUNTY COAL COMPANY, THE**
**MARSHALL COUNTY COAL COMPANY,**
**THE MONONGALIA COUNTY COAL**
**COMPANY, OHIOAMERICAN ENERGY**
**INC., THE OHIO COUNTY COAL COMPANY,**
and **UTAHAMERICAN ENERGY, INC.,**

Plaintiffs,

v.

**GINA McCARTHY**, Administrator,
United States Environmental Protection
Agency, in her official capacity,

Defendant.

Civil Action No. 5:14-CV-39
Judge Bailey

**MEMORANDUM OPINION AND ORDER DENYING THE UNITED STATES'**
**NEW MOTION FOR SUMMARY JUDGMENT AND GRANTING**
**SUMMARY JUDGMENT IN FAVOR OF THE PLAINTIFFS**

Pending before this Court are the United States' New Motion for Summary

Judgment [Doc. 204], the United States' First Motion in Limine to Exclude the Expert

Report and Related Testimony of Plaintiffs' Expert, Anne E. Smith [Doc. 266], the United

States' Second Motion in Limine to Exclude the Expert Report and Related Testimony of

Plaintiffs' Expert, Timothy Considine [Doc. 268], and the United States' Third Motion in

1

Limine to Exclude the Expert Report and Related Testimony of Plaintiffs' Expert, John Deskins [Doc. 270]. All Motions are ripe for decision.

## Background

This civil action was filed on March 24, 2014, by Murray Energy Corporation and a number of its subsidiary or affiliated companies[1] (hereinafter collectively "Murray") seeking declaratory and injunctive relief for the EPA's alleged failure to perform its duties required under 42 U.S.C. § 7621, which requires the EPA to "conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provision of [the Clean Air Act] and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement."

The plaintiffs contend that the EPA's enforcement of the Clean Air Act, combined with the EPA's refusal "to evaluate the impact that its actions are having on the American coal industry and the hundreds of thousands of people it directly or indirectly employs" is irreparably harming the plaintiffs [Amended Complaint, Doc. 31, p. 2].

The plaintiffs filed their Amended Complaint on May 23, 2014 [Doc. 31]. After the grant of an extension of time, the EPA filed its Defendant's Motion to Dismiss the Complaint and Motion to Strike Prayer for Injunctive Relief [Doc. 34] on June 30, 2014, asserting that this Court lacked subject matter jurisdiction to hear the case.

By Order entered September 16, 2014 [Doc. 40], this Court denied the Motion and

---

[1]According to the Amended Complaint, the plaintiffs collectively employ over 7,200 and comprise the largest underground coal mining operations in the United States [Doc. 31, ¶ 76].

found, as a matter of law, that the EPA had a non-discretionary duty to undertake an ongoing evaluation of job losses and that this Court had and has subject matter jurisdiction to hear the case.

On October 9, 2014, the EPA filed its United States' Motion to Clarify the Court's September 16, 2014 Order [Doc. 50]. By Order entered October 24, 2014, this Court denied the Motion to Clarify [Doc. 53].

On December 23, 2014, the defendant filed The United States' Motion to Dismiss Due to Lack of Article III Standing [Doc. 59], as well as its Motion of the United States to Stay Discovery Pending Resolution of Dispositive Motion and Request for Expedited Proceeding [Doc. 61]. By Order entered March 27, 2015, this Court denied the Motion to Dismiss and denied as moot the Motion to Stay Discovery [Doc. 71].

On April 10, 2015, the EPA filed The United States' Motion for Summary Judgment [Doc. 75]. On April 22, 2015, Murray filed Plaintiffs' Motion to Compel Discovery, Extend the Deadline for Fact Discovery, and Hold Defendant's Motion for Summary Judgment in Abeyance Pending Completion of Discovery [Doc. 81]. On May 8, 2015, the EPA filed United States' Motion for Entry of Protective Order [Doc. 87]. After briefing, on May 29, 2015, this Court granted Plaintiffs' Motion to Compel Discovery, Extend the Deadline for Fact Discovery, and Hold Defendant's Motion for Summary Judgment in Abeyance Pending Completion of Discovery [Doc. 81] and denied the United States' Motion for Entry of Protective Order [Doc. 93].

On June 1, 2015, the EPA filed United States' Motion to Reconsider or for Clarification [Doc. 95], seeking reconsideration of the May 29, 2015, Order, which was denied by this Court by Order entered June 4, 2015 [Doc. 100].

3

On June 4, 2015, the EPA sought an extension of the discovery completion deadline by motion [Doc. 101], which was granted by Order [Doc. 107].

On June 12, 2015, the EPA filed a petition with the United States Court of Appeals for the Fourth Circuit seeking a writ of mandamus directing this Court to vacate its order of May 29, 2015 [Doc. 93], which granted plaintiffs' motion to compel discovery, denied EPA's motion for a protective order, and held the agency's fully-briefed motion for summary judgment in abeyance pending completion of discovery. The EPA further requested that the Fourth Circuit direct this Court to disallow discovery in this case [Doc. 103]. By Order entered July 9, 2015, the Fourth Circuit denied the petition [Doc. 114].

On July 23, 2015, the EPA sought an additional extension of the discovery completion deadline by motion [Doc. 119], which was granted by Order [Doc. 120].

On August 14, 2015, the EPA filed a Motion for Protective Order [Doc. 121], which was granted by Order [Doc. 124].

On September 28, 2015, the parties filed a joint stipulation extending the time for the plaintiffs to respond to the EPA's discovery requests [Doc. 135].

On October 16, 2015, the EPA filed the United States' Emergency Motion for Protective Order Precluding the Deposition of EPA Administrator McCarthy [Doc. 147]. This Court denied the Motion by Order entered November 12, 2015 [Doc. 164]. The EPA, on November 10, 2015, sought a writ of mandamus from the Fourth Circuit preventing the deposition of Administrator McCarthy [Doc. 162], which writ was granted by the Fourth Circuit on November 25, 2015 [Doc. 167].

On October 23, 2015, the parties jointly moved to extend certain deadlines in the amended scheduling order [Doc. 152], which motion was granted on October 27, 2015

[Doc. 153].

On December 11, 2015, the parties jointly moved to further extend certain deadlines in the amended scheduling order [Doc. 171], which motion was granted on December 23, 2015 [Doc. 172].

On February 19, 2016, this Court denied the EPA's then-pending motion for summary judgment so that a new motion could be filed upon the completion of discovery [Doc. 178].

On April 22, 2016, the EPA filed United States' Expedited Motion for Leave to File Material Designated as "Confidential" or "Highly Confidential – Attorneys Eyes Only" under Seal [Doc. 199], which motion was granted [Doc. 201].

On May 2, 2016, the EPA filed the pending motion for summary judgment [Doc. 204].

On May 16, 2016, the EPA filed United States' Expedited Motion to Disqualify or Exclude Jeffrey Holmstead [Doc. 206], which Motion was denied in part and deferred in part on May 20, 2016 [Doc. 212]. After briefing, the Motion was denied [Doc. 238].

On May 25, 2016, the parties jointly moved to extend the briefing deadlines on the Motion for Summary Judgment [Doc. 216], which was granted on May 26, 2016 [Doc. 218].

On May 31, 2016, the plaintiffs filed a motion for extension of time to file their response to the Motion for Summary Judgment and also filed a Motion for in Camera Review, to Compel Production of Documents and to Permit Depositions [Docs. 222 & 223]. By Order entered June 2, 2016, this Court granted the motion for extension of time [Doc. 227]. The next day, the EPA filed a motion seeking reconsideration of the June 2 order [Doc. 230], which motion was denied on June 15, 2016 [Doc. 237].

On June 29, 2016, this Court heard oral argument on the Motion for in Camera Review, to Compel Production of Documents and to Permit Depositions [Doc. 223], which hearing is the subject of the Order filed July 8, 2016 [Doc. 250]. By Order entered July 20, 2016, this Court granted in part and denied in part the Motion [Doc. 251].

On August 22, 2016, the Chamber of Commerce of the United States and the National Mining Association sought leave to file an *amicus curiae* brief in support of plaintiffs [Doc. 265]. Leave was granted on August 24, 2016 [Doc. 273], and the brief was filed the same day [Doc. 275].

On August 23, 2016, the EPA filed United States' First Motion in Limine to Exclude the Expert Report and Related Testimony of Plaintiffs' Expert, Anne E. Smith [Doc. 266], the United States' Second Motion in Limine to Exclude the Expert Report and Related Testimony of Plaintiffs' Expert, Timothy Considine [Doc. 268], and the United States' Third Motion in Limine to Exclude the Expert Report and Related Testimony of Plaintiffs' Expert, John Deskins [Doc. 270], all three of which remain pending.

On September 2, 2016, the State of West Virginia and twelve other states moved for leave to file an *amicus curiae* brief in support of plaintiffs [Doc. 276]. Leave was granted on September 7, 2016 [Doc. 277], and the brief was filed the same day [Doc. 278].

On September 14, 2006, the plaintiffs filed a Motion for Leave to File Plaintiffs' Surreply in Opposition to Defendant's Motion for Summary Judgment and Response to Rule 56(c)(2) Objections [Doc. 283]. Leave was granted on September 15, 2016 [Doc. 284].

On September 23, 2016, the plaintiffs filed a Motion for Leave to File Plaintiffs' Surreply in Opposition to Defendant's Motions in Limine Seeking to Exclude the Expert

Reports and Related Testimony of Anne E. Smith, Timothy Considine, and John Deskins [Doc. 288]. Leave was granted on September 28 [Doc. 289].

## Legal Standard

Fed. R. Civ. P. 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991), *cert. denied*, 502 U.S. 1095 (1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

However, as the United States Supreme Court noted in *Anderson*, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250; *see also Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) (Summary judgment "should be granted only in those cases where it is perfectly clear that no issue

of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (citing *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950)). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323-25; *Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

## Discussion

In its Motion for Summary Judgment, the EPA seeks dismissal of this action on three grounds. First, the EPA asks this Court to reconsider its previous decision holding that Section 321(a) of the Clean Air Act, 42 U.S.C. § 7621(a), creates a non-discretionary duty on the part of the Environmental Protection Agency. Next, the EPA asks this Court to reconsider its previous decision holding that the plaintiffs have Article III standing to maintain this action. Finally, the EPA seeks a decision that it is fully complying with the requirements of § 321(a).

## I.      Section 321(a) creates a non-discretionary duty.

This action centers around § 321(a) of the Clean Air Act, 42 U.S.C. § 7621(a). This

statutory provision provides:

> The Administrator shall conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provision of [the Clean Air Act] and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement.

42 U.S.C. § 7621(a) (brackets added).

In her Motion, the Administrator argues that this Court is without subject matter jurisdiction to hear this case because the plaintiffs have not articulated a sufficient statutory waiver of the Government's sovereign immunity. This, she contends, is because the statute upon which the plaintiffs rely is discretionary and § 321(a) does not contain a date certain for action by the Administrator.

As this Court noted in its prior order, "[a]s a sovereign, the United States is immune from all suits against it absent an express waiver of its immunity. *United States v. Sherwood,* 312 U.S. 584, 586 (1941). All waivers of sovereign immunity must be 'strictly construed . . . in favor of the sovereign.' *Lane v. Pena,* 518 U.S. 187, 192 (1996). For that reason, it is the plaintiff's burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to his particular claim. *Williams v. United States,* 50 F.3d 299, 304 (4th Cir. 1995). If the plaintiff fails to meet this burden, then the claim must be dismissed. *Medina v. United States,* 259 F.3d 220, 223 (4th Cir. 2001)." *Welch v. United States*, 409 F.3d 646, 650-51 (4th Cir. 2005).

In this case, the plaintiffs assert jurisdiction under § 304 of the Clean Air Act, 42

U.S.C. § 7604, which provides in pertinent part:

Except as provided in subsection (b) of this section [notice requirements],

any person may commence a civil action on his own behalf - -

\* \* \* \* \* \*

(2) against the Administrator where there is alleged a failure of the

Administrator to perform any act or duty under this chapter which is not

discretionary with the Administrator . . .

\* \* \* \* \* \*

The district courts shall have jurisdiction, without regard to the amount in

controversy or the citizenship of the parties, . . . to order the Administrator

to perform such act or duty, as the case may be. . ..

42 U.S.C. § 7604(a).

Accordingly, the "substantive issue in this case is one of statutory construction,

specifically whether the [Clean Air Act] imposes a discretionary or non-discretionary duty

on the EPA Administrator." ***Monongahela Power Co. v. Reilly***, 980 F.2d 276 (4th Cir.

1993).

There is some confusion as to the appropriate standard to be applied in a case such

as this. The Fourth Circuit has indicated that the analysis should be conducted under Rule

12(b)(1):

[W]e observe that rather than granting summary judgment pursuant to Rule

56(c), the district court should have dismissed the suit for want of jurisdiction

under Rule 12(b)(1) if the United States is not liable for Williams' injury. *See*

10

*Broussard v. United States,* 989 F.2d 171, 177 (5th Cir. 1993) (*per curiam*) (noting that the proper practice is to dismiss for want of jurisdiction for purposes of the FTCA under Rule 12(b)(1), not to grant summary judgment under Rule 56(c)); *Shirey v. United States,* 582 F.Supp. 1251, 1259 (D. S.C.1984) (explaining that if the court lacks subject matter jurisdiction, the suit must be dismissed). We find distinguishing between the various modes of liability to have procedural ramifications. The plaintiff bears the burden of persuasion if subject matter jurisdiction is challenged under Rule 12(b)(1), *see Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.), *cert. denied,* 501 U.S. 1222 (1991), because "[t]he party who sues the United States bears the burden of pointing to ... an unequivocal waiver of immunity," *Holloman v. Watt,* 708 F.2d 1399, 1401 (9th Cir. 1983), *cert. denied,* 466 U.S. 958 (1984). In ruling on a Rule 12(b)(1) motion, the court may consider exhibits outside the pleadings. *See Mortensen v. First Federal Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977). Indeed, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.; see also Richland–Lexington Airport Dist. v. Atlas Properties,* 854 F.Supp. 400, 407 (D. S.C. 1994) (cogently explaining the differences between dismissal procedure under Rule 12(b)(1) and summary judgment under Rule 56(c)). We exercise plenary review over issues raised under Rule 12(b)(1). *See Black Hills Aviation, Inc. v. United States,* 34 F.3d 968, 972 (10th Cir. 1994). The differing procedural standards of

dismissal under Rule 12(b)(1) and summary judgment under Rule 56(c) are more than academic; dismissal under Rule 12(b)(1) has two consequences: one, the court may consider the evidence beyond the scope of the pleadings to resolve factual disputes concerning jurisdiction; and two, dismissal for jurisdictional defects has no *res judicata* effect. *See* 2A James W. Moore, *Moore's Federal Practice* ¶ 12.07, at 12–49 - 12–50 (2d ed.1994). The district court implicitly recognized these principles in opining that Williams and Meridian can litigate in state court.

**Williams v. United States**, 50 F.3d 299, 304 (4th Cir. 1995).

On the other hand, the District of Columbia Circuit has more recently held that the analysis should be conducted under Rule 12(b)(6):

Although we hold that we do not lose jurisdiction over this controversy by reason of mootness, this does not resolve the jurisdictional theory upon which the district court relied in dismissing the case under Rule 12(b)(1) for lack of subject matter jurisdiction. **Sierra Club**, 724 F.Supp.2d at 42–43. The district court's ruling was based on the proposition that the Administrator's decision was discretionary and therefore not justiciable. Before this court, Sierra Club, which certainly does not concede that the district court should have dismissed the claim at all, argues that the analysis should have been under Rule 12(b)(6) to determine whether the complaint failed to state a claim upon which relief could be granted rather than under the jurisdictional standards of Rule 12(b)(1). While it does not in the end

affect the outcome, we ultimately agree that Rule 12(b)(6) should govern. We hasten to state that we do not fault the district court for basing its dismissal on Rule 12(b)(1) rather than Rule 12(b)(6). The distinction between a claim that is not justiciable because relief cannot be granted upon it and a claim over which the court lacks subject matter jurisdiction is important. But we cannot fault the district court, as this court "ha[s] not always been consistent in maintaining these distinctions." *Oryszak v. Sullivan*, 576 F.3d 522, 527 (D.C. Cir. 2009) (Ginsburg, J., concurring). Indeed, we have provided authority both that discretionary duty claims fall outside our jurisdiction, and that such claims are nonjusticiable under Rule 12(b)(6). In *Association of Irritated Residents v. EPA*, we held that agency decisions excluded from judicial review by 5 U.S.C. § 701(a)(2) are outside the court's jurisdiction. 494 F.3d 1027, 1030 (D.C. Cir. 2007) ("In this case, subject matter jurisdiction turns on whether the Agreement constitutes a rulemaking subject to APA review, or an enforcement proceeding initiated at the agency's discretion and not reviewable by this court."). Two years later, in *Oryszak v. Sullivan*, we came to a different conclusion. Without any reference to *Association of Irritated Residents*, we stated:

> Because the APA does not apply to agency action committed to agency discretion by law, a plaintiff who challenges such an action cannot state a claim under the APA. Therefore, the court has jurisdiction over his case pursuant to § 1331, but will

> properly grant a motion to dismiss the complaint for failure to
>
> state a claim. *Oryszak*, 576 F.3d at 525.

*Sierra Club v. Jackson*, 648 F.3d 848, 853-54 (D.C. Cir. 2011).

Inasmuch as this Court is a part of the Fourth Circuit, this Court will apply Rule 12(b)(1).

In determining whether this Court has jurisdiction, the EPA's position is not entitled to deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Our Children's Earth Found. v. EPA*, 527 F.3d 842, 846 (9th Cir. 2008), citing *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1038–39 (D.C. Cir. 2002) ("Nor is an agency's interpretation of a statutory provision defining the jurisdiction of the court entitled to our deference under *Chevron*.") (In turn citing *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990)).

In determining whether the statute imposes a non-discretionary duty, this Court is mindful that "the term 'nondiscretionary' has been construed narrowly. *See Environmental Defense Fund* [*v. Thomas*], 870 F.2d [892] at 899 [(2d Cir.), *cert. denied*, 493 U.S. 991 (1989)] ('[T]he district court has jurisdiction under [section 7604] to compel the Administrator to perform purely ministerial acts. . ..'); *Sierra Club* [*v. Thomas*], 828 F.2d [783] at 791 [(D.C. Cir. 1987)] ('clear-cut nondiscretionary duty'); *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1355 (9th Cir. 1978) (citizen suit provision was intended to 'provide relief only in a narrowly-defined class of situations in which the Administrator failed to perform a mandatory function' (quoting *Wisconsin's Envtl. Decade, Inc. v. Wisconsin Power & Light Co.*, 395 F.Supp. 313, 321 (W.D. Wis. 1975))); *Mountain*

*States Legal Found. v. Costle,* 630 F.2d 754, 766 (10th Cir. 1980) ('specific non-discretionary clear-cut requirements'), *cert. denied,* 450 U.S. 1050 (1981)." ***Monongahela Power Co. v. Reilly***, 980 F.2d 272, 276 n. 3 (4th Cir. 1992).

The first point of reference is, of course, the statute itself. "Although the line between a congressional mandate and an area of agency discretion is not difficult to state, ascertaining that line is not always as easy. When Congress specifies an obligation and uses the word 'shall,' this denomination usually connotes a mandatory command. *See Alabama v. Bozeman,* 533 U.S. 146, 153 (2001). On the other hand, '[a]bsent some provision requiring EPA to adopt one course of action over the other, we can only conclude that EPA's choice represented an exercise of discretion.' ***Farmers Union Cent. Exch. v. Thomas,*** 881 F.2d 757, 761 (9th Cir. 1989)." ***Our Children's Earth Found. v. U.S.E.P.A.***, 527 F.3d 842, 847 (9th Cir. 2008).

"However, not every decision is so easily categorized. As the Supreme Court teaches, the decision-making process does not necessarily collapse into a single final decision. 'It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking.' ***Bennett v. Spear,*** 520 U.S. 154, 172 (1997). In ***Bennett,*** considering a citizen suit provision parallel to that in the CWA, the Supreme Court held, '[s]ince it is the omission of these *required* procedures that petitioners complain of, their ... claim is reviewable.' *Id.* at 172 (emphasis added)." *Id.*

Because this issue requires this Court to interpret language in a statute, the Court must follow the well-established canons of statutory interpretation. "[W]hen the statute's

language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.,* 540 U.S. 526, 534 (2004) (citations and internal quotation marks omitted). The statute in question, 42 U.S.C. § 7621, provides that the Administrator "**shall** conduct continuing evaluations . . .." (emphasis added).

"The use of 'shall' creates a mandatory obligation on the actor . . . to perform the specified action. *See Allied Pilots Ass'n v. Pension Benefit Guar. Corp.,* 334 F.3d 93, 98 (D.C. Cir. 2003) (noting 'the well-recognized principle that the word "shall" is ordinarily the language of command') (citation and internal quotation marks omitted); *United States v. Ins. Co. of N. Am.,* 83 F.3d 1507, 1510 n. 5 (D.C. Cir. 1996) ('Cases are legion affirming the mandatory character of "shall."') (citing *United States v. Monsanto,* 491 U.S. 600, 607 (1989); *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 61 (1982) (per curiam); *Anderson v. Yungkau,* 329 U.S. 482, 485 (1947); *Ass'n of Civilian Technicians v. FLRA,* 22 F.3d 1150, 1153 (D.C. Cir. 1994)." *Swanson Group Mfg. LLC v. Salazar*, 951 F.Supp.2d 75, 81 (D. D.C. 2013).

In *Raymond Proffitt Found. v. EPA*, 930 F.Supp. 1088, 1097 (E.D. Pa. 1996), the Court stated "both the Supreme Court and the Third Circuit often have stated that the use of the word 'shall' in statutory language means that the relevant person or entity is under a mandatory duty. *United States v. Monsanto,* 491 U.S. 600, 607 (1989) (By using 'shall' in a civil forfeiture statute, 'Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied. . . .'); *Pierce v. Underwood,* 487 U.S. 552, 569–70 (1988) (noting that Congress's use of 'shall' in a

statute was 'mandatory language'); ***Barrentine v. Arkansas–Best Freight Sys., Inc.,*** 450 U.S. 728, 739 n. 15 (1981) (same); ***United States v. Martinez–Zayas,*** 857 F.2d 122, 128 (3d Cir. 1988) (stating that Congress clearly and unambiguously expressed its intent by stating that the court 'shall' impose a mandatory sentence and that this created a mandatory legal duty to impose the sentence); ***United States v. Troup,*** 821 F.2d 194, 198 (3d Cir. 1987) (stating that Congress's use of the word 'shall' was 'mandatory'); *see also* ***United States ex rel. Senk v. Brierley****,* 471 F.2d 657, 659–60 (3d Cir. 1973).

> The Fourth Circuit also construes "shall" as expressing a mandatory duty:
>
> "As the Supreme Court remarked in a related context, 'Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied.' ***United States v. Monsanto,*** 491 U.S. 600, 607 (1989). 'The word "shall" does not convey discretion. It is not a leeway word, but a word of command.' ***United States v. Fleet,*** 498 F.3d 1225, 1229 (11th Cir. 2007) (internal quotation marks omitted). The plain text of the statute thus indicates that forfeiture is not a discretionary element of sentencing. Instead, § 2461 mandates that forfeiture be imposed when the relevant prerequisites are satisfied, as they are here. ***United States v. Newman,*** 659 F.3d 1235, 1240 (9th Cir. 2011); *see also* ***United States v. Torres****,* 703 F.3d 194, 204 (2d Cir. 2012)."

***United States v. Blackman****,* 746 F.3d 137, 143 (4th Cir. 2014). *See* ***In re Rowe****,* 750 F.3d 392, 396-397 (4th Cir. 2014) and ***Air Line Pilots Assoc., International v. US Airways Group, Inc.****,* 609 F.3d 338, 342 (4th Cir. 2010).

The legislative history of § 321(a) also supports the mandatory nature of the provision. As the House Interstate and Foreign Commerce Committee reported: "Under this provision, the Administrator **is mandated to undertake** an ongoing evaluation of job losses and employment shifts due to requirements of the act. This evaluation **is to include** investigations of threatened plant closures or reductions in employment allegedly due to requirements of the act or any actual closures or reductions which are alleged to have occurred because of such requirements." H.R. REP. NO. 95-294, at 317 (1977) (emphasis added).

The EPA argues that the provision is discretionary inasmuch as it contains no "date-certain deadline," citing *inter alia*, **Sierra Club v. Thomas**, 828 F.2d 783, 791 (D.C. Cir. 1987) and **Maine v. Thomas**, 874 F.2d 883, 888 (1st Cir. 1989). In fact, the provision does contain a date certain for the mandatory duty: the required timing is "continuing."

The EPA relies on **Sierra Club v. Thomas**, 828 F.2d 783 (D.C. Cir. 1987). There, Sierra Club challenged EPA's delay in issuing a regulation where the Clean Air Act provided no deadline for such issuance. The D.C. Circuit held that, in the context of an unreasonable delay claim, "a duty of timeliness must 'categorically mandat[e]' that *all* specified action be taken by a date-certain deadline." *Id.* at 791. For a claim of unreasonable delay in rulemaking, "the only question for the district court to answer is whether the agency failed to comply with that deadline." *Id.*

This case, by contrast, presents no freestanding challenge for undue delay in issuing a regulation. To the contrary, it concerns a statutory mandate that EPA "shall conduct continuing evaluations." 42 U.S.C. § 7621(a). That is an express, unambiguous

18

requirement on the agency of a continuing nature. *Black's Law Dictionary* (8th Ed.) defines "continuing" as "uninterrupted."

To borrow from the Second Circuit in another of the (albeit-dissimilar) cases on which EPA relies, "we cannot agree with [EPA] that the Administrator may simply make no formal decision to revise or not to revise [a rule], leaving the matter in a bureaucratic limbo subject neither to review in the District of Columbia Circuit nor to challenge in the district court. No discernible congressional purpose is served by creating such a bureaucratic twilight zone, in which many of the Act's purposes might become subject to evasion." *Envtl. Def. Fund v. Thomas*, 870 F.2d 892, 900 (2d Cir. 1989).

Whether a "date-certain deadline" is necessary to find a non-discretionary duty is open to some question. As Judge Sanders noted in *Cross Timbers Concerned Citizens v. Saginaw*, 991 F.Supp. 563 (N.D. Tex. 1997):

> Defendants claim that absent a "date-certain" deadline for an agency obligation under the CWA, the duty is purely discretionary. *See Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987) ("In order to impose a clear-cut nondiscretionary duty, we believe that a duty of timeliness must categorically mandat[e] that all specified action be taken by a date-certain deadline."). In *Sierra Club v. Thomas*, the D.C. Circuit interpreted the Clean Air Act to decide that congressional intent limits citizen suits to those in which the court is able to determine readily whether a violation occurred. *See id.* at 791. In the absence of an ascertainable deadline, the D.C. Circuit reasoned, it may be impossible to conclude that Congress accords an action

such high priority as to impose upon the agency a "categorical mandate" that deprives it of all discretion over the timing of its work. *Id*. Defendants belabor, but quite accurately, that Plaintiff's claim is not related to any duty for which the CWA provides a date-certain deadline.

The Court is inclined to reject Defendants' broad reading of the D.C. Circuit's opinion in *Sierra Club v. Thomas*. The D.C. Circuit itself has indicated that the question remains open whether a date-certain deadline is required for a mandatory EPA duty to arise under the Clean Water Act. *See National Wildlife Federation v. Browner*, 127 F.3d 1126, 1129, n. 6 (D.C. Cir. 1997) (declining to decide "whether, as EPA contends, a 'readily ascertainable deadline' for agency action is a necessary jurisdictional basis for a citizen suit under the [Clean Water] Act"). Furthermore, other courts have examined the issue of CWA mandatory duty without referring to a date-related test. *See, e.g., Browner*, 127 F.3d at 1128; *Miccosukee Tribe of Indians v. USEPA*, 105 F.3d 599, 602 (11th Cir. 1997) (and cases cited therein). Finally, this Circuit's relevant jurisprudence, though it pre-dates *Sierra Club v. Thomas*, examines the question from a different standpoint of analysis. *See, e.g., Sierra Club v. Train*, 557 F.2d at 491.

991 F.Supp. at 568.

In *Sierra Club v. Johnson*, 2009 WL 2413094, *3 (N.D. Cal. Aug. 5, 2009), the court refused to adopt a bright line rule that only duties with date-certain deadlines are nondiscretionary.

This Court does not find the lack of a "date-certain deadline" to be fatal to the plaintiffs' case. The statute states that the "Administrator shall conduct **continuing** evaluations . . .." While the EPA may have discretion as to the timing of such evaluations, it does not have the discretion to categorically refuse to conduct **any** such evaluations, which is the allegation of the plaintiffs.

In ***Bennett v. Spear***, 520 U.S. 154 (1997), the Supreme Court found that a provision of the Endangered Species Act stating that: "The Secretary *shall* designate critical habitat, and make revisions thereto, ... on the basis of the best scientific data available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat" was language "of obligation rather than discretion." 520 U.S. at 172 (Emphasis by Supreme Court).

The Court held that "the fact that the Secretary's ultimate decision is reviewable only for abuse of discretion does not alter the categorical *requirement* that, in arriving at his decision, he 'tak[e] into consideration the economic impact, and any other relevant impact,' and use 'the best scientific data available.' ***Ibid****.* It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking. *See **SEC v. Chenery Corp.**,* 318 U.S. 80, 94–95 (1943)." ***Id.*** (Emphasis by Supreme Court).

Based upon the foregoing, this Court continues to believe that Congress intended to impose a mandatory duty upon the EPA.

## II.     The plaintiffs have standing to maintain this action.

The EPA, in its Motion for Summary Judgment, has requested this Court to

reconsider its prior finding that the plaintiffs have standing to maintain this action.

The Court in *Mut. Funds Inv. Litig. v. AMVESCAP PLC*, 529 F.3d 207 (4th Cir. 2008), spoke to the issue of Article III standing: "Article III standing is a fundamental, jurisdictional requirement that defines and limits a court's power to resolve cases or controversies ... and 'the irreducible constitutional minimum of standing' consists of injury-in-fact, causation, and redressability." (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)).

The doctrine of standing requires federal courts to satisfy themselves that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009), quoting *Warth v. Seldin*, 422 U.S. 490, 498–499 (1975).

As the Supreme Court has explained, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "Article III standing ... enforces the Constitution's case-or-controversy requirement." *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11 (2004).

As the party invoking federal jurisdiction, the plaintiffs bear the burden of establishing standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). If plaintiffs cannot establish constitutional standing, their claims must be dismissed for lack of subject matter jurisdiction. *Cent. States Se. & Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care,* 433 F.3d 181, 198 (2d Cir. 2005). "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is

that of announcing the fact and dismissing the case." ***Steel Co. v. Citizens for a Better Env't***, 523 U.S. 83, 94 (1998) (citations omitted).

"To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." ***Summers v. Earth Island Inst.***, 555 U.S. 488, 493 (2009), quoting ***Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*** 528 U.S. 167, 180–181 (2000). *See also **Beyond Systems, Inc. v. Kraft Foods, Inc.***, 777 F.3d 712 (4th Cir. 2015). "This requirement assures that 'there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party.'" ***Id.***, quoting ***Schlesinger v. Reservists Comm. to Stop the War***, 418 U.S. 208, 221 (1974). "Where that need does not exist, allowing courts to oversee legislative or executive action 'would significantly alter the allocation of power ... away from a democratic form of government.'" ***United States v. Richardson***, 418 U.S. 166, 188 (1974) (Powell, J., concurring).

Turning to the application of the law to the facts of this case, the Court must attempt to capsulize the plaintiffs' cause of action. In their Amended Complaint [Doc. 31], the plaintiffs allege:

1.      That the plaintiffs combined employ over 7,200 workers and comprise the largest underground coal mining operation in the United States;

2.      That the financial livelihood of the plaintiffs is dependent upon a continuing domestic market for coal;

23

3.    That the actions of the EPA have caused a reduced market for coal, which threatens the economic viability of the plaintiffs;

4.    That the EPA has failed to comply with the requirement under 18 U.S.C. § 7621, which requires the EPA to "conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provision of [the Clean Air Act] and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement;" and

5.    That if the EPA were to comply with the requirements of 18 U.S.C. § 7621, the information would document the threatened business closures and consequent unemployment, which could be used to convince the EPA, the Congress, and/or the American public that the actions of the EPA have been harmful and must be changed.

In arguing that the plaintiffs lack standing, the EPA has raised the following:

1.    The allegation of a reduced market for coal is not fairly traceable to EPA's failure to conduct employment evaluations;

2.    The allegations of a reduced market for coal cannot be redressed by a favorable decision by this Court;

3.    The plaintiffs' alleged injuries are not sufficient to establish standing;

4.    Plaintiffs fail to establish standing based upon informational injury because 18 U.S.C. § 7621 neither creates a right to information nor implicates fundamental rights;

5.    Plaintiffs have failed to allege a concrete, redressable injury caused by the lack of employment evaluations;

6.    Plaintiffs do not have procedural standing because § 7621 is not a procedural

requisite to any EPA action; and

7.      Plaintiffs do not have procedural standing because § 7621 was not designed to protect their interests.

For the reasons stated below, this Court finds that the plaintiffs have established standing to proceed with this action and will not alter its prior decision finding standing.  In so doing, this Court is aware that "[w]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U .S. 555, 562 (1992)).

The EPA's argument that the plaintiffs' framing of concrete economic injury is insufficient because it "is based on the vague notion of a 'reduced market for coal' that is undefined and lacks any parameters" is a misdirected.  Any absence of such evidence is precisely because EPA has failed to fulfill its Section 321(a) duty to "conduct continuing evaluations of potential loss or shifts of employment which may result from" EPA's regulatory activities.

The fact that the failure to perform employment evaluations may affect a large number of persons or entities is not fatal to the plaintiffs' standing.  "At bottom, 'the gist of the question of standing' is whether petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'  *Baker v. Carr*, 369 U.S. 186, 204 (1962).  As Justice Kennedy explained in his *Lujan* concurrence:

While it does not matter how many persons have been injured by the

challenged action, the party bringing suit must show that the action injures

him in a concrete and personal way. This requirement is not just an empty

formality. It preserves the vitality of the adversarial process by assuring both

that the parties before the court have an actual, as opposed to professed,

stake in the outcome, and that the legal questions presented . . . will be

resolved, not in the rarified atmosphere of a debating society, but in a

concrete factual context conducive to a realistic appreciation of the

consequences of judicial action." 504 U.S. at 581 (internal quotation marks

omitted)."

*Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007).

In *White Oak Realty, LLC v. U.S. Army Corps of Eng'rs*, 2014 WL 4387317 (E.D.

La. September 4, 2014), the Court noted that "economic injury from business competition

created as an indirect consequence of agency action can serve as the required 'injury in

fact,'" citing *Envtl. Defense Fund v. Marsh*, 651 F.2d 983, 1003 (5th Cir. 1981), and that

"a company's interest in marketing its product free from competition" is a "legally

cognizable injur[y]" for purposes of Article III standing, citing *Lujan*, 504 U.S. at 578.

Based upon the foregoing authority, this Court finds that the plaintiffs have alleged

a sufficient concrete and particularized injury in fact.

In *Bennett v. Spear*, 520 U.S. 154 (1997), the Court rejected an argument by the

Government that the fairly traceable requirement is satisfied only by a proximate cause

analysis. The *Bennett* Court stated that "[t]his wrongly equates injury 'fairly traceable' to

the defendant with injury as to which the defendant's actions are the very last step in the

chain of causation. While, as we have said, it does not suffice if the injury complained of is 'th[e] result [of] the *independent* action of some third party not before the court,' ***Defenders of Wildlife***, *supra,* at 560–561 (emphasis added) (quoting ***Simon v. Eastern Ky. Welfare Rights Organization***, 426 U.S. 26, 41–42 (1976)), that does not exclude injury produced by determinative or coercive effect upon the action of someone else." 520 U.S. at 168-69.

Similarly, in ***Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC***, 713 F.3d 187, 195 (4th Cir. 2013), the Fourth Circuit stated "OpenBand's mistake, in other words, is to 'equate[ ] injury "fairly traceable" to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation.' ***Bennett v. Spear***, 520 U.S. 154, 168–69 (1997). But as the Supreme Court has explained, the causation element of standing is satisfied not just where the defendant's conduct is the last link in the causal chain leading to an injury, but also where the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendant's conduct 'upon the action of someone else.' ***Id***. at 169." 713 F.3d at 197.

In ***Competitive Enterprise Inst. v. NHTSA***, 901 F.2d 107 (D.C. Cir. 1990), the District of Columbia Circuit stated:

> To satisfy the causation and redressability requirements, Consumer Alert must show that its members' restricted opportunity to purchase larger passenger vehicles is fairly traceable to the CAFE standard as set by NHTSA and is likely to be ameliorated by a judicial ruling directing the agency to take further account of safety concerns.

We note at the outset that the standing determination must not be confused with our assessment of whether the party could succeed on the merits. *See* **Women's Equity Action League v. Cavazos**, 879 F.2d 880 (D.C. Cir. 1989); **Public Citizen v. Federal Trade Comm'n**, 869 F.2d 1541, 1549 (D.C. Cir. 1989). For standing purposes, petitioners need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test. **Duke Power Co. v. Carolina Environmental Study Group**, 438 U.S. 59, 75 n. 20 (1978); *see also* **Autolog Corp. v. Regan**, 731 F.2d 25, 31 (D.C. Cir. 1984). This is true even in cases where the injury hinges on the reactions of third parties, here the auto manufacturers, to the agency's conduct. *See* **National Wildlife Federation v. Hodel**, 839 F.2d 694, 705 (D.C. Cir. 1988). In such cases, the alleged injury must be traced back through the actions of the intermediary parties to the challenged government decision. *See* **Public Citizen**, 869 F.2d at 1547 n. 9. This case falls well within the range of those cases in which the government's action has been found substantially likely to cause the petitioners' injury despite the presence of intermediary parties. *See* **National Wildlife Federation**, 839 F.2d at 706–16 (environmental organization had standing where challenged mining regulations, as interpreted and applied by the states and mining industry, could cause injury to its members' use and enjoyment of the environment); **Community Nutrition v. Block**, 698 F.2d 1239, 1248 (D.C. Cir. 1983), *rev'd on other grounds,* 467 U.S. 340 (1984)

(within complex structure of dairy market, consumers' contention that if milk

handlers were not required to make a compensatory payment they would

pass the savings on to consumers was reasonable).

901 F.2d at 113-14.

In this case, the plaintiffs have alleged that the actions of the EPA have had a

coercive effect on the power generating industry, essentially forcing them to discontinue

the use of coal.  This Court finds these allegations sufficient to show that the injuries

claimed by the plaintiffs are fairly traceable to the actions of the EPA.  While the EPA

argues that such would only be traceable to the earlier actions of the EPA rather than the

failure of the EPA to conduct employment evaluations, this Court cannot agree.  The

claimed injuries, while in part traceable to the prior actions of the EPA, may also be fairly

traceable to the failure of the EPA to conduct the evaluations. Congress' purpose in

enacting the requirement for the evaluations was to provide information which could lead

the EPA or Congress to amend the prior EPA actions.

EPA asserts that the "market for coal" is global and therefore cannot contribute to

a concrete and particularized injury. [Doc. 205, p. 23].  A large marketplace, however, is

not a barrier to standing. *See Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*, 752

F.3d 999, 1005 (D.C. Cir. 2015) (oil and gas market); *Int'l Bhd. of Teamsters v. DOT*, 724

F.3d 206, 211–12 (D.C. Cir. 2013) (trucking).  Markets typically have "a seemingly endless

list of participants," including consumers, suppliers, regulators, contractors, and associated

business interests.  [Id.]  This does not prevent parties from being injured by the agency's

manipulation of them.  The breadth and complexity of the coal market poses no barrier to

Article III standing. The economic injury in *Environmental Defense Fund v. Marsh*, 651 F. 2d 983, 1003 (5th Cir. 1981), for example, was from increased competition in the market for the shipment coal. Further, to the extent EPA is trying to imply that the size of the market for coal makes plaintiffs' injuries generalized grievance, this too has already been addressed and rejected by the Court. [Doc. 71, p. 7–8] ("The fact that the failure to perform employment evaluations may affect a large number of persons or entities is not fatal to the plaintiffs' standing.").

EPA next argues that plaintiffs have not "quantif[ied] any lost profits, layoffs, or mine closures allegedly resulting from the reduced market for coal in a filing or discovery document in this case." [Doc. 205, p. 23–24]. Plaintiffs are not required to quantify a monetary injury to demonstrate standing. There is no threshold dollar amount for Article III standing. Furthermore, courts often find injury from difficult-to-quantify economic impacts, including increased competition and lost business opportunities. *See* 15 MOORE'S FEDERAL PRACTICE ¶ 101.40(c) (standing arising from "increased competitiveness" and "loss of business opportunity"); *see also Defenders of Wildlife*, 504 U.S. at 578 (noting a company's interest in marketing its product free from competition is sufficient for standing); *White Oak Realty, LLC v. Army Corps of Eng'rs*, *supra* (finding economic injury from business competition created as an indirect consequence of agency action).

Plaintiffs' expert, John Deskins, who prepares the annual Economic Outlook for the State of West Virginia, explains how EPA's Clean Air Act regulations have and will continue to affect the market for coal. As described in his expert report, there has been a national reduction in coal production levels between 2008 and 2015 of 24 percent, with a "sharp

acceleration in coal losses" in 2015 coming "as a direct result of the regulatory policy change" reflected in one of EPA's core utility strategy rules. [Doc. 258-1]. Dr. Deskins projects that future EPA rulemakings, including the Clean Power Plan, will "put further downward pressure on coal production." [Id.]. Looking at the employment effects of this downward pressure, Dr. Deskins found that in Boone County, West Virginia alone, a sharp reduction in coal production preceded a 65% reduction in coal employment and a 27% reduction in local employment overall, showing just how "heavy localized concentration of coal production losses is leading to devastating effects on entire communities." [Id.].

EPA argues that Murray Energy Corporation is larger today than it was in 2009, and so cannot be injured by the reduced market for coal, but EPA does not need to kill a company to injure it. "[E]ven an identifiable trifle of harm may establish standing. **Halbig v. Burwell**, 758 F.3d 390, 396 (2014) (internal quotations omitted). Plaintiffs also addressed this very point in their depositions, none of which are cited by EPA. As plaintiffs' Rule 30(b)(6) witness explained, Murray Energy Corporation grew larger through transactions with Consol and a partnership with Foresight, but this growth was "[t]o basically survive the markets." [Rule 30(b)(6) Dep. of Plaintiffs, Doc. 260-14, at 351:12] see also [id. at 349:8–351:9]. As Mr. Robert Edward Murray explained at his deposition, the mines purchased from Consolidation Coal Company made Murray Energy Corporation larger but they were not themselves immune from the war on coal:

Q.     But the Consolidated Coal, that transaction has ended up being a profitable one

A.     Not necessarily, no.

Q.     How has it not been profitable?

A.     It's allowed us to continue to pay down our debt service to our lenders, okay,

because that has to be factored into the discussion, but -- so it's allowed us to be profitable in that sense. But once we clear the debt service, once the debt service is paid, the operations do not generate a significant amount of profit.

Q.    Do you know why they don't generate a significant amount of profit?

A.    Depressed marketplace, low coal prices, less demand for coal, the destruction of our markets. As we sit here today, we're competing for less markets than what were available five, ten years ago, for example.

[Robert Edward Murray Dep., Doc. 260-15t 161:24–162:18].

This Court also finds that the injuries are redressable. If this Court were to grant the requested injunctive relief to require the EPA to perform its duty under 18 U.S.C. § 7621, the results of the inquiry may have the effect of convincing the EPA, Congress, and/or the American public to relax or alter EPA's prior decisions.

Even if EPA were to refuse to improve its regulatory activities to account for the actual employment effects of its existing regulations, accurate evaluation of substantial job loss would certainly cause heightened congressional oversight of EPA regulatory activities and provide critical information during the congressional appropriations process with respect to EPA. Indeed, as the Supreme Court noted in the context of a similar statutory mandate in the Clean Water Act, such a continuing evaluation requirement "'will allow the Congress to get a close look at the effects on employment of legislation such as this, and will thus place us in a position to consider such remedial legislation as may be necessary to ameliorate those effects.'" *EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 83 n.24 (quoting Representative Fraser from legislative record).

Finally, this Court finds that the plaintiffs fall within the zone of interests protected

by the statute. One purpose of 18 U.S.C. § 7621 is to protect industries, employers and employees from the untoward effects of prior EPA actions. As such employers, the plaintiffs clearly fall within that zone. *See **Motor Coach Industries, Inc. v. Dole***, 725 F.2d 958, 963 (4th Cir. 1984).

The plaintiffs also assert procedural and informational injury as a basis for their standing. The procedural standing argument is premised upon the fact that the EPA has failed to conduct the employment evaluations. It is clear that an individual can enforce procedural rights, provided that the procedures sought to be enforced are designed to protect his interest. ***Lujan***, 504 U.S. at 573 n. 8.

"There is this much truth to the assertion that 'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." ***Id.*** n. 7.

In ***Massachusetts v. EPA***, 549 U.S. 497 (2007), the Supreme Court stated that "a litigant to whom Congress has accorded a procedural right to protect his concrete interests, —here, the right to challenge agency action unlawfully withheld—can assert that right without meeting all the normal standards for redressability and immediacy. When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that

the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant. [**Lujan**, at 560-61], *see also* **Sugar Cane Growers Cooperative of Fla. v. Veneman**, 289 F.3d 89, 94–95 (D.C. Cir. 2002) ('A [litigant] who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result'). 549 U.S. at 517-18 (interior citations omitted). *See also* **Pye v. United States**, 269 F.3d 459, 471 (4th Cir. 2001) (where the plaintiffs validly assert a procedural injury, they need not meet the normal standards for redressability and immediacy).

> "The requirements for standing differ where, as here, plaintiffs seek to enforce procedural (rather than substantive) rights. When plaintiffs challenge an action taken without required procedural safeguards, they must establish the agency action threatens their concrete interest. **Fla. Audubon Soc'y** [**v. Bentsen**], 94 F.3d [658] at 664 [(D.C. Cir. 1996)]. It is not enough to assert 'a mere general interest in the alleged procedural violation common to all members of the public.' **Id.** Once that threshold is satisfied, the normal standards for immediacy and redressability are relaxed. **Lujan**, 504 U.S. at 572 n. 7. Plaintiffs need not demonstrate that but for the procedural violation the agency action would have been different. **Ctr. for Law & Educ. v. Dep't of Educ.,** 396 F.3d 1152, 1160 (D.C. Cir. 2005). Nor need they establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiffs' interest. **Id.** Rather, if the plaintiffs can

'demonstrate a causal relationship between the final agency action and the alleged injuries,' the court will 'assume[ ] the causal relationship between the procedural defect and the final agency action.' *Id*."

*Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

With regard to redressability, the District of Columbia Circuit has recently stated that: Plaintiffs asserting a procedural rights challenge need not show the agency action would have been different had it been consummated in a procedurally valid manner—the courts will assume this portion of the causal link. *Ctr. for Law & Educ.,* 396 F.3d at 1160. Rather, plaintiffs simply need to show the agency action affects their concrete interests in a personal way. In other words, the intervenors' argument that the agency action was lawful or correct on the merits—and therefore that it did not injure the plaintiffs—is substantially the same as arguing the omitted procedure would not have affected the agency's decision. This is precisely the argument a defendant *cannot* make in a procedural rights challenge. *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000) ("The relevant showing for purposes of Article III standing ... is not injury to the environment but injury to the plaintiff. To insist upon the former rather than the latter as part of the standing inquiry ... is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with a[ ] [discharge] permit.").

*Mendoza*, 754 F.3d at 1012-13.

In *West Virginia Assoc. of Community Health Centers, Inc. v. Heckler*, 734 F.2d 1570 (D.C. Cir. 1984), the District of Columbia Circuit found that the plaintiffs had standing to challenge DHHR's determination of the amount of funding to be allocated to West Virginia. The Court found redressability in the fact that the providers were denied the ability to compete for funding. The Court stated:

> To invoke federal jurisdiction, a party must show at a minimum that the challenged actions have caused it injury that is likely to be redressed by a favorable judicial decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). The Secretary argues that appellants have not satisfied these requirements, inasmuch as they have failed to demonstrate that a judicial decision mandating an increase in West Virginia's PCBG funding would redound to their benefit. In this regard, the Secretary relies principally upon the fact that West Virginia would have complete discretion to award any additional funding it might receive to other CHC's within the State which are not parties to this lawsuit. In response to this line of reasoning, appellants argue that they have been injured by being denied an opportunity to compete for this increased funding, and that to have standing they need not demonstrate that they would actually receive the additional funding. Our examination of applicable law mandates the conclusion that appellants do indeed have standing to sue.

734 F.2d at 1574 (footnotes omitted).

The rule is the same in the Fourth Circuit. "We note that the plaintiffs need not show that the result of the agency's deliberations will be different if the statutory procedure is followed," *Pye*, *supra* at 472, citing *Federal Election Com'n. v. Akins,* 524 U.S. 11, 25 (1998).

The EPA argues that in order to support procedural standing, the procedure violated must be a prerequisite to a final agency action. While many, if not all, of the cases cited by plaintiffs involve procedures which preceded an agency action, this Court has not found a case which so limits the doctrine. Indeed, had the plaintiffs been denied a right to appeal a final agency action, could the EPA seriously deny that there was a procedural violation? The procedure mandated by 18 U.S.C. § 7621 is designed to prompt a second look at final agency action when one can calculate the damage (or lack thereof) to employment and the economy. The denial of the benefit of the evaluations required by 18 U.S.C. § 7621 is sufficient to support procedural standing.

As noted above, the plaintiffs also assert informational standing. "The Supreme Court consistently has held that a plaintiff suffers an Article III injury when he is denied information that must be disclosed pursuant to a statute, notwithstanding '[t]he fact that other citizens or groups of citizens might make the same complaint after unsuccessfully demanding disclosure.' *Pub. Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 449–50 (1989); *see also Akins,* 524 U.S. at 21–25 (holding that a group of voters had a concrete injury based upon their inability to receive certain donor and campaign-related information from an organization); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373–74 (1982) (concluding that deprivation of information about housing availability was sufficient to

constitute an Article III injury). What each of these cases has in common is that the plaintiffs (1) alleged a right of disclosure; (2) petitioned for access to the concealed information; and (3) were denied the material that they claimed a right to obtain. Their informational interests, though shared by a large segment of the citizenry, became sufficiently concrete to confer Article III standing when they sought and were denied access to the information that they claimed a right to inspect.

This Court finds that the plaintiffs have also established standing under the informational doctrine. The statute requires the EPA to gather certain information and conduct evaluations, which plaintiffs contend it has refused to do. The plaintiffs may be entitled to the information which has not been collected or analyzed and have requested the same. This is sufficient to support standing.

This Court is unpersuaded by the EPA's argument that had the EPA conducted the employment evaluations, the plaintiffs would not be entitled to the information. The EPA fails to point out any theory by which this information could be secreted from the plaintiffs or any other person. We do not live in a secret society, and the plaintiffs would have the ability to receive the information through the Freedom of Information Act, if not through other means.

In fact, the legislative history specifically states that the results of the employment evaluations shall be shared with the public. "At the conclusion of any investigation under this section, the Administrator is required to make findings of fact, and such recommendations as he deems appropriate with respect to the issues before him. The report to the Administrator, and his findings of fact and recommendations are to be made available to the public." H.R. Rep. 95-294, 316, 318, 1977 U.S.C.C.A.N. 1395, 1397.

For the above reasons, this Court holds that the plaintiffs have standing to maintain this action.

### III.   The EPA has failed or refused to conduct the evaluations required by § 7621.

The EPA contends that certain evaluations that they have conducted, even though not explicitly conducted under § 7621, should "count" as compliance with the statutory requirements.

In order to resolve this issue, it is necessary to determine what Congress was seeking when it enacted § 7621. In the debates over the 1977 amendments to the Clean Air Act, Congress directly confronted the issue of potential job loss and other negative effects on regulated industries when it enacted a provision requiring the Secretary of Labor, in consultation with EPA Administrator, to conduct a study of potential dislocation of employees due to implementation of the laws administered by EPA. *See* Pub. L. No. 95-95, § 403(e), 91 Stat 685 (Aug. 7, 1977). The 1977 legislation also added Section 321(a)'s similar mandate for EPA to "conduct continuing evaluations of potential loss or shift of employment" potentially caused by EPA's regulatory activities. *Id.* § 311 (adding Section 321 to the Clean Air Act).

With specific statutory provisions like Section 321(a), Congress unmistakably intended to track and monitor the effects of the Clean Air Act and its implementing regulations on employment in order to improve the legislative and regulatory processes. The legislative record for these statutory provisions, as well as Supreme Court precedent, confirm this purpose. For example, the House Committee Report accompanying the 1977 amendments noted that the continuing job-loss assessment requirements under Section 321(a) were inserted to address frequent issues that have arisen concerning "the extent

to which the Clean Air Act or other factors are responsible for plant shutdowns, decisions not to build new plants, and consequent losses of employment opportunities" H.R. Rep. 95-294, at 316, 1977 U.S.C.C.A.N. 1077, 1395.

A subsequent portion of the legislative history provides:

On one side of this dispute, it has been argued that many employer statements that plants will have to shut down if certain pollution control measures become effective constitute "environmental blackmail." Thus, Representative George Brown testified in 1975 that:

(t)here have already been major instances in which plant closings due to non-environmental factors have been blamed on environmental legislation. The effect of such blackmail is to generate public pressure for the weakening of environmental standards, and to force labor unions into opposing enforcement of environmental laws. (H. 217)

On the other hand, it has been argued that environmental laws have in fact been responsible for significant numbers of plant closings and job losses. In any particular case in which a substantial job loss is threatened, in which a plant closing is blamed on Clean Air Act requirements, or possible new construction is alleged to have been postponed or prevented by such requirements, the committee recognizes the need to determine the truth of these allegations. For this reason, the committee agreed to section 304 of the bill, which establishes a mechanism for determining the accuracy of any such allegation.

COMMITTEE PROPOSAL

Section 304 of the committee bill is based on a nearly identical provision in the Federal Water Pollution Control Act. The bill establishes a new section 319 of the act. Under this provision, the Administrator is mandated to undertake an ongoing evaluation of job losses and employment shifts due to requirements of the act. This evaluation is to include investigations of threatened plant closures or reductions in employment allegedly due to requirements of the act or any actual closures or reductions which are alleged to have occurred because of such requirements.

H.R. REP. 95-294, 316-17, 1977 U.S.C.C.A.N. 1077, 1995, 96.

In the summer of 1971, Congress held hearings to determine how to address the problem of "economic dislocation, plant shutdowns, and worker layoffs resulting from environmental control orders." *Economic Dislocation Resulting from Environmental Controls: Hearings Before the Subcomm. on Air & Water Pollution of the S. Comm. on Public Works*, 92d Cong. 1 (1971) ("*Economic Dislocation Hearings*") [Doc. 258-1 & 2, Ex. 5]. Senator Muskie, Chairman of the subcommittee, noted at the outset of these hearings that one "very broad aspect" of the "national policy" on the environment is: "If people, workers, communities, [and] industrial plants are to be affected because we have resolved to protect the environment, how and by what means shall their interest, their personal health and welfare, also be protected?" [Id. at 1]. He observed that this "very broad question leads to an entire series of smaller ones," including in particular: "How do we determine . . . that a worker layoff or plant shutdown does, indeed, result from an environmental control order?" [Id].

41

In an effort to answer these questions, the subcommittee began by turning to prominent advocate Ralph Nader, who testified that to ignore the "problem of environmental layoffs or closedowns" and "simply enforce the pollution laws" "would be too narrow a policy and a cruel one at that for workers" and that ignoring the problem could lead to "[a] regime of fear and economic insecurity . . . spread[ing] through the blue-collar labor force . . . that w[ould] reflect itself in alienation from or antagonism to the cause of a delethalized environment." [Id. at 6]. He testified that it would not be enough to approach the issue using "macro-economic studies" because they "do not answer the question which a worker has about his or her family's macro-economy." [Id. at 7]. Nader explained that "[t]he first step toward an intelligent policy toward the ecology layoff or closedown posture by companies is to require a full and candid disclosure of relevant data." [Id. at 7].

Accordingly, Nader proposed that Congress should "consider legislation requiring the Administrator of the Environmental Protection Agency to investigate every plant closing or threat of plant closing involving 25 or more workers, which he has reason to believe results from an order or standard for the protection of environmental quality." [Id. at 7–8]. He proposed that "[t]his would apply to actual or proposed orders issued by his agency, other Federal agencies, or State and municipal agencies pursuant to approved implementation plans." [Id. at 8]. Nader also urged that, "[t]o the extent possible, the Administrator should try to anticipate problems and investigate them before anyone is actually laid off." [Id.].

On the third day of the hearings, Chairman Muskie summarized the subcommittee's findings "that all of us need more information on why plants are shut down" and "the public needs better access to this information." [Id. at 281]. Over time, Congress amended each

of the five major federal environmental statutes to include a provision requiring the Administrator to generate this information. *See* Section 507(e) of the Clean Water Act (33 U.S.C. § 1367(e)); Section 24 of the Toxic Substances Control Act (15 U.S.C. § 2623); Section 7001(e) of the Solid Waste Disposal Act (42 U.S.C. § 6971(e)); Section 321 of the Clean Air Act (42 U.S.C. § 7621); and Section 110(e) of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9610(e)).

The provision first appeared in a House floor amendment to the Clean Water Act amendments of 1972 on March 29, 1972. The floor amendment provided: "The Administrator shall conduct continuing evaluations of potential loss or shifts of employment which may result from the issuance of any effluent limitation or order under this Act, including, where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such limitation or order." 118 CONG. REC. 10,766 (1972) [Doc. 258-2, Ex.6]. In support of the floor amendment, Representative Dulski explained: "What we are proposing in simplest terms is that the Environmental Protection Agency *constantly monitor* the economic effect on industry of pollution control rules." [Id. at 10,767 (emphasis added)]. Representative Abzug summarized the provision as one that "would require the Environmental Protection Administration *to study and evaluate, on a continuing basis,* the effects of effluent limitations on employment," which would "allow the Congress to get a close look at the effects on employment of legislation such as this, and will thus place us in a position to consider such remedial legislation as may be necessary to ameliorate those effects." [Id. (emphasis added)]. Representative Meeds observed in support of the amendment that when plant shutdowns are attributed to environmental requirements, "workers and other people of the community have the right to know the

43

truth," noting that "[i]f indeed the closure is caused by pollution controls, there should be no difficulty in establishing that fact." [Id.]. The House adopted the floor amendment, and the Senate acceded to the "addition of a new subsection . . . which *requires* the Administrator to investigate threatened plant closures or reductions in employment allegedly resulting from any effluent limitation or order under the Act." S. REP. NO. 92-1465, at 146 (1972) (Conf. Rep.) [Doc. 258-2, Ex.7 (emphasis added)].

The following year, Congress added the provision to the Clean Air Act in Section 321. Pub. L. No. 95-95, § 311, 91 Stat. 685, 782 (1977). The House committee report summarized that, "[u]nder this provision, the Administrator is mandated to undertake an ongoing evaluation of job losses and employment shifts due to requirements of the Act." H.R. REP. NO. 95-294, at 317 (1977) [Doc. 258-2, Ex.8]. This evaluation was "to include investigations of threatened plant closures or reductions in employment allegedly due to requirements of the Act or any actual closures or reductions which are alleged to have occurred because of such requirements." [Id.].[2] The committee report also specifically references the 1971 Economic Dislocation Hearing as providing "a comprehensive review" of the issue addressed by this provision. [Id. at 317 n.4]. The final conference report further describes § 321(a) as "related to the Administrator's evaluations and investigations of loss of employment and plant closure." H.R. REP. NO. 95-564, at 181 (1977) (Conf. Rep.) [Doc. 258-2, Ex.10].

_____

[2] An earlier conference report similarly summarized § 321(a) as providing that "[t]he Administrator shall . . . conduct an ongoing evaluation of the effect of this Act's requirements on employment." H.R. REP. NO. 94-1742, at 116 (1976) (Conf. Rep.) [Doc. 258-2, Ex.9].

While Congress took several years to enact employment effects provisions in each of the major environmental statutes, EPA did not wait to begin continuing evaluations of losses and shifts in employment caused by the agency's regulatory and enforcement actions. By the time Congress enacted § 321(a), EPA had in place already "in a single Agency division, a practicable system for tracking actual employment losses and for performing economic impact analyses that could identify risks of additional employment losses from future regulations." [Doc. 258-2, Expert Report of Anne E. Smith, Ph.D. at 5, Ex.11 ("Smith Report")]. Beginning in 1972, this Economic Dislocation Early Warning System ("EDEWS") "attempted to identify potential or actual industrial plant closings or curtailments and employment dislocations resulting from Federal, State, or local pollution control regulations" U.S. Resp. to Pls.' Second Set of Disc. Reqs. at 21, Oct. 19, 2015 [Doc. 258-4, Ex.34 ("U.S. Resp.")].

The EDEWS process was designed "to identify at the earliest possible time plants which may be forced to close due to environmental regulations." [Doc. 258-3, *H.R. 7739 and H.R. 10632, Small Business Impact Bill (Part 2): Hearings Before the Subcomm. on Special. Small Bus. Problems of the H. Comm. on Small Bus.*, 95th Cong. 254 (1979) (Ex.18) (statement of Roy N. Gamse, Deputy Assistant Adm'r for Planning and Evaluation, U.S. EPA)]. The EDEWS process constantly monitored worker dislocations resulting from federal, state, and local enforcement actions, private civil actions, state implementation plans, and regulatory deadlines. EPA would then notify relevant government agencies of threatened or actual plant closings and production curtailments that would result in job losses and shifts "so that their assistance programs and expertise c[ould] be used to aid the firms, workers, and communities which may be affected." [Id.]. This was specifically

"intended to bring into play any government programs available to provide financial assistance which would prevent plant closings or production curtailments or to assist workers and communities impacted by closings and curtailments." [Doc. 258-3, *SBA Assistance for Agric. Concerns & to Meet Pollution Standards: Hearings Before the Subcomm. on SBA & SBIC Legislation of the H. Comm. on Small Bus.*, 94th Cong. 163 (1975) (Ex.19)].

In the first ten years, EPA identified actual closures and curtailments of 155 plants and the dislocation of 32,899 workers resulting from environmental requirements. [Doc. 258-3, EDEWS Rep. 1982 Q4, at 2 (Ex.28)]. Roughly half of the threatened dislocations actually occurred. [Id.].

At some point, and for reasons unknown to plaintiffs, EPA discontinued these continuing evaluations of losses and shifts in employment resulting from its actions. EPA stated in this case that it is not aware of any records regarding the cessation of the EDEWS system. [Doc. 258-3, U.S. Resp., at 22–23 (Ex.34)].

Until recently in this case, the EPA has made no claim that it was complying with § 321(a). When six Senators requested the results of EPA's continuing evaluations of the potential loss or shifts in employment resulting from four greenhouse gas rulemakings, Administrator McCarthy responded on October 26, 2009, that the agency "has not interpreted CAA section 321 to require EPA to conduct employment investigations in taking regulatory actions" and that "[c]onducting such investigations as part of rulemakings would have limited utility." [Doc. 258-4, Letter from Gina McCarthy, Ass't. Adm'r, U.S. EPA, to Sen. James M. Inhofe, U.S. Senate (Oct. 26, 2009) (Ex.48) ("Letter to Sen. Inhofe")]. McCarthy candidly admitted EPA "has not conducted a section 321 investigation of its

greenhouse gas actions" and informed the Senators that EPA would "not undertak[e] a section 321 analysis" for a planned future greenhouse action. [Id.].

A few months later, responding to a letter from two members of Congress asking if EPA complies with § 321(a) of the Clean Air Act, McCarthy broadly repudiated any obligation "to conduct employment investigations in taking regulatory actions" and reiterated her position that such investigations have only "limited utility." [Doc. 258-4, Letter from Gina McCarthy, Ass. Adm'r, U.S. EPA, to Rep. Greg Walden, H. Comm. on Energy & Commerce (Jan. 12, 2010) (Ex.49) ("Letter to Rep. Walden")]. In response to a follow-up question asking about potential employment impacts, without referencing § 321(a) McCarthy admitted "EPA did not analyze the potential employment impacts of the proposed standards." [Doc. 258-4, Letter from Gina McCarthy, Ass't. Adm'r, U.S. EPA, to Rep. Joe Barton, Ranking Member, H. Comm. on Energy & Commerce (Aug. 3, 2010) (Ex. 50) ("Letter to Rep. Barton")].

Then, on May 2, 2011, the Chairman of the House Oversight Committee wrote McCarthy directly and raised his concern that "it ha[d] come to [his] attention that the EPA has failed to perform the statutorily required job impacts analyses of GHG regulations under section 321(a)." [Doc. 258-4, Letter from Rep. Darrell E. Issa, Chairman, H. Comm. on Oversight & Gov't Reform, to Gina McCarthy, Ass't. Adm'r, U.S. EPA (May 2, 2011) (Ex.51)]. He informed her that "[e]mployers have expressed deep concerns that the requirements of the CAA, as implemented through GHG regulations, will adversely impact employment" and requested that she promptly provide the House Oversight Committee "[a] section 321(a) analysis on the individual and cumulative impact of GHG regulations on potential job losses." [Id.]. Instead of honoring this request from the Chairman, McCarthy

claimed that "EPA has not received any request under section 321" "to investigate specific allegations." She reiterated that "EPA has not interpreted section 321 to require the agency to conduct employment investigations in taking regulatory actions," and reiterated her judgment that investigating job losses "would have limited utility." [Doc. 258-4, Letter from Gina McCarthy, Ass't. Adm'r, U.S. EPA, to Rep. Darrell E. Issa, Chairman, H. Comm. on Oversight & Gov't Reform 2, 5 (June 22, 2011) (Ex.52) ("Letter to Chairman Issa")].

Senator Vitter fared no better than Chairman Issa in late 2011 when he wrote former EPA Administrator Lisa Jackson requesting that she "[p]lease provide the results of your continuing Section 321(a) evaluations of potential loss or shifts of employment which may result from the suite of regulations EPA has proposed or finalized that address CSAPR and Utility MACT . . . including threatened plant closures or reductions in employment." *See* Letter from Gina McCarthy, Ass't. Adm'r, U.S. EPA, to Sen. David Vitter, U.S. Senate 2, 7 (Mar. 06, 2012) [Doc. 258-5 (Ex.53) ("Letter to Sen. Vitter")]. McCarthy personally "respond[ed] on the Administrator's behalf" and merely informed him that EPA did not believe it was required to conduct the job loss evaluations at all and that she believed that they "would have limited utility." [Id.].

When Ms. McCarthy was nominated to be EPA Administrator, Senator Inhofe asked her directly on the record during her confirmation hearing whether she "believe[d] the Agency has an obligation to conduct continuing evaluations of the impact its regulations could have on jobs." [Doc. 258-5, *Hearing on the Nomination of Gina McCarthy to be Adm'r of the EPA: Hearing Before the S. Comm. on Env't & Pub. Works*, 113th Cong. 200 (2013) (Ex.54) ("*Nomination Hearing*")]. McCarthy answered that "EPA has not interpreted this provision to require EPA to conduct employment investigations in taking regulatory

actions," justifying her position with the claim that "EPA has found no records indicating that any Administration since 1977 has interpreted section 321 to require job impacts analysis for rulemaking actions." [Id. at 88]. Furthermore, Senator Vitter directly asked whether "EPA has ever investigated a plant closure or reduction in employment to see what role, if any, the administration or enforcement of the Clean Air Act played?" [Id.]. Rather than give a yes or no answer to this simple question, McCarthy avoided answering the actual question he asked her entirely. [Id.].

In a question for the record for a November 2013 House Science Committee hearing, Chairman Smith observed that EPA's regulatory impact analyses did not constitute compliance with Section 321(a) of the Clean Air Act, and then asked "[w]hy has EPA not conducted a study to consider the impacts of CAA programs on job shifts and in employment" and would EPA "commit to conducting such studies in the future." [Doc. 258-5, *Strengthening Transparency and Accountability Within the EPA: Hearing Before the H. Comm. on Sci., Space & Tech.*, 113th Cong. 82–83 (2013) (Ex.55)]. Administrator McCarthy again justified EPA's actions by stating that "EPA has found no records to indicate that CAA section 321, since its inclusion in the 1977 amendments, has been interpreted by any Administration to require job impacts analysis of rulemakings or job impacts analysis of existing CAA requirements as a whole." After claiming that EPA's regulatory impact analyses "have generally found that environmental regulations may have both positive and negative effects on jobs but that these effects tend to be relatively small and difficult to quantify with any precision," she committed only that EPA "will continue to comply with statutory and administrative requirements for analysis of our programs in a manner consistent with principles of sound science and economics." [Id. at 83].

49

Through it all, McCarthy consistently articulated the agency's statutory interpretation that the precise question addressed by Section 321(a) is whether specific lay-offs result from EPA's actions,[3] but she just as consistently admitted explicitly and implicitly that her agency is not conducting any efforts to answer it and claimed answering the question has "limited utility."

Consistent with the agency's admissions to Congress, EPA responded to a Freedom of Information Act request [Doc. 258-5, Ex. 57] asking for records pertaining to "[a]ll draft, interim final and final reports and/or evaluations prepared by EPA or its contractor(s) pursuant to section 321 of the Clean Air Act" by stating that "neither the Office of Air and Radiation nor the Office of Policy were able to find any documents pertaining to [the] request." [Doc. 258-5, Ex. 58].

Having failed in the agency's initial attempts to avoid compliance with the duty set forth in Section 321(a), the agency now asks the Court to enter summary judgment claiming that, based on a new interpretation of § 321(a) arising exclusively in this litigation,

---

[3] *Cf.* Doc. 258-5, *FY2014 Hearing*, at 69 (Ex.56) (Acting EPA Administrator testifying that "**EPA has not conducted any studies or evaluations under Section 321(a)**" "[a]s a result" of EPA not finding "any records of any requests for Section 321 investigations of job losses alleged to be related to regulation-induced plant closure" (emphasis added)); *see also* Letter to Sen. Inhofe [Doc. 258-4, Ex.48] (admitting EPA "has not conducted a section 321 investigation of its greenhouse gas actions" and stating that EPA would "not undertak[e] a section 321 analysis" for a planned future greenhouse action); Order Denying Motion for Protective Order, [Doc. 164 at 12 n.2 (Nov. 12, 2015)] (finding January 12, 2010, letter contained "an admission that as of January 12, 2010, the EPA had conducted NO section 321 investigations"); Letter to Rep. Barton, at 13–14 [Doc. 258-4, Ex.50] (admitting "EPA did not analyze the potential employment impacts of the proposed" stringent national ambient air quality standard for ozone); [Doc. 164 at 14 n.3] (finding June 22, 2011, letter contained "an admission that as of June 22, 2011,the EPA had conducted NO section 321 investigations"); [id.] at 18 ("The fair reading of these statements, many of which were made by Administrator McCarthy, is that the EPA has never made any evaluations of job losses under § 321(a). This is directly contrary to the position of the EPA in this case.").

it has found 64 documents that somehow constitute compliance with EPA's obligation to conduct continuing evaluations of losses and shifts in employment caused by the agency's administration and enforcement of the Clean Air Act and applicable implementation plans. [Doc. 205 at 32].

While the 64 documents have some seemingly random additions, EPA cites primarily regulatory impact analyses and economic impact analyses that EPA has prepared since 2009 as a part of the rulemaking process. EPA offers no interpretation of § 321(a) other than the assertion that the 64 documents suffice to demonstrate compliance. EPA also does not explain the contradictions between its litigation position and the repeated admissions by McCarthy and her agency that EPA is not conducting the continuing evaluations described by § 321(a), intentionally or otherwise. And despite its previously consistent interpretation of § 321(a) and this Court's interpretation of that provision, EPA does not claim that any of the documents determine whether specific layoffs have already resulted or will in the future result from the war on coal, and EPA does not contend that the documents provide "a second look at" its actions "when one can calculate the damage (or lack thereof) to employment and the economy." [Order Denying Second Motion to Dismiss, Doc. 71 at 16 (Mar. 27, 2015)].

EPA originally argued the duty expressed in § 321(a) was discretionary, as opposed to mandatory. Never outside its recent arguments, however, has EPA maintained that § 321(a) is about anything other than determining the cause of specific job dislocations. As EPA's 30(b)(6) witness James DeMocker recently explained:

Q. Is 321(a) about investigating specific layoffs?

MR. GLADSTEIN: Objection; scope and form.

THE WITNESS: Well, under the agency's prior interpretation of the scope of the

Section 321 requirements, our interpretation back five or six years ago was that

Section 321(a)'s specific reference to investigations was interpreted -- it was

interpreted that the Congressional intent was to provide the authority for us in a

reactive way to investigate claims submitted to us that a job dislocation was

attributed by a company owner or operator to the need to comply with regulatory

requirements.

[Doc. 258-1, U.S. Dep. IIA, at 297:20–298:11 (Ex.3)].

Only in response to this Court's finding that § 321(a) was mandatory did EPA decide

that § 321(a) must instead be about "estimating employment effects [of] regulatory

actions":

Q. Has EPA's interpretation of 321(a) changed since then?

MR. GLADSTEIN: Objection.

THE WITNESS: I'm not an attorney, but my understanding is that there is an

alternative interpretation of Section 321 that's been offered by the court in this case

that defines a duty to conduct on an ongoing basis employment effects evaluations

of our rulemaking activities.  But under that interpretation the agency's view is that

the work that we have done pursuant to estimating employment effects for our

regulatory actions would meet any duty to conduct that type of employment

analysis.

[Id. at 298:13–299:3].

The evidence also shows that, under the correct interpretation of § 321(a), the

interpretation that EPA originally described to this Court, and the interpretation EPA had

been using for almost 40 years, EPA is not complying:

> Q. Under EPA's original interpretation, the one that it held five or six years ago, under that interpretation of 321(a), are the RIAs what 321(a) is looking for?
>
> MR. GLADSTEIN: Objection as to scope and form.
>
> THE WITNESS: Under that interpretation, the RIAs are not the same as an investigation of a specific change in employment in response to an actual or a threatened plant closure that a facility owner is attributing to environmental requirements. . . .

[Id. at 312:2–312:14].

The most EPA does is "conduct proactive analysis of the employment effects of our rulemakings actions," which is simply not what § 321(a) is about. [Id. at 312:16–312:18]. As James DeMocker, EPA's declarant in support of the motion for summary judgment and Rule 30(b)(6) witness admitted, the agency is not investigating power plant and mine closures and worker dislocations resulting from the utility strategy on an ongoing basis.

When specifically asked whether EPA had ever investigated a threatened plant closure or reduction in employment allegedly resulting from administration or enforcement of the Clean Air Act, Mr. DeMocker could recall only "a couple of cases" from decades before, and he did not claim that any of the documents cited in his declaration in support of the motion were the result of such investigations. [Id. at 295:25–296:19]. He could not and did not claim that any documents reflected efforts to determine whether specific layoffs were the result of EPA actions. [Id. at 301:21–307:10]. And he was "not aware" of any "analysis specifically aimed at discerning the relevant contribution of regulatory requirements to a decision to close" power plants. [Doc. 258-4, U.S. Dep. I, at

244:11–245:2 (Ex.40)].

One of EPA's expert witnesses, Dr. Charles Kolstad, likewise did not "recall seeing anything about investigating threatened plant closures" or reductions in employment resulting from the requirements of the Clean Air Act in the 64 documents. Furthermore, Dr. Kolstad agreed that documents like the RIAs for the Transport Rule, Utility MACT, and the Clean Power Plan, which estimate changes in labor utilization as measured by full-time equivalents, do not even "answer" the "question" of how many people will be involuntarily terminated. [Doc. 258-7, Kolstad Dep. at 62–63].

EPA contends in its brief that the sufficiency of EPA's evaluations is not before the Court (Doc. 205 at 45) but this is precisely the question that the courts in *Frey v. EPA*, 751 F.3d 461 (7th Cir. 2014) and *Alaska Ctr. For the Env't v. Browner*, 20 F.3d 981 (9th Cir. 2014) decided. As EPA itself later acknowledges, "whether EPA has *performed* the continuing evaluations described in Section 321(a)" is within the Court's role to decide. [Doc. 205 at 45]. EPA's consistent acknowledgement that it has no such evaluations, coupled with the testimony from various experts that EPA's claimed attempts do not comply, demonstrates that he EPA has not fulfilled its duty under § 321(a).

The documents cited do not evaluate loss and shifts in employment. The documents are Regulatory Impact Analyses ("RIAs") and Economic Impact Analyses ("EIA") prepared to comply with a number of other statutory and Executive Order requirements. The rest are analyses done pursuant to § 812 of the Clean Air Act and a handful of white papers and articles written by EPA staff—some not even published by the Agency—involving their own personal research. EPA readily admits that none of these

documents were prepared because of or for the purpose of complying with § 321(a). *See* Doc. 205 at 44; *see also* U.S. Resp. at 24 (Ex.34) ("[N]one of the documents upon which it relies to demonstrate its performance of the duty in Section 321(a) were prepared explicitly for that purpose or labeled as Section 321(a) evaluations."). None of the documents even *mentions* § 321(a), despite each of the RIAs and EIAs cited by the agency containing explicit reference to the Executive Orders, statutes, and other requirements for which the analyses were prepared. *See, e.g.*, DeMocker Decl., Ex. 1 (Doc.205-30), at 6-1 (citing Executive Order 13,563). Substantively, these documents do not present a continuing evaluation of actual loss and shifts in employment either. *[See* Doc. 258-1, Smith Report at 20 (Ex.11)] ("EPA's claim that RIAs and other studies it has produced meet the requirements of 321(a) is not supportable."). As explained by Dr. Smith:

> The important thing to note is that the role of RIAs has no relationship to the concept of continuing evaluation after promulgation. Indeed, they are much the opposite in nature, being a one-time analysis conducted only at the time when a rule is either proposed or finalized. They are inherently pre-promulgation in nature, and provide no information about actual outcomes of regulations.

[Id. at 10].

In fact, no "facility- and community-specific at-risk assessment" of jobs has been done "in any electricity sector air RIA released in the past 20 years." [Id.]. Rather "the economic impact chapters of electric sector RIAs typically perform generic estimates of job losses based on total plant capacity changes and total coal demand changes nationally, or across very broad regions. [Id. at 16]. Moreover, the other documents cited by Mr.

55

DeMocker "individually and as a group . . . provide even less of the type of evaluation . . . consistent with Section 321(a) requirements." [Id.]. As discussed by Dr. Smith, the cited RIAs share several fundamental flaws. First, "RIAs do not cover all Clean Air Act actions that can cause employment dislocations, and their discontinuous nature can result in "lost closures" associated even with the regulations that they do cover." [Id. at 21]. Second, "RIAs do not provide a continuing evaluation of regulations while they are being implemented, which is when the actual impacts that may merit assistance or other governmental response are first observed." [Id.]. Third, "RIAs fail to even provide an *ex ante* projection of potential employment dislocations with any of the specificity necessary to identify needs for effective worker and community assistance." In addition, "[n]one of the other studies or activities cited by Mr. DeMocker in his Declaration provides relevant or timely information on locations of closures and actual employment dislocations that might be viewed as consistent with Section 321(a)." [Id.].

EPA cannot redefine statutes to avoid complying with them. Nor can EPA render them superfluous or contrary to their original purpose by simply defining them to be.

Having determined that: (1) this Court will not change its previous decision holding that Section 321(a) of the Clean Air Act, 42 U.S.C. § 7621(a), creates a non-discretionary duty on the part of the Environmental Protection Agency; (2) this Court will not change its previous decision holding that the plaintiffs have Article III standing to maintain this action; and (3) that the EPA is not fully complying with the requirements of § 321(a), this Court will deny the United States' New Motion for Summary Judgment.

Inasmuch as this Court considered the opinions of John Deskins and Anne E. Smith, it is incumbent on the Court to address the Motions *In Limine* seeking to exclude

56

their evidence. Inasmuch as this Court did not consider the opinions of Timothy Considine, the Motion seeking to exclude his opinions will be denied as moot.

With respect to John Deskins this Court did consider his opinions concerning the effect of EPA regulations on the coal industry. The EPA seeks to exclude his opinions on the basis that: (1) Deskins is not qualified to render an expert opinion on the causes of power-plant retirements or on the impacts of federal environmental policy; and (2) Deskins's opinions are irrelevant, unreliable, and unhelpful to deciding the issues in this case.

With respect to the first issue, Dr. John Deskins is a professor of economics and Director of the West Virginia University Bureau of Business and Economic Research. [Doc. 281-6, Expert Report of John Deskins, April 25, 2016 ("Deskins Report") at 04]. Dr. Deskins has studied, testified, and published on the coal industry and effects of employment on local communities routinely. For example, he has co-authored the West Virginia Economic Outlook for the State Legislature annually since 2014; he has testified before the West Virginia State Legislature; and just ten days ago, he appeared before the United States Senate Committee on Energy and Natural Resources, where he testified about "the deep decline in coal production observed in recent years which has had a devastating effect on West Virginia's economy . . ." [Doc. 281-3, Decl. of John Deskins dated September 9, 2016 ("Deskins Decl.") at 1-2:3].

Dr. Deskins' report and testimony address whether "EPA's rulemakings contributed to job losses in the coal industry" and whether "the decline of coal production [can] be attributed solely to other factors such as a decline of exports or cheaper natural gas," an issue raised by EPA in its new motion for summary judgment. [Doc. 281-6, 02]. He offers

insight on the "impact of coal-related job losses on the broader community" and how that information aids policy-making. [Id.]. His testimony therefore addresses two of the most fundamental questions in this litigation: whether EPA is causing job losses and why Section 321(a) is invaluable to communities and policy-makers. [*See* Id. at 4-5:9].

This Court finds that Dr. Deskins is qualified to give his opinions, and, to the extent that this Court relied upon those opinions, finds that his opinions were relevant, reliable, and helpful to the Court. This Court will deny the Motion seeking the exclusion of Dr. Deskins' testimony.

With respect to Anne E. Smith, the EPA seeks to exclude her opinions and the bases that: (1) Smith proffers improper and unhelpful legal conclusions for which she lacks the qualifications to render; and (2) Smith's remaining opinions are irrelevant, unreliable, and unhelpful to deciding the issues in this case. In deciding the Motion for Summary Judgment in this case, this Court considered Dr. Smith's historical view of the "EDEWS" program, the type of product that was generated by that program, and her insight as to whether the 64 documents relied upon by the EPA provided the information sought by Congress in enacting § 321(a).

Dr. Anne Smith has specialized in environmental risk assessment, cost-benefit analysis, economic impact assessment, and decision analysis for over 35 years. [Doc. 281-4, Expert Report of Anne E. Smith, April 25, 2016 ("Smith Report") at 1]. She obtained her B.A. in economics from Duke University and Ph.D. in economics from Stanford University with a concentration in labor economics and industrial organization and a minor in Engineering-Economic Systems. [Id.]. In 1977, she served as an economist in the Economic Analysis Division of the Office of Policy Planning and Evaluation of the U.S.

Environmental Protection Agency ("EPA"). [Id.]; [*See also* Doc. 281-1, Declaration of Anne E. Smith dated September 9, 2016" ("Smith Decl.") at 1-2:3]. There, her "main responsibilit[y] was to prepare quarterly reports from the EPA Administrator to the Secretary of Labor on actual and threatened closures of plants in which environmental regulations were a contributing factor, and associated job losses" through the Economic Dislocation Early Warning System ("EDEWS"). Doc. 281-4 at 1]. Dr. Smith formally left EPA in 1979 to consult on risk assessment for environmental policy, but continued working with EPA serving as a contracted consultant for the Office of Air Quality Planning and Standards. [Id.]. Overall, "[t]he focus of [her] career in the 35 years since [she] left EPA's employment has been on applying and advancing the concepts and analytic tools of economic impact analysis and benefit-cost analysis." [Doc. 281-1, Smith Decl. at 2:4]. She is now Senior Vice President of NERA Economic Consulting and serves as the co-head for its global environmental practice, focusing on environmental and energy economic issues. [Doc. 281-4 at 1].

Dr. Smith's testimony provides insight on what "the key elements of a system for complying with the requirement of the [CAA] Section 321(a)" are. [Id. at 2-3]. She provides context for the EDEWS program that defendant has been unable to provide throughout this litigation. [Doc. 281-4 at 5]. She also offers a perspective on what a continuing evaluation of loss and shifts in employment would look like, and how EPA could conduct such a continuing evaluation with the resources it already has and within the typical costs in time and resources EPA expends on other types of economic assessments. Dr. Smith's testimony is also directly relevant to an issue which defendant has raised in both of its Motions for Summary Judgment, which is whether its now 64 documents show EPA is

complying with Section 321(a) despite the growing mountain of evidence to the contrary, as raised by EPA through the non-expert declaration of its employee James DeMocker. [*See* Doc. 77: Ex. A, 205: Ex. AA]. Dr. Smith's report addresses why EPA's RIAs and other documents simply do not provide a continuing evaluation of loss and shifts in employment, missing the fundamental point of Section 321(a).

While the EPA contends that certain of Dr. Smith's opinions are inadmissible legal conclusions, "opinion testimony that arguably states a legal conclusion is helpful to the jury and thus, admissible . . . if the case involves a specialized industry." Weinstein's Federal Evidence § 704.04 at 2; *See also* **United States v. Offill**, 666 F.3d 168, 175 (4th Cir. 2011) ("expert testimony that arguably state[d] a legal conclusion [was admissible] to assist jury . . . to understand complex concepts involving securities, registration, registration exemptions, and specific regulatory practices").

This Court finds that Dr. Smith is qualified to give her opinions, and, to the extent that this Court relied upon those opinions, finds that her opinions were relevant, reliable, and helpful to the Court. This Court will deny the Motion seeking the exclusion of Dr. Smith's testimony.

In a typical case, a Court may not grant summary judgment to a party which has not filed a motion seeking the same, unless notice and a reasonable time to respond is provided. Rule 56(f), Federal Rules of Civil Procedure. In this case, however, the Court finds that the EPA has waived notice and time to respond, by stating "[i]f this Court concludes that the documents upon which EPA relies do not constitute performance of the evaluations described in Section 321(a), then the Court should enter judgment for Plaintiffs

and order EPA to perform the duty." [Doc. 205, p. 46].

Having found that the documents upon which the EPA relies do not constitute performance of the evaluations required by § 321(a), this Court will grant summary judgment to the plaintiffs. This leaves the issue of the remedy. While the EPA contends that all this Court may do is say "go, do your duty," this Court's discretion is more broad than that suggested by the EPA.

EPA argues that the relief sought by plaintiffs is beyond the jurisdiction afforded to the Court by the Clean Air Act. EPA fails to mention, however, that it unsuccessfully raised a very similar argument in one of the very cases cited in its brief.

In *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981 (9th Cir. 1994), the EPA argued that the district court could not even order it to prepare and submit a report on the review EPA had been statutorily mandated to undertake because the Clean Water Act did not "specifically require it to prepare or present a report on water quality monitoring," and "relegate[d] the pace" of EPA's review "entirely to the EPA's discretion." 20 F.3d at 986. The Ninth Circuit disagreed, holding "[t]he district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Id*. As the Ninth Circuit reasoned: "In this case the established wrong is the failure of the EPA to take any steps to establish the TMDLs mandated by Congress for more than a decade. In tailoring the relief granted, the district court correctly recognized that in order to bring about any progress toward achieving the congressional objectives of the CWA, the EPA would have to be directed to take specific steps." *Id*. at 986. The Ninth Circuit thus made clear that the similarly-worded citizen suit provision of the Clean Water Act did not limit the scope of

the district court's traditional, equitable, remedial authority:

> In enacting environmental legislation, and providing for citizen suits to enforce its directives, Congress can only act as a human institution, lacking clairvoyance to foresee the precise nature of agency dereliction of duties that Congress prescribes. When such dereliction occurs, it is up to the courts in their traditional, equitable, and interstitial role to fashion the remedy.

*Id*. at 987.

The above case affirmed the District Court's decision in *Alaska Ctr. for the Env't v. Reilly*, 796 F.Supp. 1374, in which the District Court noted that:

> When the intent of Congress clearly requires the Agency to act without undue delay, courts have the authority to order the EPA to establish a reasonable schedule in which to achieve compliance. *See, Abramowitz v. EPA*, 832 F.2d 1071, 1078–79 (9th Cir. 1987) (finding that the court had the authority under the Clean Air Act to set the deadline by which the EPA had to act on a state's proposed carbon monoxide and ozone controls); *Natural Resources Defense Council, Inc. v. New York State Dep't of Envtl. Conservation*, 700 F.Supp. 173, 177–181 (S.D.N.Y. 1988) (ordering the EPA to establish a schedule for New York's compliance with the Clean Air Act); *Environmental Defense Fund v. Thomas,* 627 F.Supp. 566, 569–570 (D.D.C. 1986) (finding that the EPA had a duty to set deadlines for compliance).

796 F.Supp. 1374, 1379–80 (W.D. Wash. 1992), *aff'd sub nom. Alaska Ctr. for Env't v.*

*Browner*, 20 F.3d 981 (9th Cir. 1994).

In *Friends of Wild Swan v. U.S. EPA*, 74 Fed.Appx. 718 (9th Cir. 2003), the Ninth Circuit held:

> While courts may not "usurp[ ] an administrative function, *FPC v. Idaho Power Co.,* 344 U.S. 17, 20 (1952) (*"Idaho Power"* ), they retain equitable powers to shape an appropriate remedy. *See* ***West. Oil & Gas Ass'n v. EPA,*** 633 F.2d 803, 813 (9th Cir. 1980) (*"Western Oil"*). Equitable considerations are appropriate in reviewing agency decisions under the APA and crafting a remedy. *See* ***Nat'l Wildlife Fed'n v. Espy****,* 45 F.3d 1337, 1343 (9th Cir. 1995) ("The court's decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity."); ***Sierra Pacific Indus. v. Lyng****,* 866 F.2d 1099, 1111 (9th Cir. 1989) ("Our inquiry into the district court's authority to order equitable relief begins with the well-established principle that 'while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action.'" (quoting ***Ford Motor Co. v. NLRB****,* 305 U.S. 364, 373 (1939))).

74 Fed.App'x at 721.

This Court finds that the EPA must fully comply with the requirements of § 321(a). This Court further finds that, due to the importance, widespread effects, and the claims of the coal industry, it would be a abuse of discretion for the EPA to refuse to conduct a §

321(a) evaluation on the effects of its regulations on the coal industry.

Based upon the foregoing:

(A)     the United States' New Motion for Summary Judgment [**Doc. 204**] is **DENIED**;

(B)     the United States' First Motion in Limine to Exclude the Expert Report and Related Testimony of Plaintiffs' Expert, Anne E. Smith [**Doc. 266**] is **DENIED**;

(C)     the United States' Second Motion in Limine to Exclude the Expert Report and Related Testimony of Plaintiffs' Expert, Timothy Considine [**Doc. 268**] is **DENIED AS MOOT**;

(D)     the United States' Third Motion in Limine to Exclude the Expert Report and Related Testimony of Plaintiffs' Expert, John Deskins [**Doc. 270**] is **DENIED**;

(E)     Summary Judgment in favor of the plaintiffs is **GRANTED**; and

(F)     The defendant is **ORDERED** to file, within fourteen days of the date of this Order, a plan and schedule for compliance with § 321(a) both generally and in the specific area of the effects of its regulations on the coal industry.   The plaintiffs may file any comments or criticisms of the defendant's submission within fourteen days of the filing of the same.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to any counsel of record.

**DATED:** October 17, 2016.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE