**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**

| | | |
|---|---|---|
| MURRAY ENERGY CORPORATION, et al., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | **Civil Action No. 5:14-CV-00039** |
| **v.** | ) | **Judge Bailey** |
| | ) | |
| GINA MCCARTHY, Administrator, | ) | |
| United States Environmental Protection Agency, | ) | |
| | ) | |
|     Defendant. | ) | |

**UNITED STATES' RESPONSE TO THE OCTOBER 17, 2016**
**MEMORANDUM OPINION AND ORDER REQUIRING SECTION 321(a)**
**COMPLIANCE PLAN AND SCHEDULE**

**INTRODUCTION**

On October 17, 2016, this Court denied the United States' New Motion for Summary Judgment, granted summary judgment in favor of Plaintiffs, and ordered the Administrator to submit a plan and schedule for compliance with Section 321(a) of the Clean Air Act ("CAA"), 42 U.S.C. § 7621(a), within 14 days.   Memorandum Opinion and Order Denying the United States' New Motion for Summary Judgment and Granting Summary Judgment in Favor of the Plaintiffs ("October 17 Order"), ECF No. 293.   The United States maintains each of the positions set out in its summary-judgment briefs and reserves the right to appeal all aspects of the October 17 Order.   In particular, the United States maintains that this Court lacks jurisdiction over this matter; that the U.S. Environmental Protection Agency ("EPA") has performed the evaluations described in Section 321(a); and that this Court may not prescribe the manner or timing of EPA's performance under Section 321(a).   Subject to these reservations and objections, the United States submits the plan and schedule below in an effort to comply with the October 17 Order, but the United States does not concede that it would be necessary or proper

for EPA to follow this plan and schedule in the absence of the October 17 Order.

Given the Court's determination that EPA's current practices do not constitute performance of the evaluations described in Section 321(a), the Agency faces the task of developing an alternative approach to conducting the evaluations that is supported by sound economics, informed by reliable data, subject to appropriate public participation, and consistent with budgetary and other financial or administrative constraints.   As described in further detail below, EPA believes that the most reasonable first step in this process is to seek the scientific and technical advice of the EPA Science Advisory Board concerning the analytic tools and methodologies appropriate to undertaking the evaluations described in Section 321(a).   Seeking the Board's advice has the advantage of bringing recommendations from a variety of highly qualified technical experts in relevant subject matter areas to the Agency through a transparent public process that will allow interested stakeholders an opportunity to make their recommendations as well.

Due to the 14-day response time in the October 17 Order, it was not possible for EPA to determine every detail of its proposed plan and every step or interval in the proposed schedule. The Agency is presenting the best plan and schedule it could formulate in the time allotted in the October 17 Order.   Moreover, some considerations cannot be addressed until EPA considers advice from the Science Advisory Board and as EPA implements its plan.   These considerations include, but are not limited to, what resources are or will be available to EPA, what information is or will be available to EPA, what information EPA may need to request or require of industry (including business operations, financial data, market data, and decisions affecting employment at individual plants or facilities) to conduct appropriate analyses, how that information can best

2

be collected in the short and long-term, and the appropriate methodologies required to meet the evaluation objectives.

EPA is committed to ensuring that its work (1) is the product of sound scientific and technical analysis and review, and (2) is accompanied by open, transparent processes that afford opportunities for public engagement.   Thus, EPA's plan should allow for — and, in its details and specifications, be the product of — appropriate scientific and technical evaluation and public participation.

## I.    BRIEF SUMMARY.

In accordance with the reservations expressly noted and subject to the limitations described above, EPA responds to the October 17 Order by describing the following plan and schedule to supplement its current performance of the evaluations described in Section 321(a).[1] First, EPA will seek the advice and assistance of the Science Advisory Board on issues and questions that will inform the future performance of employment evaluations related to the CAA. EPA will then take additional steps and action, in light of the advice and recommendations of the Board, including, if appropriate, undertaking public rulemaking (e.g., to establish rules and procedures for information-gathering or data collection from business or industry sources). These steps will enable EPA to conduct further evaluations under Section 321(a), beyond the evaluations currently conducted, as this Court has determined is necessary to comply with Section 321(a).

---

[1] EPA also will continue the evaluations and analyses that EPA conducts in its Regulatory Impact Analyses, Economic Impact Analyses, and the other evaluations identified in the United States' New Motion for Summary Judgment, which this Court found do not, standing alone, constitute performance of the evaluations described in Section 321(a).

II.      **THE SCIENCE ADVISORY BOARD.**

One of the key resources for scientific or technical evaluation and recommendations available to EPA is the Science Advisory Board.   As authorized by the Environmental Research, Development, and Demonstration Authorization Act of 1978 ("ERDDAA"), Pub. L. No. 95-155, 91 Stat. 1257 (codified at 42 U.S.C. § 4365 (1977)), the Administrator established the Science Advisory Board to provide independent advice on various scientific and technical issues, including economic analysis.   In accordance with the Board's Charter, the Board is a "scientific/technical advisory committee."   EPA Science Advisory Board (SAB)*, Charter.*[2] The Board "will review scientific issues, provide independent scientific and technical advice on EPA's major programs, and perform special assignments as requested by Agency officials."   *Id*. While not all matters involving scientific and technical issues are referred to the Board, EPA may, in its discretion, opt to take advantage of the Board's expertise and established processes. Among the Board's major objectives are to review and provide advice and recommendations on the "scientific and technical adequacy of Agency programs, guidelines, documents, methodologies, protocols and tests" and on "new information needs and the quality of Agency plans and programs for research, development and demonstration."   *Id*.

The Science Advisory Board is an advisory committee subject to the Federal Advisory Committee Act ("FACA"), Pub. L. No. 92-463, 86 Stat. 770 (codified as amended at 5 U.S.C. app. § 3(2) (1972)).   In accordance with the general findings and purpose underlying FACA, Congress found that advisory committees, such as the Science Advisory Board, are "a useful and

---

[2] https://yosemite.epa.gov/sab/sabproduct.nsf/WebBOARD/currentcharter?OpenDocument (last visited October 31, 2016).

beneficial means of furnishing expert advice, ideas, and diverse opinions to the Federal

Government." 5 U.S.C. app. § 2(a). FACA requires that Science Advisory Board meetings be

open to the public, that notice of Board meetings be published in the Federal Register, and that

"interested persons . . . be permitted to attend, appear before, or file statements with" the Board.

5 U.S.C. app. § 10(a). FACA also provides for the keeping of minutes and transcription of

Board meetings. 5 U.S.C. app. §§ 10–11. In addition, under the ERDDAA, the Act

authorizing the establishment of the Science Advisory Board, the Board "shall make every effort

. . . to maximize public participation and transparency, including making the scientific and

technical advice of the Board . . . publically available in electronic form on the website of

[EPA]." 42 U.S.C. § 4365(h).

　　　The Science Advisory Board has advised EPA concerning a wide variety of scientific and

technical matters.[3] The Board's varied activities may be: (1) consultative, where "a panel of

knowledgeable experts discusses a technical topic before the Agency begins substantive work on

that particular subject"; (2) advisory, where the Board reports on "the deliberations of one or

more public sessions in which panel members provide advice on technical issues during the

period in which the Agency is developing its position on a topic"; or (3) peer review, where the

Board reports on "the deliberations of one or more public sessions in which panel members

review a completed Agency product." U.S. EPA, *Advisory Committee Meetings and Report*

*Development: Process for Public Involvement, A Report of the Science Advisory Board Staff*

---

[3] *See, e.g.*, EPA Science Advisory Board (SAB),
https://yosemite.epa.gov/sab/sabpeople.nsf/WebCommittees/BOARD (last visited Oct. 31, 2016) (listing
current activities).

*Office*, EPA-SABSO-04-0001, at 4 (2004).[4]   Board activities typically begin with EPA's development and submission to the Board of a "charge" or "charges," which guide the formation and work of an appropriate panel.   U.S. EPA, Science Advisory Board, *Overview of the Panel Formation Process at the Environmental Protection Agency Science Advisory Board,* EPA-SAB-EC-010, at 9 (2002).[5]   Public participation is available throughout the Board process, including at the panel formation stage.   *Id*. at 7–10.[6]

The Board's activities may range from short reviews of particular EPA reports to more complicated consultations and reviews.   Recent examples of some of the Board's activities include the following:   (1) the Panel for the Review of the EPA Water Body Connectivity Report ("Water Body Report Panel"); (2) the Hydraulic Fracturing Research Advisory Panel (a multi-phase effort) ("Fracking Panel"); and (3) the Economy-Wide Modeling Panel (on-going). EPA charged the Water Body Report Panel to review a draft EPA report, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence*, and to give advice about the clarity and technical accuracy of the draft report overall, as well as particular aspects or portions of the report.   After preliminary communications between EPA and the Science Advisory Board, the Board published a notice in the *Federal Register* seeking public comment and nominations of experts to serve on the Water Body Report Panel.   78 Fed. Reg. 15012–13 (Mar. 8, 2013).   In due course, the Panel formed, held several public meetings,

---

[4] *Available at* https://yosemite.epa.gov/sab/sabproduct.nsf/WEBSABSO/part-mtgs-reports/$File/sabso_04_001.pdf.

[5] *Available at* http://yosemite.epa.gov/sab/sabproduct.nsf/WebFiles/OverviewPanelForm/$File/ec02010.pdf.

[6] *See also* EPA Science Advisory Board Staff, *Public Involvement in Advisory Activities*, https://yosemite.epa.gov/sab/sabproduct.nsf/WebSABSO/PublicInvolvement?OpenDocument (last visited Oct. 31, 2016).

deliberated, and, in October 2014, issued a report.   The Board's activities took approximately 19 months.[7]

The activities of the Fracking Panel were more complicated than the Water Body Report Panel and included multiple phases.   After receiving public input, the Board formed a preliminary panel in January 2011 to address threshold issues concerning hydraulic fracturing, known as the Hydraulic Fracturing Study Plan Review Panel, which was charged to review a draft plan to study the potential impacts of hydraulic fracturing on drinking water.[8]   After considering this preliminary panel's advice, EPA prepared a final plan of study and began work in accordance with that plan.   In late 2012 and early 2013, EPA sought further consultation concerning the progress of the work to study the impacts of hydraulic fracturing and submitted to the Board further questions based on the course of the study.   The Board, again, sought further public input and then, in March 2013, formed the Fracking Panel to address the additional charges related to EPA's efforts to study the impacts of hydraulic fracturing.   The Fracking Panel held meetings, consulted with EPA, and issued a brief report in June 2013.   By 2015, EPA had prepared a draft report reflecting its assessment of the literature and science concerning potential impacts of hydraulic fracturing on drinking water, and EPA returned to the Fracking Panel for a review of the draft report, submitting to the Panel a formal charge in October 2015. The Fracking Panel held a series of meetings in 2015 and 2016 and issued its final report in

---

[7] *See* EPA Science Advisory Board (SAB)*, Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence,*
https://yosemite.epa.gov/sab/sabproduct.nsf/02ad90b136fc21ef85256eba00436459/7724357376745f4885 2579e60043e88c!OpenDocument&TableRow=2.1#2 (last visited Oct. 31, 2016).

[8] In 2010, a different arm of the Science Advisory Board provided advice concerning preliminary questions related to studying the drinking-water effects of hydraulic fracturing.

August 2016.   The multiple phases of the activities of the Fracking Panel and its predecessor

panel, altogether, consumed approximately five years, from 2011 to 2016.[9]

The work of the Board's Economy-Wide Modeling Panel is ongoing.   In February 2014,

before formally charging the Science Advisory Board and before the formation of the Economy-

Wide Modeling Panel, EPA provided public notice that it would seek the assistance of the Board

concerning the use of economy-wide modeling to evaluate benefits, costs, and economic impacts

of air regulations and invited comment on a number of challenges and questions on which the

Board's advice may be needed.   *See* Docket No. EPA-HQ-OA-2014-0129,

https://www.regulations.gov/docket?D=EPA-HQ-OA-2014-0129.   Subsequently, EPA

requested the Board's scientific and technical advice on questions relating to economic

evaluations.   On April 30, 2014, the Science Advisory Board issued a public notice

acknowledging EPA's draft charge to the Board and seeking nominations for an expert panel to

advise EPA, including nominations of environmental economists and others with expertise in

cost-benefit analysis, computable general equilibrium ("CGE") modeling, non-CGE models for

capturing general equilibrium effects of environmental policy, and other areas.   By March 2015,

the Board had determined the make-up of the Economy-Wide Modeling Panel.   The Panel has

---

[9] *See* EPA Science Advisory Board (SAB), *Hydraulic Fracturing Study Plan*,
https://yosemite.epa.gov/sab/sabproduct.nsf/02ad90b136fc21ef85256eba00436459/d3483ab445ae614185
25775900603e79!OpenDocument&TableRow=2.0#2 (last visited Oct. 31, 2016) (providing details on the
preliminary panel); EPA Science Advisory Board (SAB), *Hydraulic Fracturing Potential Impacts on
Drinking Water Resources — 2012 Progress Report*,
https://yosemite.epa.gov/sab/sabproduct.nsf/fedrgstr_activites/HF%20and%20DW%20Progress%20Repo
rt?OpenDocument (last visited Oct. 31, 2016) (providing details on the earlier phase Fracking Panel);
EPA Science Advisory Board (SAB), *Assessment of the Potential Impacts of Hydraulic Fracturing for
Oil and Gas on Drinking Water Resources*,
https://yosemite.epa.gov/sab/sabproduct.nsf/02ad90b136fc21ef85256eba00436459/f7a9db9abbac015785
257e540052dd54!OpenDocument&Highlight=0,hydraulic (last visited Oct. 31, 2016) (providing details
on the latest phase Fracking Panel).

held several public meetings and teleconferences and deliberated the charge.   The Panel's next meeting is scheduled for December 2016.   To date, the Board's activities relating to the Economy-Wide Modeling Panel have transpired over the course of two-plus years.[10]

## III.   EPA'S PLAN AND SCHEDULE.

EPA believes that it should obtain the scientific and technical advice of the Science Advisory Board concerning a variety of challenges and questions relating to further efforts to evaluate potential loss or shifts in employment that may result from EPA's administration, enforcement, and implementation of the CAA.   Because of the 14-day period to respond to the October 17 Order, EPA has not had sufficient time to prepare draft charges that could be publicly noticed or shared with the Science Advisory Board.   However, EPA believes there are various data and methodological challenges and questions that will benefit from the scientific and technical assistance of the Board.   Such challenges and questions should be addressed by an independent and objective body of qualified subject-matter experts in accordance with the Board's public processes.

Some of the potential analytical challenges, presented by the Court's order, that EPA may refine into charges to submit to the Science Advisory Board include:   (1) isolating CAA regulatory impacts from other economic factors, as well as isolating CAA-related impacts from the impacts of other federal and State regulatory programs or actions, and distinguishing correlation from causation; (2) addressing the wide variety of programs and activities that fall under the broad scope of the CAA, including programs affecting stationary sources and mobile

---

[10] *See* EPA Science Advisory Board (SAB), *Economy-wide Modeling of the Benefits and Costs of Environmental Regulation*, https://yosemite.epa.gov/sab/sabproduct.nsf/LookupWebProjectsCurrentBOARD/07E67CF77B54734285257BB0004F87ED (last visited Oct. 31, 2016).

sources, programs addressing different types of pollutants, and programs requiring implementation at the State, tribal, and federal level, as well as the interaction effects among these various programs; (3) developing models and other tools to conduct employment evaluations at various levels or degrees of granularity — depending on feasibility — that could range from analysis for individual facilities or firms to local and regional analysis, to sectoral analysis, or perhaps even economy-wide modeling for the wide array of CAA programs and activities discussed above, for various sectors "both generally and in the specific area of the effects of [EPA's] regulations on the coal industry," as directed by the October 17 Order; and (4) identifying the types of financial data and employment information that would be necessary to conduct more evaluations, at a greater degree of granularity than data currently available to EPA may allow, as well as methods for collecting, gathering, and evaluating such data.

In the course of this litigation, Plaintiffs have urged certain approaches under Section 321(a) and have offered reports or testimony of certain individuals, such as Dr. Anne E. Smith, in support of those approaches. As EPA's experts have explained in their reports and deposition testimony, the opinions and methodologies of Dr. Smith and other individuals identified by Plaintiffs raise serious scientific and technical challenges, including challenges related to the capabilities of existing models and the limitations and uncertainties of available plant- or facility-level information,[11] that would benefit from the kind of robust peer review and scientific and technical evaluation that the Board will provide.

---

[11] For instance, EPA's experts opined that: (1) the Integrated Planning Model, which Dr. Smith calls for EPA to use in developing the "*ex ante* watch list" was not designed to reliably predict individual plant or mine closures; (2) the "robustness analysis" suggested by Dr. Smith to further refine the *ex ante* watch list does not account for major sources of uncertainty (such as plant operators' future expectations); and (3) resuming the Economic Dislocation Early Warning System, as also suggested by Dr. Smith, would entail enormous costs to EPA and industry with little or no gain in reliable information.

EPA believes that the charges that it will submit to the Science Advisory Board concerning the evaluations described in Section 321(a) and the subsequent activities of the Board likely will entail complicated issues, interactions, and steps similar to the activities of the Fracking Panel and the Economy-Wide Modeling Panel.   The exact course of the Board's activities in response to EPA's charges relating to employment evaluations — including the precise timing of the various steps — cannot be determined at this time, and may well evolve as EPA prepares charges and begins to consult with, and receive advice from, the Board.   With that caveat, EPA will follow the general process for other, similar Board matters.   EPA will prepare draft preliminary charges seeking the Board's advice and consultation, provide public notice and invite public comment concerning the charges, consider public input, and consult with the Board to prepare final charges to submit to the Board.   As part of an iterative process, the charges may be further refined and clarified through public involvement, engagement with the Board, and the work of the Board.   The Board will, with public notice and involvement, identify candidates to comprise a panel to assist in providing scientific and technical advice concerning the charges submitted.   The panel will — with public notice and participation — hold meetings, duly deliberate the charges, and report to and otherwise advise EPA.

Throughout the process of obtaining the Science Advisory Board's scientific and technical advice, EPA will continue the efforts that it has thus far taken to evaluate CAA-related potential employment shifts or losses.   While EPA is committed to performing additional evaluations as soon as possible in light of the October 17 Order, the precise timing, form, and manner of such further evaluations can be determined only after receiving the Board's advice. It may be appropriate, for example, to engage in formal rule-making processes to aid such further

evaluations, including, without limitation, rule-making relating to procedures for gathering data from industry in order to carry out evaluations with a level of precision and granularity that currently available data does not allow.

The principal steps and estimated intervals associated with EPA's plan to obtain scientific and technical advice from the Science Advisory Board are set out below.   The timing for these steps are estimates based on experience with other Board activities, such as the examples noted above, and may require adjustment as EPA works with the Board to refine the charges, the members of the relevant panel are selected, and meetings and deliberations commence.

| STEP | ESTIMATED TIMING[12] |
|---|---|
| EPA submits draft charges to Board and gives public notice/posting | 45 days |
| Public comment period and EPA revises charges | 60 days |
| Board publishes *Federal Register* notice for panel nominations | Concurrent |
| Public panel nomination period | 30 days |
| Board initially screens and evaluates nominees and gives public notice/posting of final Panel formation | 90 days |
| Board requests formal appointment process, including personnel-related actions, for panel members; members are formally appointed; and preliminary, background information and panel schedule considered | 90 days |
| Board holds meetings, deliberates, and issues report | 12–16 months |

---

[12]  Based on the October 17 Order, the United States expects that the Court will issue a further remedy order.   The dates outlined, here, beginning with the first step, are intended to commence from the date this Court issues a further order approving EPA's plan.   Unless an action runs concurrent with the preceding action, each subsequent step runs from the conclusion of the period identified in the former step(s).   The action of the Board in publishing a *Federal Register* notice seeking panel nominations is expected to occur concurrently with the period for public input concerning the draft charges and refinement of the charges and is estimated to occur not later than 60 days after submission of draft charges.

EPA reviews Board advice and sets an evaluation schedule                      90 days

## CONCLUSION

While reserving all rights and without prejudice to any potential appeal by the United

States of the October 17 Order or to any potential appeal or request for stay of any subsequent

order, the United States responds to the October 17 Order and submits, as directed, this plan and

schedule.


DATED:   October 31, 2016                          Respectfully Submitted,

                                                    JOHN C. CRUDEN
                                                    Assistant Attorney General
                                                    U.S. Department of Justice
                                                    Environment & Natural Resources Division

                                                    /s/ *Patrick R. Jacobi*
                                                    PATRICK R. JACOBI
                                                    RICHARD GLADSTEIN
                                                    SONYA SHEA
                                                    LAURA J. BROWN
                                                    JUSTIN D. HEMINGER
                                                    U.S. Department of Justice
                                                    Environment & Natural Resources Division
                                                    Environmental Defense Section
                                                    601 D Street, N.W., Suite 8000
                                                    Washington, D.C. 20004
                                                    (202) 514-2398 (Jacobi)
                                                    (202) 514-1711 (Gladstein)
                                                    (202) 514-2741 (Shea)
                                                    (202) 514-3376 (Brown)
                                                    (202) 514-2689 (Heminger)
                                                    patrick.r.jacobi@usdoj.gov
                                                    richard.gladstein@usdoj.gov
                                                    sonya.shea@usdoj.gov
                                                    laura.j.s.brown@usdoj.gov
                                                    justin.heminger@usdoj.gov

                                                    WILLIAM J. IHLENFELD, II

13

United States Attorney for the
Northern District of West Virginia

/s/ *Erin Carter Tison*_____
ERIN CARTER TISON (WV Bar No.
12608)
Assistant United States Attorney
U.S. Courthouse & Federal Bldg.
1125 Chapline Street Suite 3000
Wheeling, W.V. 26003
(304) 234-0100
erin.tison@usdoj.gov

OF COUNSEL:
Matthew C. Marks
United States Environmental Protection Agency
Office of General Counsel
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460
(202) 564-3276
marks.matthew@epa.gov

14

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA
### Wheeling

| | |
|---|---|
| MURRAY ENERGY CORPORATION, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Action No. 5:14-CV-00039** |
| ) | **Judge Bailey** |
| GINA McCARTHY, Administrator, ) | |
| UNITED STATES ENVIRONMENTAL ) | |
| PROTECTION AGENCY, acting in her ) | |
| official capacity, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## CERTIFICATE OF SERVICE

I, Erin Carter Tison, hereby certify that on this 31st day of October, 2016, the foregoing United States' Response to the October 17, 2016 Memorandum Opinion and Order Requiring Section 321(a) Compliance Plan and Schedule, was served using the CM/ECF system, which will cause a copy to be served upon counsel of record.

/s/ *Erin Carter Tison*
ERIN CARTER TISON (WV Bar No. 12608)
Assistant United States Attorney
U.S. Courthouse & Federal Bldg.
1125 Chapline Street Suite 3000
Wheeling, W.V. 26003
(304) 234-0100
erin.tison@usdoj.gov