**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

**MURRAY ENERGY CORPORATION,
MURRAY AMERICAN ENERGY, INC.,
THE AMERICAN COAL COMPANY,
AMERICAN ENERGY CORPORATION,
THE HARRISON COUNTY COAL COMPANY,
KENAMERICAN RESOURCES, INC., THE
MARION COUNTY COAL COMPANY, THE
MARSHALL COUNTY COAL COMPANY,
THE MONONGALIA COUNTY COAL
COMPANY, OHIOAMERICAN ENERGY
INC., THE OHIO COUNTY COAL COMPANY,
and UTAHAMERICAN ENERGY, INC.,**

                              Plaintiffs,

              v.                                      **Civil Action No. 5:14-CV-39**
                                                      Judge Bailey
**GINA McCARTHY**, Administrator,
United States Environmental Protection
Agency, in her official capacity,

                              Defendant.

**FINAL ORDER**

On October 17, 2016, this Court entered its Memorandum Opinion and Order

Denying the United States' New Motion for Summary Judgment and Granting Summary

Judgment in Favor of the Plaintiffs [Doc. 293].  In that Order, this Court ordered the EPA

to provide, within two weeks, a plan and schedule for compliance with § 321(a) both

generally and in the specific area of the effects of its regulations on the coal industry.  This

Court also granted plaintiffs the opportunity to file any comments or criticisms of the

defendant's submission within fourteen days of the filing of the same.

On October 31, 2016, the EPA filed its response to this Court's order [Doc. 296], and on November 14, 2016, the plaintiffs filed their response to the EPA submission [Doc. 297].

In her submission, EPA Administrator Gina McCarthy takes several positions. First, that this Court is wrong and that the EPA would not be complying with § 321(a) in the absence of this Court's order; Second, that the time frame set by this Court was too short to provide a full response to the Order, but not requesting any extension of the response time; and Third, that it will take the EPA around two years to come up with a methodology to use in an effort to begin to comply with § 321(a).

This response is wholly insufficient, unacceptable, and unnecessary. It evidences the continued hostility on the part of the EPA to acceptance of the mission established by Congress.

This action centers around § 321(a) of the Clean Air Act, 42 U.S.C. § 7621(a). This statutory provision provides:

> The Administrator shall conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provision of [the Clean Air Act] and applicable implementation plans, including where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement.

42 U.S.C. § 7621(a) (brackets added).

As discussed at length in this Court's summary judgment decision, this Court continues to believe that Congress intended to impose a mandatory duty upon the EPA.

2

With specific statutory provisions like Section 321(a), Congress unmistakably intended to track and monitor the effects of the Clean Air Act and its implementing regulations on employment in order to improve the legislative and regulatory processes. As noted in this Court's summary judgment decision, the legislative record for these statutory provisions, as well as Supreme Court precedent, confirm this purpose. For example, the House Committee Report accompanying the 1977 amendments noted that the continuing job-loss assessment requirements under Section 321(a) were inserted to address frequent issues that have arisen concerning "the extent to which the Clean Air Act or other factors are responsible for plant shutdowns, decisions not to build new plants, and consequent losses of employment opportunities" H.R. Rep. 95-294, at 316, 1977 U.S.C.C.A.N. 1077, 1395.

A subsequent portion of the legislative history provides:

On one side of this dispute, it has been argued that many employer statements that plants will have to shut down if certain pollution control measures become effective constitute "environmental blackmail." Thus, Representative George Brown testified in 1975 that:

> (t)here have already been major instances in which plant closings due to non-environmental factors have been blamed on environmental legislation. The effect of such blackmail is to generate public pressure for the weakening of environmental standards, and to force labor unions into opposing enforcement of environmental laws. (H. 217)

On the other hand, it has been argued that environmental laws have in fact

3

been responsible for significant numbers of plant closings and job losses.  In any particular case in which a substantial job loss is threatened, in which a plant closing is blamed on Clean Air Act requirements, or possible new construction is alleged to have been postponed or prevented by such requirements, the committee recognizes the need to determine the truth of these allegations.  For this reason, the committee agreed to section 304 of the bill, which establishes a mechanism for determining the accuracy of any such allegation.

COMMITTEE PROPOSAL

Section 304 of the committee bill is based on a nearly identical provision in the Federal Water Pollution Control Act.  The bill establishes a new section 319 of the act.  Under this provision, the Administrator is mandated to undertake an ongoing evaluation of job losses and employment shifts due to requirements of the act.  This evaluation is to include investigations of threatened plant closures or reductions in employment allegedly due to requirements of the act or any actual closures or reductions which are alleged to have occurred because of such requirements.

H.R. REP. 95-294, 316-17, 1977 U.S.C.C.A.N. 1077, 1995, 96.

In the summer of 1971, Congress held hearings to determine how to address the problem of "economic dislocation, plant shutdowns, and worker layoffs resulting from environmental control orders."  *Economic Dislocation Resulting from Environmental Controls: Hearings Before the Subcomm. on Air & Water Pollution of the S. Comm. on Public Works*, 92d Cong. 1 (1971) ("*Economic Dislocation Hearings*") [Doc. 258-1 & 2, Ex.

4

5].  Senator Muskie, Chairman of the subcommittee, noted at the outset of these hearings that one "very broad aspect" of the "national policy" on the environment is: "If people, workers, communities, [and] industrial plants are to be affected because we have resolved to protect the environment, how and by what means shall their interest, their personal health and welfare, also be protected?" [Id. at 1].  He observed that this "very broad question leads to an entire series of smaller ones," including in particular: "How do we determine . . . that a worker layoff or plant shutdown does, indeed, result from an environmental control order?" [Id.].

In an effort to answer these questions, the subcommittee began by turning to prominent advocate Ralph Nader, who testified that to ignore the "problem of environmental layoffs or closedowns" and "simply enforce the pollution laws" "would be too narrow a policy and a cruel one at that for workers" and that ignoring the problem could lead to "[a] regime of fear and economic insecurity . . . spread[ing] through the blue-collar labor force . . . that w[ould] reflect itself in alienation from or antagonism to the cause of a delethalized environment."  [Id. at 6].  He testified that it would not be enough to approach the issue using "macro-economic studies" because they "do not answer the question which a worker has about his or her family's macro-economy."  [Id. at 7].  Nader explained that "[t]he first step toward an intelligent policy toward the ecology layoff or closedown posture by companies is to require a full and candid disclosure of relevant data."  [Id.].

Accordingly, Nader proposed that Congress should "consider legislation requiring the Administrator of the Environmental Protection Agency to investigate every plant closing or threat of plant closing involving 25 or more workers, which he has reason to believe results from an order or standard for the protection of environmental quality."  [Id. at 7–8].

5

He proposed that "[t]his would apply to actual or proposed orders issued by his agency, other Federal agencies, or State and municipal agencies pursuant to approved implementation plans." [Id. at 8]. Nader also urged that, "[t]o the extent possible, the Administrator should try to anticipate problems and investigate them before anyone is actually laid off." [Id.].

On the third day of the hearings, Chairman Muskie summarized the subcommittee's findings "that all of us need more information on why plants are shut down" and "the public needs better access to this information." [Id. at 281]. Over time, Congress amended each of the five major federal environmental statutes to include a provision requiring the Administrator to generate this information. *See* Section 507(e) of the Clean Water Act (33 U.S.C. § 1367(e)); Section 24 of the Toxic Substances Control Act (15 U.S.C. § 2623); Section 7001(e) of the Solid Waste Disposal Act (42 U.S.C. § 6971(e)); Section 321 of the Clean Air Act (42 U.S.C. § 7621); and Section 110(e) of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9610(e)).

The provision first appeared in a House floor amendment to the Clean Water Act amendments of 1972 on March 29, 1972. The floor amendment provided: "The Administrator shall conduct continuing evaluations of potential loss or shifts of employment which may result from the issuance of any effluent limitation or order under this Act, including, where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such limitation or order." 118 CONG. REC. 10,766 (1972) [Doc. 258-2, Ex. 6]. In support of the floor amendment, Representative Dulski explained: "What we are proposing in simplest terms is that the Environmental Protection Agency *constantly monitor* the economic effect on industry of pollution control rules." [Id.

6

at 10,767 (emphasis added)].  Representative Abzug summarized the provision as one that "would require the Environmental Protection Administration *to study and evaluate, on a continuing basis,* the effects of effluent limitations on employment," which would "allow the Congress to get a close look at the effects on employment of legislation such as this, and will thus place us in a position to consider such remedial legislation as may be necessary to ameliorate those effects."  [Id. (emphasis added)].  Representative Meeds observed in support of the amendment that when plant shutdowns are attributed to environmental requirements, "workers and other people of the community have the right to know the truth," noting that "[i]f indeed the closure is caused by pollution controls, there should be no difficulty in establishing that fact." [Id.].  The House adopted the floor amendment, and the Senate acceded to the "addition of a new subsection . . . which *requires* the Administrator to investigate threatened plant closures or reductions in employment allegedly resulting from any effluent limitation or order under the Act." S. REP. NO. 92-1465, at 146 (1972) (Conf. Rep.) [Doc. 258-2, Ex. 7 (emphasis added)].

The following year, Congress added the provision to the Clean Air Act in Section 321. Pub. L. No. 95-95, § 311, 91 Stat. 685, 782 (1977).  The House committee report summarized that, "[u]nder this provision, the Administrator is mandated to undertake an ongoing evaluation of job losses and employment shifts due to requirements of the Act." H.R. REP. NO. 95-294, at 317 (1977) [Doc. 258-2, Ex. 8]  This evaluation was "to include investigations of threatened plant closures or reductions in employment allegedly due to requirements of the Act or any actual closures or reductions which are alleged to have

occurred because of such requirements." [Id.].[1]   The committee report also specifically references the 1971 Economic Dislocation Hearing as providing "a comprehensive review" of the issue addressed by this provision.   [Id. at 317 n.4].   The final conference report further describes § 321(a) as "related to the Administrator's evaluations and investigations of loss of employment and plant closure." H.R. REP. NO. 95-564, at 181 (1977) (Conf. Rep.) [Doc. 258-2, Ex. 10].

One of § 321(a)'s distinguishing characteristics is its focus on specific worker dislocations resulting from EPA's actions.   As this Court discussed in its opinion and order granting summary judgment, § 321(a) focuses on the "people, workers, communities, [and] industrial plants" that "are to be affected because we have resolved to protect the environment." Opinion at 41 [Doc. 293] (quoting *Economic Dislocation Resulting from Environmental Controls: Hearings Before the Subcomm. on Air & Water Pollution of the S. Comm. on Public Works,* 92d Cong. 1 (1971) ("Economic Dislocation Hearings") [Doc. 256-5]).   While EPA is elsewhere required to research national, regional, and sector-wide economic impacts, § 321 requires EPA to answer the particular question of whether the EPA is contributing to specific worker dislocations and plant and mine closures.   *See Economic Dislocation Hearings* at 1 [Doc. 256-5].   No other provision requires this type of "'facility - and - community-specific at-risk assessment' of jobs." Opinion at 55 [Doc. 293] (quoting Expert Report of Anne E. Smith ("Smith Report") at 10 [Doc. 256-11].

---

[1] An earlier conference report similarly summarized § 321(a) as providing that "[t]he Administrator shall . . . conduct an ongoing evaluation of the effect of this Act's requirements on employment."  H.R. REP. NO. 94-1742, at 116 (1976) (Conf. Rep.) [Doc. 258-2, Ex.9].

To comply with § 321(a), EPA must both "track and monitor the effects of the Clean Air Act and its implementing regulations on employment," Opinion at 39 [Doc. 293], and evaluate "the cause of specific job dislocations."  *Id.*  In this way, EPA is both prospectively "investigat[ing] . . . threatened plant closures or reductions in employment allegedly due to requirements of the act," and retrospectively evaluating "any actual closures or reductions which are alleged to have occurred because of such requirements." *Id.* at 41 (quoting H.R. REP. No. 95-294, at 316-17 (1977) [Doc. 256-8]); *see also* Smith Report at 5 [Doc. 256-11] (providing the "core" elements of a § 321(a) program).

Congress did not envision EPA using § 321(a) to push the envelope of the economic literature or create new science, as EPA proposes to do.  When "closure is caused by pollution controls [requirements]," Congress found "there should be no difficulty in establishing that fact."  Opinion at 43-44 [Doc. 293] (quoting [118 CONG. REC. 10,767 (1972) [Doc. 256-6].  Plaintiffs' expert, Jeffrey Holmstead, has similarly opined that "EPA has the expertise and resources to investigate actual and potential plant and mine closure, job losses and shifts in employment that result from CAA regulatory and enforcement actions." Expert Report of Jeffrey R. Holmstead ("Holmstead Report"), at 13 [Doc. 260].

Dr. Smith provided an example of how this could be done with EPA's current resources.  Smith Report at 8-9 [Doc. 256-11].  Dr. Smith also provided historical background on EPA's own Economic Dislocation Early Warning System ("EDEWS"), which was used to identify at risk workers, track actual worker dislocations, and identify their causes and potential community impacts during her tenure at EPA.  As this Court found, the EDEWS program "constantly monitored worker dislocations resulting from federal, state, and local enforcement actions, private civil actions, state implementation plans, and

regulatory deadlines." Opinion at 45 [Doc. 293].  Through this program, EPA was able to identify threatened, actual, and avoided worker dislocations.  Pls' Opp'n to Summ. J., at 9 [Doc. 256].  For each threatened and actual dislocation, EPA was able to: (1) determine the total plant employment; (2) determine the number of threatened or actual job losses; and (3) assess the workers and their local communities to determine the impacts of the worker dislocations at issue. *Id.* at 9-10.

While Congress took several years to enact employment effects provisions in each of the major environmental statutes, EPA did not wait to begin continuing evaluations of losses and shifts in employment caused by the agency's regulatory and enforcement actions.  By the time Congress enacted § 321(a), EPA had in place already "in a single Agency division, a practicable system for tracking actual employment losses and for performing economic impact analyses that could identify risks of additional employment losses from future regulations."  [Doc. 258-2, Expert Report of Anne E. Smith, Ph.D. at 5, Ex. 11 ("Smith Report")].  Beginning in 1972, this Economic Dislocation Early Warning System ("EDEWS") "attempted to identify potential or actual industrial plant closings or curtailments and employment dislocations resulting from Federal, State, or local pollution control regulations"  U.S. Resp. to Pls.' Second Set of Disc. Reqs. at 21, Oct. 19, 2015 [Doc. 258-4, Ex. 34 ("U.S. Resp.")].

The EDEWS process was designed "to identify at the earliest possible time plants which may be forced to close due to environmental regulations." [Doc. 258-3, *H.R. 7739 and H.R. 10632, Small Business Impact Bill (Part 2): Hearings Before the Subcomm. on Special. Small Bus. Problems of the H. Comm. on Small Bus.*, 95th Cong. 254 (1979) (Ex. 18) (statement of Roy N. Gamse, Deputy Assistant Adm'r for Planning and Evaluation, U.S.

10

EPA)].   The EDEWS process constantly monitored worker dislocations resulting from federal, state, and local enforcement actions, private civil actions, state implementation plans, and regulatory deadlines.   EPA would then notify relevant government agencies of threatened or actual plant closings and production curtailments that would result in job losses and shifts "so that their assistance programs and expertise c[ould] be used to aid the firms, workers, and communities which may be affected."  [Id.].   This was specifically "intended to bring into play any government programs available to provide financial assistance which would prevent plant closings or production curtailments or to assist workers and communities impacted by closings and curtailments."   [Doc. 258-3, *SBA Assistance for Agric. Concerns & to Meet Pollution Standards: Hearings Before the Subcomm. on SBA & SBIC Legislation of the H. Comm. on Small Bus.*, 94th Cong. 163 (1975) (Ex.19)].

In the first ten years, EPA identified actual closures and curtailments of 155 plants and the dislocation of 32,899 workers resulting from environmental requirements.  [Doc. 258-3, EDEWS Rep. 1982 Q4, at 2 (Ex. 28)].   Roughly half of the threatened dislocations actually occurred.  [Id.].

At some point, and for reasons unknown to plaintiffs, EPA discontinued these continuing evaluations of losses and shifts in employment resulting from its actions.  EPA stated in this case that it is not aware of any records regarding the cessation of the EDEWS system.  [Doc. 258-3, U.S. Resp., at 22–23 (Ex. 34)].

Until recently in this case, the EPA has made no claim that it was complying with § 321(a).  When six Senators requested the results of EPA's continuing evaluations of the potential loss or shifts in employment resulting from four greenhouse gas rulemakings,

11

Administrator McCarthy responded on October 26, 2009, that the agency "has not interpreted CAA section 321 to require EPA to conduct employment investigations in taking regulatory actions" and that "[c]onducting such investigations as part of rulemakings would have limited utility." [Doc. 258-4, Letter from Gina McCarthy, Ass't. Adm'r, U.S. EPA, to Sen. James M. Inhofe, U.S. Senate (Oct. 26, 2009) (Ex.48) ("Letter to Sen. Inhofe")]. McCarthy candidly admitted EPA "has not conducted a section 321 investigation of its greenhouse gas actions" and informed the Senators that EPA would "not undertak[e] a section 321 analysis" for a planned future greenhouse action. [Id.].

A few months later, responding to a letter from two members of Congress asking if EPA complies with § 321(a) of the Clean Air Act, McCarthy broadly repudiated any obligation "to conduct employment investigations in taking regulatory actions" and reiterated her position that such investigations have only "limited utility." [Doc. 258-4, Letter from Gina McCarthy, Ass. Adm'r, U.S. EPA, to Rep. Greg Walden, H. Comm. on Energy & Commerce (Jan. 12, 2010) (Ex. 49) ("Letter to Rep. Walden")]. In response to a follow-up question asking about potential employment impacts, without referencing § 321(a) McCarthy admitted "EPA did not analyze the potential employment impacts of the proposed standards." [Doc. 258-4, Letter from Gina McCarthy, Ass't. Adm'r, U.S. EPA, to Rep. Joe Barton, Ranking Member, H. Comm. on Energy & Commerce (Aug. 3, 2010) (Ex. 50) ("Letter to Rep. Barton")].

Then, on May 2, 2011, the Chairman of the House Oversight Committee wrote McCarthy directly and raised his concern that "it ha[d] come to [his] attention that the EPA has failed to perform the statutorily required job impacts analyses of GHG regulations under section 321(a)." [Doc. 258-4, Letter from Rep. Darrell E. Issa, Chairman, H. Comm.

12

on Oversight & Gov't Reform, to Gina McCarthy, Ass't. Adm'r, U.S. EPA (May 2, 2011) (Ex. 51)]. He informed her that "[e]mployers have expressed deep concerns that the requirements of the CAA, as implemented through GHG regulations, will adversely impact employment" and requested that she promptly provide the House Oversight Committee "[a] section 321(a) analysis on the individual and cumulative impact of GHG regulations on potential job losses." [Id.]. Instead of honoring this request from the Chairman, McCarthy claimed that "EPA has not received any request under section 321" "to investigate specific allegations." She reiterated that "EPA has not interpreted section 321 to require the agency to conduct employment investigations in taking regulatory actions," and reiterated her judgment that investigating job losses "would have limited utility." [Doc. 258-4, Letter from Gina McCarthy, Ass't. Adm'r, U.S. EPA, to Rep. Darrell E. Issa, Chairman, H. Comm. on Oversight & Gov't Reform 2, 5 (June 22, 2011) (Ex. 52) ("Letter to Chairman Issa")].

Senator Vitter fared no better than Chairman Issa in late 2011 when he wrote former EPA Administrator Lisa Jackson requesting that she "[p]lease provide the results of your continuing Section 321(a) evaluations of potential loss or shifts of employment which may result from the suite of regulations EPA has proposed or finalized that address CSAPR and Utility MACT . . . including threatened plant closures or reductions in employment." *See* Letter from Gina McCarthy, Ass't. Adm'r, U.S. EPA, to Sen. David Vitter, U.S. Senate 2, 7 (Mar. 06, 2012) [Doc. 258-5 (Ex.53) ("Letter to Sen. Vitter")]. McCarthy personally "respond[ed] on the Administrator's behalf" and merely informed him that EPA did not believe it was required to conduct the job loss evaluations at all and that she believed that they "would have limited utility." [Id.].

When Ms. McCarthy was nominated to be EPA Administrator, Senator Inhofe asked

13

her directly on the record during her confirmation hearing whether she "believe[d] the Agency has an obligation to conduct continuing evaluations of the impact its regulations could have on jobs." [Doc. 258-5, *Hearing on the Nomination of Gina McCarthy to be Adm'r of the EPA: Hearing Before the S. Comm. on Env't & Pub. Works*, 113th Cong. 200 (2013) (Ex. 54) ("*Nomination Hearing*")]. McCarthy answered that "EPA has not interpreted this provision to require EPA to conduct employment investigations in taking regulatory actions," justifying her position with the claim that "EPA has found no records indicating that any Administration since 1977 has interpreted section 321 to require job impacts analysis for rulemaking actions." [Id. at 88]. Furthermore, Senator Vitter directly asked whether "EPA has ever investigated a plant closure or reduction in employment to see what role, if any, the administration or enforcement of the Clean Air Act played?" [Id.]. Rather than give a yes or no answer to this simple question, McCarthy avoided answering the actual question he asked her entirely. [Id.].

In a question for the record for a November 2013 House Science Committee hearing, Chairman Smith observed that EPA's regulatory impact analyses did not constitute compliance with Section 321(a) of the Clean Air Act, and then asked "[w]hy has EPA not conducted a study to consider the impacts of CAA programs on job shifts and in employment" and would EPA "commit to conducting such studies in the future." [Doc. 258-5, *Strengthening Transparency and Accountability Within the EPA: Hearing Before the H. Comm. on Sci., Space & Tech.*, 113th Cong. 82–83 (2013) (Ex. 55)]. Administrator McCarthy again justified EPA's actions by stating that "EPA has found no records to indicate that CAA section 321, since its inclusion in the 1977 amendments, has been interpreted by any Administration to require job impacts analysis of rulemakings or job

14

impacts analysis of existing CAA requirements as a whole."   After claiming that EPA's regulatory impact analyses "have generally found that environmental regulations may have both positive and negative effects on jobs but that these effects tend to be relatively small and difficult to quantify with any precision," she committed only that EPA "will continue to comply with statutory and administrative requirements for analysis of our programs in a manner consistent with principles of sound science and economics."   [Id. at 83].

Through it all, McCarthy consistently articulated the agency's statutory interpretation that the precise question addressed by Section 321(a) is whether specific lay-offs result from EPA's actions,[2] but she just as consistently admitted explicitly and implicitly that her agency is not conducting any efforts to answer it and claimed answering the question has "limited utility."

Consistent with the agency's admissions to Congress, EPA responded to a Freedom of Information Act request [Doc. 258-5, Ex. 57] asking for records pertaining to "[a]ll draft, interim final and final reports and/or evaluations prepared by EPA or its contractor(s)

---

[2] *Cf.* Doc. 258-5, *FY2014 Hearing*, at 69 (Ex. 56) (Acting EPA Administrator testifying that "**EPA has not conducted any studies or evaluations under Section 321(a)"** "[a]s a result" of EPA not finding "any records of any requests for Section 321 investigations of job losses alleged to be related to regulation-induced plant closure" (emphasis added)); *see also* Letter to Sen. Inhofe [Doc. 258-4, Ex. 48] (admitting EPA "has not conducted a section 321 investigation of its greenhouse gas actions" and stating that EPA would "not undertak[e] a section 321 analysis" for a planned future greenhouse gas action); Order Denying Motion for Protective Order, [Doc. 164 at 12 n.2 (Nov. 12, 2015)] (finding January 12, 2010, letter contained "an admission that as of January 12, 2010, the EPA had conducted NO section 321 investigations"); Letter to Rep. Barton, at 13–14 [Doc. 258-4, Ex. 50] (admitting "EPA did not analyze the potential employment impacts of the proposed" stringent national ambient air quality standard for ozone); [Doc. 164 at 14 n.3] (finding June 22, 2011, letter contained "an admission that as of June 22, 2011,the EPA had conducted NO section 321 investigations"); [id.] at 18 ("The fair reading of these statements, many of which were made by Administrator McCarthy, is that the EPA has never made any evaluations of job losses under § 321(a).  This is directly contrary to the position of the EPA in this case.").

pursuant to section 321 of the Clean Air Act" by stating that "neither the Office of Air and Radiation nor the Office of Policy were able to find any documents pertaining to [the] request." [Doc. 258-5, Ex. 58].

As EPA's 30(b)(6) witness James DeMocker recently explained:

Q. Is 321(a) about investigating specific layoffs?

MR. GLADSTEIN: Objection; scope and form.

THE WITNESS: Well, under the agency's prior interpretation of the scope of the Section 321 requirements, our interpretation back five or six years ago was that Section 321(a)'s specific reference to investigations was interpreted -- it was interpreted that the Congressional intent was to provide the authority for us in a reactive way to investigate claims submitted to us that a job dislocation was attributed by a company owner or operator to the need to comply with regulatory requirements.

[Doc. 258-1, U.S. Dep. IIA, at 297:20–298:11 (Ex. 3)].

Only in response to this Court's finding that § 321(a) was mandatory did EPA decide that § 321(a) must instead be about "estimating employment effects [of] regulatory actions":

Q. Has EPA's interpretation of 321(a) changed since then?

MR. GLADSTEIN: Objection.

THE WITNESS: I'm not an attorney, but my understanding is that there is an alternative interpretation of Section 321 that's been offered by the court in this case that defines a duty to conduct on an ongoing basis employment effects evaluations of our rulemaking activities.  But under that interpretation the agency's view is that the work that we have done pursuant to estimating employment effects for our

16

regulatory actions would meet any duty to conduct that type of employment analysis. [Id. at 298:13–299:3].

The evidence also shows that, under the correct interpretation of § 321(a), the interpretation that EPA originally described to this Court, and the interpretation EPA had been using for almost 40 years, EPA is not complying:

Q. Under EPA's original interpretation, the one that it held five or six years ago, under that interpretation of 321(a), are the RIAs what 321(a) is looking for?

MR. GLADSTEIN: Objection as to scope and form.

THE WITNESS: Under that interpretation, the RIAs are not the same as an investigation of a specific change in employment in response to an actual or a threatened plant closure that a facility owner is attributing to environmental requirements. . . .

[Id. at 312:2–312:14].

The most EPA does is "conduct proactive analysis of the employment effects of our rulemakings actions," which is simply not what § 321(a) is about.  [Id. at 312:16–312:18]. As James DeMocker, EPA's declarant in support of the motion for summary judgment and Rule 30(b)(6) witness admitted, the agency is not investigating power plant and mine closures and worker dislocations resulting from the utility strategy on an ongoing basis.

When specifically asked whether EPA had ever investigated a threatened plant closure or reduction in employment allegedly resulting from administration or enforcement of the Clean Air Act, Mr. DeMocker could recall only "a couple of cases" from decades before, and he did not claim that any of the documents cited in his declaration in support of the motion were the result of such investigations.  [Id. at 295:25–296:19].  He could not

17

and did not claim that any documents reflected efforts to determine whether specific layoffs were the result of EPA actions.  [Id. at 301:21–307:10].  And he was "not aware" of any "analysis specifically aimed at discerning the relevant contribution of regulatory requirements to a decision to close" power plants.  [Doc. 258-4, U.S. Dep. I, at 244:11–245:2 (Ex. 40)].

One of EPA's expert witnesses, Dr. Charles Kolstad, likewise did not "recall seeing anything about investigating threatened plant closures" or reductions in employment resulting from the requirements of the Clean Air Act in the 64 documents.  Furthermore, Dr. Kolstad agreed that documents like the RIAs for the Transport Rule, Utility MACT, and the Clean Power Plan, which estimate changes in labor utilization as measured by full-time equivalents, do not even "answer" the "question" of how many people will be involuntarily terminated.  [Doc. 258-7, Kolstad Dep. at 62–63].

In fact, no "facility- and community-specific at-risk assessment" of jobs has been done "in any electricity sector air RIA released in the past 20 years."  [Id.].  Rather "the economic impact chapters of electric sector RIAs typically perform generic estimates of job losses based on total plant capacity changes and total coal demand changes nationally, or across very broad regions. [Id. at 16].  Moreover, the other documents cited by Mr. DeMocker "individually and as a group . . . provide even less of the type of evaluation . . . consistent with Section 321(a) requirements."  [Id.].  As discussed by Dr. Smith, the cited RIAs share several fundamental flaws.  First, "RIAs do not cover all Clean Air Act actions that can cause employment dislocations, and their discontinuous nature can result in "lost closures" associated even with the regulations that they do cover."  [Id. at 21].  Second, "RIAs do not provide a continuing evaluation of regulations while they are being

18

implemented, which is when the actual impacts that may merit assistance or other governmental response are first observed."  [Id.].  Third, "RIAs fail to even provide an *ex ante* projection of potential employment dislocations with any of the specificity necessary to identify needs for effective worker and community assistance."  In addition, "[n]one of the other studies or activities cited by Mr. DeMocker in his Declaration provides relevant or timely information on locations of closures and actual employment dislocations that might be viewed as consistent with Section 321(a)." [Id.].

Moreover, while there is nothing in § 321(a) that requires input from the SAB, EPA has also already obtained SAB review of its EDEWS program.  Sci. Advisory Bd., U.S. EPA, Economics in EPA, at 5, 38 (1980) [Doc. 259-2].  Specifically, after reviewing each of EPA's economic assessment programs, including EDEWS, the SAB found that EPA "can determine how much of a strain environmental requirements impose on an industry, locality, or segment of the population and can thus detect situations in which its regulations are causing hardship."  *Id.* At 4.

To the extent EPA is implying it needs to study further how to determine whether EPA's actions contribute to plant closure decisions, the SAB has also already reviewed EPA guidelines for estimating plant closures and employment impacts.  *See* U.S. EPA, Guidelines for Preparing Economic Analyses, at A-1, A-3 (2000) [Doc. 261-9].  EPA specifically charged the SAB to determine whether "the guidance document contain[s] an objective and reasonable presentation on the measurement of economic impacts, " including "facility closure" and changes in employment.  *Id.* at A-5.  SAB's advisory committee concluded that "the Guidelines . . . reflect[] methods and practices that enjoy widespread acceptance in the environmental economics profession. . .."  [Doc. 261-9, at

88].

Incredibly, Dr. McGartland, EPA's chief economist, revised the SAB-approved guidelines by deleting the approved discussion of estimating plant closures *without* consulting or even notifying the SAB.  Compare Doc. 298-2 (document containing the text of former sections 9.2.8, 9.2.9, and 9.2.10 in the form reviewed by the SAB) with Doc. 298-3 (document from Dr. McGartland's computer after meeting with EPA staff containing a dramatic revision to former section 9.2.8 and deleting the entirety of section 9.2.9).  *See also* Doc. 298-4 (email informing then Assistant Administrator McCarthy that "Al McGartland is personally writing" a "jobs section" for the Guidelines after Ms. McCarthy told Lisa Heinzerling on November 21, 2010, that she was "really interested in enhancing our jobs analysis that accompanies our rules" "for obvious reasons."); Doc. 298-5 ("Al is taking on the employment impacts revisions."); Doc. 298-6 (Dr. McGartland emailing the revised "unemployment write up for guidelines" to his staff on December 5, 2010, and asking for "review").

Dr. Charles Kolstad and EPA labor economist Ann Ferris admitted in depositions that these midnight changes to the Guidelines were significant, troubling, and highly irregular.  *See* Ann Ferris Dep. at 204:18-24 [Doc. 298-7] (testifying she had "been told that peer review is required for updating the guidelines"); *id.* at 228-229 (testifying it "seems potentially significant in the sense that it was previously identified as a methodology and isn't identified as a methodology in the 2010 document"); Charles D. Kolstad Dep. at 255:7-19 [Doc. 263] (testifying that the Guidelines are "an important document, and probably things like that should be cleared with the SAB"); *id.* at 255:24-25 ("you would think one would be really careful about doing a switch").

20

EPA's rejection of SAB-approved language in the guidelines undermines EPA's professed need to consult the SAB before complying with § 321(a).

EPA cannot redefine statutes to avoid complying with them.  Nor can EPA render them superfluous or contrary to their original purpose by simply defining them to be.

The record in this case demonstrates hostility on the part of the EPA to doing what is ordered by § 321(a).  EPA thinks it is bad to make worker dislocations known to the public and bad policy for regulators to look at worker dislocations in making decisions.  EPA has gone so far as to state that compliance with § 321(a) "would be irresponsible."  Rule 30(b)(6) Dep. of the U.S. at 255:6-9, Aug. 10, 2016 ("U.S. IIB") (Ex. 64).

Dr. McGartland - EPA's primary expert and the individual most responsible for limiting EPA's discussion of employment effects in RIAs - cannot even fathom why EPA would want to track plant closures and layoffs resulting from the administration and enforcement of the C;ean Air Act.  McGartland Expert Dep. at 107:11-21  (Ex. 81) ("Why would EPA want to track all plant closures?"); see also Kolstad Dep. at 292:21-295:22 (Ex.80) ("I would say that I really don't think that serves the public interest. . . . It will take manpower, and to very questionable ends. . . . I don't really see a purpose.").  More to the point, Dr. McGartland testified to fearing that, if EPA complied with § 321(a), there would be "calls from Congress about EPA not infiltrating the business of industry beyond environmental controls."  McGartland Expert Dep. at 110:21-24 (Ex.81).  And that it could be "misleading" if EPA were to identify threatened plants and the "New York Times, or the Washington Post picked it up and published it on their front pages."  *Id.* at 145:9-14.

EPA does not get to decide whether compliance with § 321(a) is good policy, or would lead to too many difficulties for the agency.  EPA can recommend amendments to

Congress if it feels strongly enough, but EPA's clear reticence to comply coupled with 8 years of refusal to comply—even in the face of Congressional and public pressure—with the Clean Air Act justifies an injunction detailed enough to ensure compliance.  It is time for the EPA to recognize that Congress makes the law, and EPA must not only enforce the law, it must obey it.

EPA argues that the relief sought by plaintiffs is beyond the jurisdiction afforded to the Court by the Clean Air Act.  EPA fails to mention, however, that it unsuccessfully raised a very similar argument in one of the very cases cited in its brief.

In **Alaska Ctr. for the Env't v. Browner**, 20 F.3d 981 (9th Cir. 1994), the EPA argued that the district court could not even order it to prepare and submit a report on the review EPA had been statutorily mandated to undertake because the Clean Water Act did not "specifically require it to prepare or present a report on water quality monitoring," and "relegate[d] the pace" of EPA's review "entirely to the EPA's discretion." 20 F.3d at 986. The Ninth Circuit disagreed, holding "[t]he district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong." **Id**.  As the Ninth Circuit reasoned: "In this case the established wrong is the failure of the EPA to take any steps to establish the TMDLs mandated by Congress for more than a decade.  In tailoring the relief granted, the district court correctly recognized that in order to bring about any progress toward achieving the congressional objectives of the CWA, the EPA would have to be directed to take specific steps."  **Id**. at 986.  The Ninth Circuit thus made clear that the similarly-worded citizen suit provision of the Clean Water Act did not limit the scope of the district court's traditional, equitable, remedial authority:

In enacting environmental legislation, and providing for citizen suits to enforce its directives, Congress can only act as a human institution, lacking clairvoyance to foresee the precise nature of agency dereliction of duties that Congress prescribes.  When such dereliction occurs, it is up to the courts in their traditional, equitable, and interstitial role to fashion the remedy.

*Id*. at 987.

The above case affirmed the District Court's decision in **Alaska Ctr. for the Env't v. Reilly**, 796 F.Supp. 1374, in which the District Court noted that:

When the intent of Congress clearly requires the Agency to act without undue delay, courts have the authority to order the EPA to establish a reasonable schedule in which to achieve compliance. *See, **Abramowitz v. EPA**,* 832 F.2d 1071, 1078–79 (9th Cir. 1987) (finding that the court had the authority under the Clean Air Act to set the deadline by which the EPA had to act on a state's proposed carbon monoxide and ozone controls); **Natural Resources Defense Council, Inc. v. New York State Dep't of Envtl. Conservation**, 700 F.Supp. 173, 177–181 (S.D.N.Y. 1988) (ordering the EPA to establish a schedule for New York's compliance with the Clean Air Act); **Environmental Defense Fund v. Thomas**, 627 F.Supp. 566, 569–570 (D.D.C. 1986) (finding that the EPA had a duty to set deadlines for compliance).

796 F.Supp. 1374, 1379–80 (W.D. Wash. 1992), *aff'd sub nom.* **Alaska Ctr. for Env't v. Browner**, 20 F.3d 981 (9th Cir. 1994).

23

In *Friends of Wild Swan v. U.S. EPA*, 74 F.App'x 718 (9th Cir. 2003), the Ninth Circuit held:

> While courts may not "usurp[ ] an administrative function, *FPC v. Idaho Power Co.,* 344 U.S. 17, 20 (1952) (*"Idaho Power"* ), they retain equitable powers to shape an appropriate remedy.  *See West. Oil & Gas Ass'n v. EPA,* 633 F.2d 803, 813 (9th Cir. 1980) (*"Western Oil"*).  Equitable considerations are appropriate in reviewing agency decisions under the APA and crafting a remedy.  *See Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("The court's decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity."); *Sierra Pacific Indus. v. Lyng*, 866 F.2d 1099, 1111 (9th Cir. 1989) ("Our inquiry into the district court's authority to order equitable relief begins with the well-established principle that 'while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action.'" (quoting *Ford Motor Co. v. NLRB,* 305 U.S. 364, 373 (1939))).

74 Fed.App'x at 721.

EPA cannot legitimately contest that it has the data and resources to immediately begin complying with § 321(a).  The unrebutted evidence at summary judgment demonstrated that EPA can "conduct such a continuing evaluation with the resources it already has and within the typical costs in time and resources EPA expends on other types

of economic assessments."  Opinion at 59 [Doc. 293].  EPA itself "used to do this" through

its EDEWS program. Anne E. Smith Dep. at 156:10-12  [Doc. 297-1].  And "[i]f anything,

it should be easier to do now than it was back then." *Id.*  Dr. John Deskins similarly used

publicly available data to evaluate "whether `EPA's rulemakings contributed to job losses

in the coal industry' and whether `the decline of coal production [can] be attributed solely

to other factors such as a decline of exports or cheaper natural gas. " Opinion at 57-58

[Doc. 293] (quoting Expert Report of John Deskins, Ph.D § 1 [Doc. 281-6]).  EPA's own

expert, Dr. Charles Kolstad, also testified at his deposition that EPA can "certainly"

determine "which plants have closed" because that is a matter of "public record," and can

"go back and.. . get a better idea of the reasons for the closure," in part by examining

"documents" "filed" with the state utility commissions "that address some of that already."

Charles D. Kolstad Dep. at 126:18-25 [Doc. 263].  Dr. Kolstad further testified that this

Court can "ask for a study of which mines were impacted by closed power plants," and that

connecting mine impacts to power plants that have stopped burning coal "could be done,"

and this Court can further "order a report" "identifying what is due to EPA actions versus

what is due to other actions." *Id.* at 294:1-295:4.

This Court finds that the EPA must fully comply with the requirements of § 321(a).

This Court further finds that, due to the importance, widespread effects, and the claims of

the coal industry, it would be an abuse of discretion for the EPA to refuse to conduct a §

321(a) evaluation on the effects of its regulations on the coal industry and other entities

affected by the rules and regulations affecting the power generating industry.

Based upon the foregoing, the Administrator of the EPA is hereby ORDERED and

ENJOINED to do the following:

1.  To address EPA's continuing failure to evaluate the loss and shifts in employment in the coal industry and other entities affected by the rules and regulations affecting the coal mining and power generating industries:

    a.  Prepare and submit to the Court a § 321(a) evaluation of the coal industry and other entities affected by the rules and regulations affecting the coal mining and power generating industries as expeditiously as practicable and by no later than July 1, 2017, which evaluation shall:

        (i)   identify those facilities that are at risk of closure or reductions in employment because of EPA's regulations and enforcement actions impacting coal and/or the power generating industry;

        (ii)  evaluate the impacts of the potential loss and shifts in employment which may be attributable to EPA's regulations and enforcement actions impacting coal and/or the power generating industry, including identifying the number of employees potentially affected, the communities that may be impacted, and the reasonably foreseeable impacts on families and industries reliant on coal;

        (iii) identify those coal mines and coal-fired power generators that have closed or reduced employment since January 2009 and, for each, evaluate whether EPA's administration and enforcement of the Clean Air Act contributed to the closure or reduction in employment; and

26

(iv) identify those subpopulations at risk of being unduly affected by job loss and shifts and environmental justice impacts.

2. To address EPA's continuing violation of § 321(a), as expeditiously as practicable, but by no later than December 31, 2017, submit evidence to the Court demonstrating that EPA has adopted measures to continuously evaluate the loss and shifts in employment which may result from its administration and enforcement of the Clean Air Act, including such rulemakings, guidance documents, and internal policies as necessary to demonstrate that EPA has begun to comply with § 321(a) and will continue to do so going forward.

3. To submit a comprehensive filing detailing the actions the agency is taking to comply with § 321(a) and this Court's orders within 60 days.

It is so **ORDERED**.

The plaintiffs have further requested that this Court stay the effective date of any pending regulations under the Clean Air Act for the coal industry and coal-fired utilities until EPA complies with the Court's orders and enjoin EPA from proposing or finalizing new regulations under the Clean Air Act impacting the coal industry or coal-fired electric generating units until EPA complies with the Court's orders.

This Court is of the opinion that the plain reading of § 321(d), which provides that: "Nothing in this section shall be construed to require or authorize the Administrator, the States, or political subdivisions thereof, to modify or withdraw any requirement imposed or proposed to be imposed under this chapter," precludes such relief. This Court can force the EPA to follow its statutory mandate, but lacks the jurisdiction to provide any other relief.

27

**SO ORDERED**.

The Clerk is directed to transmit copies of this Order to any counsel of record.

**DATED:** January 11, 2017.


JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE